UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

-------------------------------------------------------------

Vonzell Scott, Sr.,


        Plaintiff,



   vs.                         Case Number 2020 CV 6829



Wendy's Properties, LLC, et al.



        Defendants.

-------------------------------------------------------------

Video Deposition of S. Ronald Hauri

Wednesday

March 30th, 2022


-at-


Keefe, Campbell, Biery & Associates

118 North Clinton Street

Suite 300

Chicago, Illinois 60661



PLAINTIFF'S
EXHIBIT
C

Andrew Lee Camphouse 03/15/2022          www.InDemandReporting.com          (773) 239-6008

Page 2

### APPEARANCES

1
2
3     For the Plaintiff:
4
5         Michael K. Muldoon
6         Muldoon & Muldoon
7         111 West Washington Street
8         Suite 1500
9         Chicago, Illinois 60602
10
11    For the Defendant:
12
13        Bradley J. Smith
14        Keefe, Campbell, Biery & Associates, LLC
15        118 North Clinton Street
16        Suite 300
17        Chicago, Illinois 60661
18
19
20
21
22
23
24
25

Page 3

### EXAMINATION INDEX

1
2
3     DIRECT    CROSS    REDIRECT    RECROSS
4     5         158      163         --
5
6     CERTIFIED QUESTION
7
8     PAGE NUMBER              LINE NUMBER
9     53                       21
10
11    EXHIBIT INDEX
12
13    EXHIBIT                  PAGE NUMBER
14    1 -                      9
15    2 -                      47
16    3 -                      51
17    4 -                      115
18
19
20
21
22
23
24
25

Page 4

1       THE RECORDER:  Good afternoon.  We are now on
2   the record, Wednesday, March 30th, 2022.  The time is
3   1:04 p.m.  We are located at Keefe, Campbell, Biery &
4   Associates, at 118 North Clinton Street, Suite -- Suite
5   300, Chicago, Illinois 60661, for a video-recorded
6   deposition in the matter of Vonzell Scott, Sr. versus
7   Wendy's Properties, LLC, et al., Case No. 20 CV 6829,
8   before the Northern District of Illinois, Eastern
9   Division.                                    0:00:32
10      This deposition is being recorded by In
11  Demand Court Reporting, located at 216 South Jefferson
12  Street, Chicago, Illinois 60662 (sic), on behalf of the
13  Defendant and being taken at the instance of the
14  Defendant.  The witness today is S. Ronald Hauri.    0:00:44
15      Mr. Hauri, my name is Allyson Pritchard.  I'm
16  a notary public and the video recording device operator
17  for this deposition.  At this time, would you please
18  raise your right hand for the oath?          0:00:52
19      (Witness sworn)
20      THE RECORDER:  Thank you.
21      Would the attorneys please state their
22  appearances for the record?                  0:01:01
23      MR. MULDOON:  Michael Muldoon for the
24  Plaintiff.
25      MR. SMITH:  Bradley Smith on behalf of

Page 5

1   Defendant.                                   0:01:06
2       THE RECORDER:  That completes the required
3   information, and we can proceed.
4           DIRECT EXAMINATION
5   BY MR. SMITH:
6       Q.  Mr. Hauri, can you state and spell your name
7   for the record today?                        0:01:11
8       A.  S. Ronald Hauri.  H-A-U-R-I.
9       Q.  And this deposition's going to be taken
10  pursuant to the Federal Rules of Civil Procedure, the
11  Federal Rules of Evidence, applicable Local Rules in
12  the Northern District of Illinois.           0:01:26
13      I know you've given multiple depositions in
14  the past.  Correct?
15      A.  Yes.
16      Q.  And I'm assuming you know the rules of how
17  depositions proceed.                         0:01:34
18      A.  Yes.
19      Q.  As a part of that, you'll make sure that you
20  understand my question -- all my questions today before
21  you answer them.
22      A.  Yes.                                 0:01:44
23      Q.  If you don't understand one or you don't hear
24  one, let me know.  Okay?
25      A.  I will.                             0:01:49

00000000-0000-0000-0000-0000000000

Page 6

1   Q. All right. Mr. Hauri, can you define -- I'd
2 -- I'd like you to define a -- a military -- I know you
3 have some police background.     0:02:06
4     I'd like you to define military or combat
5 style attack or execution on an individual for me.
6 That sort of phrase.     0:02:14
7   A. Well, it depends upon -- it depends upon what
8 branch of the military we're talking about. But in
9 short, something that may well be pre-trained and --
10 and even pre-planned to -- depending on the target, to
11 eliminate or capture the target.     0:03:05
12   Q. And with a -- that -- that sort of definition
13 in mind --
14     THE RECORDER: Sorry.     0:03:15
15     MR. SMITH: It's okay.
16 BY MR. SMITH:
17   Q. With that definition in mind as pre-planned
18 or pre-trained to eliminate or execute a target, can
19 that also happen through private training of some sort?     0:03:34
20   A. Oh, of course.
21   Q. Can that happen -- can that be learned from
22 gang or other violence?
23   A. Yes.     0:03:44
24   Q. Okay. And I understand in your background,
25 you've -- you've -- you've -- you've worked with a lot

Page 7

1 of Fortune 500 company -- companies. You've also
2 worked in other countries.     0:03:59
3     Is that fair as far as security issues?
4   A. Yes.
5   Q. And you've worked in war zones?     0:04:05
6   A. Conflict zones. Yes.
7   Q. Okay. And in those zones, tell me a little
8 bit about how you attempted to advise on security
9 issues to your clients in those types of zones.     0:04:20
10   A. Well, you would start with certainly an
11 assessment, a situation assessment, of what's going on
12 in your environment. And use that information against
13 what you're planning to do, what you need to do.     0:04:49
14     What -- what is it that you want to
15 accomplish.
16   Q. Mm-hmm. And in the past, have you secured
17 certain perimeters for clients in conflict zones?     0:04:58
18   A. Thinking back. We were involved when I
19 worked for Amoco in creating a drilling area for oil in
20 Colombia.     0:05:27
21     And we utilized the Colombian military to
22 build a -- a platform basically to support the
23 operations there.
24   Q. And as far as the reasonable standards for a
25 combat zone versus a normal non-conflict area, there

Page 8

1 are different reasonable standards that apply to those
2 two as far as securing areas or preventing criminal
3 activity.     0:06:04
4   A. I suppose. You -- you're -- you're not
5 looking at criminal activity necessarily in -- in a
6 conflict zone.     0:06:19
7     You -- you have in a conflict zone usually
8 some sort of quasi-military or full-on military
9 combatants on either side. So it -- it's not an issue
10 of -- when -- when you say criminal activity, we don't
11 look at something like that as the bad guys are going
12 to come in and do an armed robbery.     0:06:51
13     Or commit some -- some other type of regular
14 crime against their target. So usually it involves an
15 operation that's designed to take over the objective
16 and even kill or capture the people that are holding
17 that particular objective.     0:07:27
18   Q. Okay. And can you define one other thing for
19 me? I want to know the definition -- excuse me -- the
20 definition of reasonably foreseeable, your definition
21 as it relates to this case.     0:07:40
22   A. My definition would be that reasonable means
23 that you'll take steps to mitigate what can be
24 anticipated.
25   Q. And what is foreseeable?     0:08:10

Page 9

1   A. Well foreseeable is based on elements such as
2 prior history of a location and an understanding of the
3 environment where the location is. Or the facility, if
4 you will, is located.     0:08:32
5     And then the operational aspects of that
6 business. And what it's there to do.
7     (Exhibit No. 1 marked for identification.)
8 BY MR. SMITH:
9   Q. Okay. I've marked for you what's been marked
10 -- or I've marked Hauri Exhibit 1 for you.     0:08:56
11     MR. MULDOON: Thank you.
12 BY MR. SMITH:
13   Q. What is it?
14   A. Plaintiff's Rule 26 Disclosures to Defendant.     0:09:07
15   Q. Okay. And towards the end of that document,
16 I believe your curriculum vitae Professional Experience
17 is there on page 17 of that document.     0:09:20
18   A. Excuse me. Yes. I see the --
19   Q. Is there anything that needs to be changed
20 today as we sit here in that Professional Experience
21 document that you've submitted?     0:09:37
22   A. I don't believe so.
23   Q. I want to talk about your past. You were a
24 -- a -- you worked as a -- a police chief in Waukegan?     0:09:53
25   A. Correct.

3 (Pages 6 to 9)

00000000-0000-0000-0000-00000000

Page 10

1    Q.  How many years were you a police chief in
2    Waukegan for?
3    A.  Three and a half, I believe.          0:10:01
4    Q.  And why did you leave that position?
5    A.  A medical issue.
6    Q.  Okay.  And what was your next position after
7    that?                                      0:10:15
8    A.  I was the manager of protection services for
9    Amoco.
10   Q.  And is that -- in each role, you were in the
11   private sector after being a police chief.  Is that
12   fair?                                      0:10:36
13   A.  Yes.
14   Q.  When did you leave the -- the -- the public
15   sector?
16   A.  1988.
17   Q.  Is that the last time you did any public
18   sector police work?                        0:10:51
19   A.  Yes.
20   Q.  When you were in the private sector,
21   generally, what did your positions -- what were your
22   duties in those positions?
23   A.  To manage a corporate security operation.
24   All things related to what's usually -- usually termed
25   as corporate security.                     0:11:34

Page 11

1        So that could include assessing locations and
2    making recommendations for target hardening and
3    mitigating against known risks.            0:12:01
4        I dealt with human resources departments,
5    legal departments, police departments, a -- a -- a
6    pretty wide variety of interests, if you will.  0:12:16
7    Q.  Okay.
8    A.  To -- in order to protect the assets of the
9    corporation, including its customers, its employees,
10   etc.
11   Q.  Are some criminal acts unpreventable?   0:12:37
12       MR. MULDOON:  Objection as to broad and
13   speculation.
14       Go ahead.
15       THE WITNESS:  There are no guarantees that --
16   and when we -- when we look at -- at the reasonableness
17   issue, there are no guarantees.            0:12:57
18       There's -- nothing is going to be 100 percent
19   perfect.  It's not perfection.  It's -- it's
20   reasonableness.                            0:13:04
21       Did you do the right thing.  As opposed to
22   can you make it perfect.  So as we all know, there are
23   no guarantees in life.  And that applies here as well.  0:13:20
24   BY MR. SMITH:
25   Q.  And I guess what I'm getting at is, not every

Page 12

1    criminal act is preventable.  Correct?
2    A.  Correct.                               0:13:33
3    Q.  Not every attempted homicide is preventable.
4    Correct?
5    A.  Yes.
6    Q.  Homicides that relate to targeted or combat
7    style targeted issues are difficult to pre- -- prevent.
8    Correct?                                   0:14:01
9    A.  They're more difficult than others.  Yes.
10   Q.  Why is that?                           0:14:09
11   A.  Because you have a -- a -- a different
12   motivation, if you will.  Oftentimes predators,
13   criminal predators, will work very hard at defeating
14   the mitigation strategies.                 0:14:33
15       As opposed to the casual criminal, if you
16   will, who might walk into an opportunity to commit a
17   crime.
18   Q.  So it's -- it's harder -- it -- tell me if
19   this is a fair statement.                  0:14:52
20       It's harder to prevent a targeted combat
21   style homicide than it is to prevent normal criminal
22   activity such as robbery, burglary, that sort of thing.  0:15:08
23       MR. MULDOON:  Objection --
24   BY MR. SMITH:
25   Q.  Fair?

Page 13

1        MR. MULDOON:  -- relevance.
2        THE WITNESS:  Well, I -- I wouldn't say it's
3    necessarily harder.  But it's more complicated.  0:15:21
4    BY MR. SMITH:
5    Q.  And I don't want to quabble (phonetic) over
6    the definition of harder versus complicated.  But
7    complicated means it is more difficult to prevent a
8    combat style targeted homi- -- attempted homicide as
9    opposed to your average everyday crime like a burglary
10   or robbery.  Correct?                      0:15:41
11   A.  Well, like every -- I -- I --
12       MR. MULDOON:  I'll just object to asked and
13   answered.                                  0:15:48
14       THE WITNESS:  The -- the -- the offender in
15   what you're asking -- a lot of the success of the
16   offender depends on their capabilities and their
17   motivation.                                0:16:13
18       How strongly are they motivated.  And usually
19   a military style attack on someone indicates there's
20   more planning, if you will.                0:16:30
21       And you have to mitigate against that.  But
22   if -- if the bad guys starts to commit a crime in a
23   combat style method and he's not very good at it, then
24   it's easier to defeat.                     0:16:50
25       So it really depends on the level of training

                                        4 (Pages 10 to 13)

## Page 14

1  and motivation that the offender has.
2  BY MR. SMITH:
3      Q.  A targeted pre-planned military combat style
4  attempted homicide is more difficult to prevent than a
5  -- a normal criminal act such as burglary or robbery.
6  Correct?                              0:17:22
7          MR. MULDOON:  Objection.  That's been asked
8  and answered twice now and it's also a objection as to
9  -- as to relevance.
10  BY MR. SMITH:
11     Q.  You can answer.                0:17:28
12     A.  Not necessarily correct.  No.
13     Q.  Why is that, sir?
14     A.  Well, because as I said, it depends on their
15  capability and their motivation.       0:17:40
16     Q.  Have you seen news of federal judges being
17  targeted at their homes both in New Jersey and in
18  Illinois in the past ten years --
19         MR. MULDOON:  Objection --      0:17:55
20  BY MR. SMITH:
21     Q.  -- with --
22         MR. MULDOON:  -- relevance.
23  BY MR. SMITH:
24     Q.  -- targeted killings?
25     A.  Yes.                          0:18:00

## Page 15

1      Q.  Right in our own Northern District of
2  Illinois.  Fair?
3          MR. MULDOON:  Objection.  Relevance.   0:18:05
4          THE WITNESS:  Yes.
5  BY MR. SMITH:
6      Q.  And that attack was successful.  Yes?
7          MR. MULDOON:  Objection.  Relevance.   0:18:10
8          THE WITNESS:  Yes.  As I recall.
9  BY MR. SMITH:
10     Q.  And the one in New Jersey was at least
11  successful in killing a son of a federal judge.   0:18:18
12         MR. MULDOON:  Objection --
13  BY MR. SMITH:
14     Q.  Fair?
15         MR. MULDOON:  -- relevance.
16         THE WITNESS:  I believe so.      0:18:21
17  BY MR. SMITH:
18     Q.  And those circumstances involved targeted
19  style killings.  Correct?
20         MR. MULDOON:  Objection.  Relevance.   0:18:26
21         THE WITNESS:  I believe so.  Yes.
22  BY MR. SMITH:
23     Q.  Okay.  When the predator or combat style
24  criminal is pre-planning an -- a -- a homicide goal, if
25  the other individual does not know about that

## Page 16

1  particular goal or premeditation, it is more difficult
2  to prevent it.                          0:18:51
3          Is that a fair statement?
4          MR. MULDOON:  Objection.  Relevance.
5          THE WITNESS:  No, not really.     0:18:59
6  BY MR. SMITH:
7      Q.  Why, sir?
8          MR. MULDOON:  Same objection.
9          THE WITNESS:  There are certain security
10  measures that some people have to take.  And they may
11  not know about a specific individual who wants to
12  commit a homicide against them.          0:19:29
13         Yet they'll still plan their security program
14  considering that that could be an outcome.
15  BY MR. SMITH:
16     Q.  And in doing so, usually that involves either
17  keeping yourself away from the predator criminal.
18  Fair?                                  0:19:53
19         MR. MULDOON:  Objection.  Relevance.
20         THE WITNESS:  Well, you can't keep yourself
21  away from him if you don't know him.  Or her.   0:19:59
22  BY MR. SMITH:
23     Q.  But in generally speaking, that would be one
24  way to prevent the predator criminal from attacking you
25  in a homicidal fashion.  Fair?          0:20:10

## Page 17

1          MR. MULDOON:  Objection.  Relevance.
2  BY MR. SMITH:
3      Q.  If you were never in contact with them or if
4  you stayed away from them?               0:20:16
5          MR. MULDOON:  Same objection.
6          THE WITNESS:  But that concludes that you
7  know who that person is.
8  BY MR. SMITH:
9      Q.  Isn't that why witnesses sometimes go into
10  witness protection programs?             0:20:28
11         MR. MULDOON:  Objection --
12         THE WITNESS:  Yes.
13         MR. MULDOON:  -- relevance.
14  BY MR. SMITH:
15     Q.  And so putting space between yourself and the
16  predator criminal where they can't find you --
17  sometimes that will prevent a -- a -- a pre-planned
18  homicide attempt.  Fair?                 0:20:40
19         MR. MULDOON:  Objection.  Relevance.
20         THE WITNESS:  Yes.
21  BY MR. SMITH:
22     Q.  Also, in line with what your answer was a
23  second ago, the other thing that some Americans do to
24  prevent homicides are to arm themselves in self
25  defense.  Fair?                         0:20:59

Andrew Lee Camphouse 03/15/2022        www.InDemandReporting.com        (773) 239-6008

Page 18

1          MR. MULDOON: Objection. Relevance.
2          THE WITNESS: Yes.
3     BY MR. SMITH:
4          Q.  That's one of the ultimate ways to attempt to
5     prevent a pre-planned predator criminal's homicide
6     against you. Is that fair?            0:21:11
7          MR. MULDOON: Objection. Relevance.
8     BY MR. SMITH:
9          Q.  If you know it's coming.        0:21:15
10         A.  If -- if --
11         MR. MULDOON: Same --
12         THE WITNESS: -- you know --
13         MR. MULDOON: -- objection.
14         THE WITNESS: -- it's coming.
15         THE RECORDER: I'm sorry. Did you say same
16    objection?                0:21:20
17         MR. MULDOON: Give me a second, okay, before
18    your answer.
19    BY MR. SMITH:
20         Q.  And criminal predators. Can you describe for
21    me what you would define as a -- a -- I think we've
22    been talking about in the form of an attempted
23    homicide, but a criminal predator in that sort of
24    definition of a -- a criminal homicide type of person?    0:21:41
25         What would you define that as a -- a criminal

Page 19

1     predator?
2          MR. MULDOON: Objection. Relevance.    0:21:46
3          THE WITNESS: Someone who has a grudge
4     against an individual or a company. It could be
5     someone who is mentally deranged.        0:22:07
6          There are a lot of motives out there that --
7     that could be assigned to that kind of activity.
8     BY MR. SMITH:
9          Q.  It's -- it's one of our biggest fears, right,
10    of somebody mentally deranged coming in and doing
11    something crazy; is that fair?            0:22:27
12         MR. MULDOON: Objection. Relevance.
13         THE WITNESS: What do you mean by our?    0:22:32
14    BY MR. SMITH:
15         Q.  I'll strike the question.
16         Do criminal predators sometimes stalk the
17    victims prior to attempting to commit a criminal
18    homicide?                0:22:44
19         MR. MULDOON: Objection. Relevance.
20         THE WITNESS: Yes.
21    BY MR. SMITH:
22         Q.  Do -- is that sometimes indicated in their
23    pre-planning efforts, the stalking of the victim?    0:22:56
24         MR. MULDOON: Same objection.
25         THE WITNESS: Yes.

Page 20

1     BY MR. SMITH:
2          Q.  And why do they do that?        0:23:02
3          MR. MULDOON: Objection. Relevance.
4          THE WITNESS: Because they want to be
5     successful at what they're planning.        0:23:10
6     BY MR. SMITH:
7          Q.  And for a criminal predator attempting a
8     homicide on a victim, is there any variable time that
9     you consider stalking -- that they would stalk that
10    person that generally from your background, knowledge,
11    experience -- is there a certain amount of time?    0:23:31
12         How long do they take? What do they do to
13    stalk people?
14         MR. MULDOON: Objection. Relevance.    0:23:35
15         THE WITNESS: It all depends on the
16    individual and their ability to carry out the stalking.
17    And the availability of the potential victim to be
18    stalked. Or not, as the case may be.        0:23:59
19    BY MR. SMITH:
20         Q.  Are -- sometimes do criminal predators stalk
21    their victims in vehicles or cars?
22         MR. MULDOON: Objection. Relevance.    0:24:11
23         THE WITNESS: Yes.
24    BY MR. SMITH:
25         Q.  Okay. Hang on just one second.

Page 21

1          MR. SMITH: Can we go off the record, please?
2          THE RECORDER: Going off record at 1:28 p.m.    0:24:20
3          (Off the record)
4          THE RECORDER: Back on record at 1:29 p.m.
5     BY MR. SMITH:
6          Q.  So just -- just going back to that question.
7     I'm sorry if I'm repeating it. I don't remember, but.    0:24:31
8          Do criminal predators sometimes stalk their
9     victims in cars, vehicles?
10         MR. MULDOON: Objection. Relevance and asked
11    and answered.                0:24:42
12         THE WITNESS: Yes.
13    BY MR. SMITH:
14         Q.  And how do they do that? Do they remain
15    behind the victim and try to watch where they're going
16    and wait for an opportune time?            0:24:50
17         Or what does -- what does a criminal predator
18    usually do in that situation?
19         MR. MULDOON: Objection --
20         Q.  To be --                0:24:54
21         MR. MULDOON: -- relevance.
22    BY MR. SMITH:
23         Q.  -- successful.
24         MR. MULDOON: Same objection.

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com        (773) 239-6008

00000000-0000-0000-0000-0000000000

Andrew Lee Camphouse 03/15/2022  www.InDemandReporting.com  (773) 239-6008

## Page 22

1  THE WITNESS: Well, certainly I think what
2 you're describing is -- is that they follow their
3 victim. And yes, that happens.  0:25:14
4  But there are other ways to stalk the victim,
5 whether it's electronically through social media or
6 whether it's going to their place of work or worship,
7 places that the stalker knows that they go to, or could
8 be in their office. Or place of work.  0:25:45
9 BY MR. SMITH:
10  Q. Do predator -- criminal predators sometime
11 wait for the opportune moment to attempt -- I -- now, I
12 know that generally, but I'm talking about in a
13 homicide fashion.  0:26:02
14  Do they want for an opportune time to attempt
15 the homicide?
16  MR. MULDOON: Objection. Relevance.
17  THE WITNESS: I suppose they do sometimes.
18 Other times, they'll find an opportunity.  0:26:15
19  They'll literally stumble across an
20 opportunity to commit the crime. And -- and just to --
21 to more clearly define this, you know, we're -- we're
22 using this term criminal predator.  0:26:30
23  Those aren't just stalkers. Criminal
24 predators are people who prey upon members of society
25 and oftentimes operate on an opportunity basis.  0:26:50

## Page 23

1  Something comes up, a target comes up that
2 they think is weak, and they'll take advantage of it.
3 BY MR. SMITH:
4  Q. And in that same fashion, sometimes when the
5 opportunity's right, or not right, they'll still take
6 advantage of it. Fair?  0:27:10
7  A. Yes.
8  Q. Want to get back into your experience. When
9 you were in the private sector, when did you stop
10 working for businesses and start working more in the
11 consulting and expert witness area?  0:27:37
12  MR. MULDOON: Meaning -- objection. That
13 assumes facts that are --
14 BY MR. SMITH:
15  Q. Well, did that happen?  0:27:43
16  A. Well, I left the corporate world as an
17 employee from time to time. When I was between
18 positions, I would do some consulting for different
19 corporations.  0:27:59
20  And then in -- oh, I think it was about 2007,
21 I went into consulting on a full-time basis. And my
22 litigation work began some years after that. Several
23 years, I'd say.  0:28:35
24  Q. Do you know when you started doing litigation
25 work?

## Page 24

1  A. I actually did my first case I think in 1995.
2  Q. And have you been doing cases ever since the
3 year 1995?  0:28:53
4  A. Off and on.
5  Q. Are they usually -- what -- what are your --
6 probably your highest percentage of cases? Bars,
7 nightclubs?  0:29:01
8  A. No.
9  MR. MULDOON: For -- I'm sorry. For which?
10  MR. SMITH: Since he's been working in the
11 litigation field.  0:29:10
12  MR. MULDOON: Okay. But he also does
13 consulting. So --
14  MR. SMITH: Yeah.
15  MR. MULDOON: -- you gotta just, you know,
16 make sure you're clear.  0:29:13
17 BY MR. SMITH:
18  Q. Since you've been in the litigation field in
19 1995, has your highest percentage of cases been factual
20 circumstances involving bars, nightclubs, places that
21 serve alcohol?  0:29:28
22  A. I really don't know because I -- I -- I
23 haven't -- I haven't counted them to -- to see where
24 the -- the most work lies. I would have to guess at it
25 and say it's about even with other types of -- of

## Page 25

1 cases.  0:29:55
2  Q. What other types of cases have you had
3 besides this particular restaurant case that we're
4 talking about today? Factually. Settings.  0:30:05
5  A. I'm sorry. Can you repeat that?
6  Q. Yeah. What other types of factual settings,
7 you know, have you been on cases for besides this one
8 today we're talking about a restaurant?  0:30:19
9  And I'm -- I'm differentiating restaurants
10 versus bars, nightclubs, places that serve alcohol.
11  A. I -- I -- you know, I really don't know. I
12 -- looking back at cases, I've dealt with a number of
13 different venues.  0:30:42
14  Retail operations. Hotels.
15  Q. Okay.
16  A. Housing complexes. Those are just a few of
17 the ones I can think of right off the top of my head.  0:31:02
18  Q. What are the percentage of your cases in
19 homicides or attempted homicides over the years in
20 litigation setting versus burglaries, robberies, stuff
21 like that? Breaking and entering?  0:31:14
22  A. Wow. I -- I really don't know. I just -- I
23 -- I don't track those kinds of descriptors.  0:31:26
24  Q. Mm-hmm. Most of the cases I found -- and
25 you've been in a lot of cases -- seem to be in bars and

7 (Pages 22 to 25)

00000000-0000-0000-0000-000000000

Page 26

1    restaurants or nightclubs.                    0:31:33
2         Is that a fair statement?
3         A. I don't know what you mean by most. But I --
4    I know over the years I've done a number of them.   0:31:45
5         I just can't tell you how many or -- or guess
6    at what the percentage might be.
7         Q. Mm-hmm. And a majority of your cases -- have
8    they involved alcohol in some form or manner? Or other
9    illegal substances.                            0:32:10
10        A. Again, I -- I don't know. I just haven't
11   looked to see what that statistic would be.     0:32:22
12        Q. Mm-hmm. Have you ever taught any classes?
13   Do you teach any classes currently related to premises
14   security or security?                          0:32:36
15        A. No. And -- and you're saying -- well, I
16   assume you're saying --
17        Q. Are you a teacher, professor, anything like
18   --                                             0:32:43
19        A. Not --
20        Q. -- that?
21        A. -- currently.
22        Q. When was the last time you taught?        0:32:48
23        A. Several years ago.
24        Q. Would any of your teachings relate to the
25   type of factual circumstances that are in this case?   0:33:02

Page 27

1         A. Well, I taught at Webster University in their
2    security administration program. And as part of that,
3    conducting risk assessments and managing corporate
4    security function.                             0:33:26
5         I did that for 25 years for Webster.
6         Q. When did you teach?
7         A. I -- the last time I taught for them was
8    probably four, five years ago.                 0:33:50
9         Q. Were any of the topics caught -- taught in
10   that class related to similar opinions, bases that
11   you're -- you're touching on in this case?      0:34:03
12        A. Yes. In -- in terms of risk assessments and
13   mitigation strategies.
14        Q. And have you given any webinars, speeches,
15   lectures, or anything within the last five years on any
16   topics that relate to the things that you're opining on
17   in this case?                                  0:34:32
18        A. No.
19        Q. Have you given any lectures, presentations,
20   webinars, anything within the last five years to an
21   audience?
22        A. Yes.                                    0:34:43
23        Q. When?
24        A. Three or maybe four years ago. I taught a --
25   or I -- I presented at Illinois State University.   0:35:01

Page 28

1         Q. And what did you teach? What was the
2    lecture?
3         A. The lecture was in regards to Continental
4    Africa and the security issues that arise for many of
5    those countries and how they deal with those issues.   0:35:28
6         Q. And how does Continental Africa relate to
7    this case?
8         A. It doesn't. You -- your -- I -- I understood
9    your question to be have I made any presentations.   0:35:39
10        Q. Okay. So that presentation in no way relates
11   to this case. Is that fair?
12        A. That's fair.                            0:35:47
13        Q. Other lectures, presentations in the last
14   five years?
15        A. No. Not that I can think of.            0:35:54
16        Q. Have you written any subject matter -- any
17   treatises, books, anything on subjects that you believe
18   are related to this case?
19        A. No.                                    0:36:05
20        Q. I know you have a case list here in -- in
21   Exhibit 1 at the end. And you can -- I'll give you the
22   page number.                                   0:36:23
23        That is page 27 of 28, so it's the last two
24   pages. Do you see that?
25        MR. MULDOON: Of Exhibit 1?                0:36:37

Page 29

1         MR. SMITH: Am I in the wrong thing?
2         MR. MULDOON: I see it.
3    BY MR. SMITH:
4         Q. Last two pages.
5         A. Yes.                                    0:36:45
6         Q. Okay. And in that case list -- is that your
7    case list -- all your cases that you've given
8    deposition testimony or trial testimony within the last
9    four years?                                    0:36:55
10        A. Yes.
11        Q. Are there any that you left out?
12        A. No. I don't believe so.                0:37:02
13        Q. Okay. The first case there, Michael Parker
14   versus Lofton & Lofton Management. What was that case
15   about?                                        0:37:08
16        A. That case was about a restaurant employee who
17   battered a customer of the restaurant.
18        Q. Which side were you on?                0:37:30
19        A. Plaintiff.
20        Q. Do you recall what kind of opinions you were
21   giving there?
22        A. No, I don't.                           0:37:38
23        Q. The second case, Sat- -- Saturnino Medrano
24   Herrera versus Toju -- Toju Bay.
25        (Chime noise in background)

00000000-0000-0000-0000-000000000000

Page 30

1    BY MR. SMITH:
2        Q.  I'm sorry about that.  What was that case?    0:37:51
3        A.  That was a case of a customer battering
4    another customer at the restaurant.
5        Q.  What side were you on in that case?
6        A.  Defendant.                    0:38:12
7        Q.  Do you recall what kind of opinions you were
8    giving?
9        A.  No.  Not at the moment.            0:38:22
10       Q.  Was alcohol involved in that?
11       A.  While they served alcohol there, I don't
12   recall that alcohol was an issue.        0:38:32
13       Q.  Was that a nightclub or bar?  Or was it a
14   restaurant?
15       A.  Restaurant.
16       Q.  And was it a restaurant that also was a
17   nightclub bar?                        0:38:39
18       A.  They had a bar there.  I -- I don't believe
19   there was a nightclub.
20       Q.  Do you know what time of day the assault
21   happened in that one?                0:38:49
22       A.  It was in the evening sometime.  And that's
23   as close as I can get.
24       Q.  This third case, Woodworth versus Tavco.
25   What was the setting of that situation?    0:39:06

Page 31

1        A.  A restaurant bar.
2        Q.  And what type of incident?
3        A.  It was a disagreement between two customers.
4    And one customer battered the other.        0:39:23
5        Q.  Okay.  Do you know what time of day that
6    occurred?
7        A.  It was in the afternoon sometime.    0:39:32
8        Q.  And was alcohol involved?
9        A.  I don't recall it being an issue.  However, I
10   would say they were served alcohol.  But I -- I don't
11   recall it as being in excess in terms of service.    0:39:54
12       Q.  Who'd you testify for in that?  Or I mean who
13   -- whose side were you on?
14       A.  Plaintiff.
15       Q.  Did you give trial testimony in that case?    0:40:04
16       A.  No.
17       Q.  Did you give trial testimony in any of the
18   other cases that we've already discussed?
19       A.  No.                        0:40:11
20       Q.  Richard Clark and Helen Pecoraro versus
21   Village of Grayslake.  What's that case about?
22       A.  That was a police pursuit case.    0:40:35
23       Q.  And which side did you testify for?
24       A.  Plaintiff.
25       Q.  Did you give trial testimony in that case?    0:40:47

Page 32

1        A.  No.
2        Q.  Saturnino -- this is another Toju Bay case.
3    I think it was the retrial.  We've already discussed
4    that.                            0:40:59
5            But did you give -- you gave trial testimony
6    in that case.  Yes?
7        A.  Yes.
8        Q.  And you'd already given deposition testimony
9    in the case.  Fair?                    0:41:10
10       A.  Correct.
11       Q.  Nothing about the case substance changed,
12   right; it was a retrial?
13       A.  I believe so.                0:41:17
14       Q.  Patricia Woods, as administrator versus
15   Central Park Tap.  And what's that case about?
16       A.  That case involved a customer of the bar and
17   package store.  The -- the offender in the case
18   battered -- ultimately it -- it ended in the death of
19   -- of the victim.                    0:41:58
20           Battered him outside the establishment there.
21       Q.  Okay.  Was that a alcohol issue?    0:42:09
22       A.  No.
23       Q.  Which side were you testifying for?
24       A.  Defendant.                    0:42:18
25       Q.  You with Burke and Burke's office on that?

Page 33

1    Or were you -- who were you with?  Who was the
2    attorneys that hired you on the case?  Who were the
3    attorneys?                        0:42:31
4        A.  Hmm.
5        Q.  Heineke and Burke?
6        A.  It doesn't -- no.  No.            0:42:40
7        Q.  Okay.  Did you give any trial testimony in
8    that case?
9        A.  Yes.
10       Q.  And that rest-- -- that particular place was
11   -- that was a bar.  Correct?            0:43:00
12       A.  A bar and a liquor store and package store.
13       Q.  Ryan -- Ryan Lambert versus Bliss?  What was
14   that case about?                    0:43:13
15       A.  That was a -- a fast food restaurant where a
16   customer at the restaurant battered another customer in
17   a disagreement outside in the parking lot.    0:43:44
18       Q.  Who'd you testify for?
19       A.  Plaintiff.
20       Q.  Did you give trial testimony in that case?    0:43:52
21       A.  No.
22       Q.  What were your opinions in that case?  Do you
23   remember?
24       A.  Other than to say it -- it revolved around
25   the security issues, I don't remember exactly what the

00000000-0000-0000-0000-0000000000

Page 34

1   opinions were. No.                          0:44:22
2       Q.  Okay.  And the Kirchhoff case below that,
3   versus the Aragon?  What was that about?     0:44:29
4       A.  The Kirchhoff case -- involved three visitors
5   or -- or customers, if you will, of the -- the Aragon
6   Ballroom, where they got up into a space in the
7   building that was just below the roof.        0:44:57
8       And the -- one of the three young men fell
9   and died of his injuries, landing on some rebar.
10      Q.  Okay.  Which side did you testify for?  0:45:17
11      A.  Plaintiff.
12      Q.  Okay.  Pourghobadi versus ARC Hospitality?
13  What was that about?                          0:45:28
14      A.  A guest at a hotel reported that someone
15  entered her room at night and assaulted her.
16      Q.  Who'd you testify for?                0:45:55
17      A.  Plaintiff.  Oh, I'm sorry.  Defendant.
18      Q.  And did you give trial testimony?     0:46:01
19      A.  No.
20      Q.  The case below that, Ulisa Howell-Darby.
21  What was that about?
22      A.  This was a case on a CHA property, where an
23  offender came to the property and -- and this was 2:00
24  in the morning, 3:00 in the morning.          0:46:33
25      He -- there -- there was a -- a gathering of

Page 35

1   people, some of whom didn't belong there.  And -- and
2   they got into a disagreement with the security company
3   that was handling security for the location.  0:46:55
4       And the deceased shot two of the guards and
5   was himself shot in the return fire, and he died in the
6   process.  And that was the long and the short of it.  0:47:21
7       Q.  Who'd you testify for?  Which side?
8       A.  Defendant.
9       Q.  And did you give trial testimony in that
10  case?                                         0:47:31
11      A.  Yes.
12      Q.  Lisa Marie Babich.  What's that case about?
13      A.  A hotel case where an employee
14  surreptitiously brought his girlfriend into the hotel
15  and -- when he was off duty.  And he battered her while
16  they were in the hotel.                       0:48:04
17      Q.  Who'd you testify for?
18      A.  Defendant.
19      Q.  And did you give trial testimony in that
20  case?                                         0:48:23
21      A.  No.
22      Q.  Jane Doe versus Joel Berman.  What's that?
23      A.  That was a real estate issue where Defendants
24  rented out part of their house, the upstairs of -- of
25  -- of the house.  It was a two-flat basically.  0:48:48

Page 36

1       And the plaintiff in that case was sexually
2   assaulted and robbed while she was in her apartment.
3       Q.  Which side did you testify for?       0:49:07
4       A.  Defendant.
5       Q.  And did you give trial testimony?     0:49:12
6       A.  No.
7       Q.  Okay.  Derek Evitt?
8       A.  That case was a police case involving an
9   officer who was struck by a tow truck.        0:49:41
10      Q.  Who'd you give testimony for?
11      A.  Defendant.
12      Q.  Trial testimony?                      0:49:56
13      A.  No.
14      Q.  Jesse Sala.
15      A.  That involved a nightclub with an individual
16  who had -- had left the nightclub.  And it was right
17  around closing time.                          0:50:23
18      He tried to get back in, and they were
19  already in the process of closing.  So everyone was
20  coming out.  And he tried to batter his way back
21  inside.                                       0:50:41
22      Didn't take no for an answer.  And was -- was
23  ultimately rejected.  And during that process was
24  injured.                                      0:50:56
25      Q.  Who'd you testify for?

Page 37

1       A.  Defendant.
2       Q.  Did you give trial testimony?         0:51:01
3       A.  No.
4       Q.  Was that case resolved?
5       A.  Yes.
6       Q.  Tracy Scott-Blake.                    0:51:09
7       A.  That involved a nightclub where three women
8   that were visiting Chicago went to the nightclub and
9   were attacked by an individual at the club, both inside
10  and outside.                                  0:51:37
11      Q.  Who'd you testify for?  What side?
12      A.  The plaintiff.
13      Q.  Did you give trial testimony in the case?  0:51:47
14      A.  No.
15      Q.  Did your opinions in that case relate to
16  security?
17      A.  Yes.                                  0:51:57
18      Q.  Did you indicate in a lot of your nightclub
19  cases that security is -- is -- is even more required
20  in locations that have -- that serve alcohol and have
21  dancing?                                      0:52:10
22      MR. MULDOON:  I'll object to the vagueness of
23  the question.
24  BY MR. SMITH:
25      Q.  Are there heightened --               0:52:19

10  (Pages 34 to 37)

Andrew Lee Camphouse 03/15/2022     www.InDemandReporting.com     (773) 239-6008

Page 38

1  A. I'm --
2  Q. -- security measures for restaurant -- or
3  excuse me -- for places -- establishments that have
4  alcohol and dancing mixed together?  0:52:29
5  A. Well, it's -- it's a little bit different. A
6  consideration, I suppose. But it's not -- yeah, again,
7  I can't -- I -- I -- you know, I can't think of how
8  many places that I've been involved with that had
9  dancing.  0:52:53
10  Q. What about games? Do alcohol and games cause
11  heightened issues?
12  A. Sometimes. Yes.  0:53:01
13  Q. Why?
14  A. Well, it's a competitive atmosphere. And,
15  you know, whether it's a -- a pool game or darts or
16  whatever, there's -- there tends to be the competitive
17  atmosphere and sometimes emotions run high over the
18  results of the game.  0:53:26
19  Q. All right. The Moody case? What was that
20  about?
21  A. That's a -- an apartment complex. The --
22  think back to this one.  0:53:47
23  The plaintiff -- plaintiff was attacked by an
24  individual who was not supposed to be on the property.
25  Q. Okay. And who'd you testify for?  0:54:16

Page 39

1  A. Defendant.
2  Q. Did you give trial testimony?
3  A. No.
4  Q. In -- in all your cases that you've --
5  litigation you've testified for, have you ever been
6  disallowed from testifying by a court?  0:54:27
7  A. No.
8  Q. Have your opinions ever been barred in any
9  proceeding that you've ever testified in?
10  A. No.  0:54:33
11  Q. Whether by your fault or anyone else's.
12  A. No.
13  Q. Okay. The Deist case, versus TRKYMIK.
14  What's that case about?  0:54:49
15  A. That was a shooting at -- at a -- a bar. The
16  bar had video poker machines in the bar.
17  Q. Did you equate that as to -- was there an
18  issue involving the video poker machines in the
19  shooting?  0:55:31
20  A. Well, that was where it happened, inside the
21  establishment. But it -- it didn't -- it didn't cause
22  the -- the shooting.  0:55:39
23  Q. Okay. Who'd you testify for?
24  A. Defendant.
25  Q. And what type of opinions did you give in

Page 40

1  that case? I'm assuming it related in some way that
2  the -- the bar was not at fault for the -- the
3  shooting.  0:56:02
4  Is that fair?
5  A. Yes.
6  Q. And the bar did not have reasonable
7  foreseeability to prevent that shooting. Is that fair?  0:56:09
8  A. Yes.
9  Q. And you would've given that opinion in that
10  case because the bar was defending the case and if they
11  didn't have reasonable foreseeability of the shooting
12  or the attack, then they had no liability. Fair?  0:56:23
13  A. Yes.
14  Q. Okay. Did you give any trial testimony in
15  that case?
16  A. No.  0:56:32
17  Q. Barriga. What's that case about?
18  A. That was a -- a bar restaurant case where a
19  customer was attacked in the parking lot of the
20  establishment after closing hours by a security person.  0:57:10
21  Q. Okay. Who'd you testify for?
22  A. Defendant.
23  Q. And did you give trial testimony?  0:57:20
24  A. No.
25  Q. And I'm assuming in that case -- that's

Page 41

1  another case where you would've had some opinion that
2  the bar restaurant could not reasonably foresee that
3  attack or incident or shooting. Is that fair?  0:57:37
4  A. No.
5  Q. What was your opinion?
6  A. My opinion was that --
7  MR. MULDOON: I'm sorry. Which case are we
8  talking about?  0:57:46
9  MR. SMITH: Excuse me?
10  MR. MULDOON: Which case are we talking
11  about?
12  MR. SMITH: This is --  0:57:49
13  THE WITNESS: Gastelum.
14  MR. SMITH: -- Barriga.
15  MR. MULDOON: No --
16  THE WITNESS: No --
17  MR. MULDOON: -- you were --  0:57:53
18  THE WITNESS: -- you're -- you're asking me
19  about Gastelum.
20  BY MR. SMITH:
21  Q. Am I?
22  A. Yeah.  0:57:59
23  Q. Okay. All right. So that was the
24  establishment shooting? There was a shooting at that
25  establishment?  0:58:05

11 (Pages 38 to 41)

(773) 239-6008

00000000-0000-0000-0000-000000000000

Page 42

1    A.  No.  No.  The victim wasn't shot.
2    Q.  Attacked?
3    A.  He was attacked and beaten.        0:58:11
4    Q.  And that was a bar location?
5    A.  Yeah.  A bar restaurant.  Primarily --
6    Q.  And --
7    A.  -- a restaurant.        0:58:16
8    Q.  And I'm assu- -- you were for defense?
9    A.  Correct.
10   Q.  And you would've had some opinion that the
11   restaurant was not liable in that case for the attack.
12   Fair?        0:58:26
13   A.  Yes.
14   Q.  And part of that opinion would've related to
15   reasonable foreseeability of the -- the restaurant bar
16   as to the -- the attack --        0:58:35
17   A.  No.
18   Q.  -- fair?  What -- what would the opinions
19   have related to in that case?
20   A.  Related to the security contractor and its
21   employees.        0:58:43
22   Q.  So you blamed it on the security contractor
23   in that case?
24   A.  Yes.
25   Q.  Why?

Page 43

1    A.  Because he did it.        0:58:54
2    Q.  Okay.  Did you also say it was -- that the --
3    the restaurant bar had no foreseeability of him doing
4    that?
5    A.  Yes.        0:59:05
6    Q.  And you would've had those opinions in the
7    case that the restaurant bar has no reasonable
8    foreseeability under the circumstances to prevent the
9    security guard from attacking this individual inside
10   the bar.  Fair?        0:59:20
11   A.  Yes.
12   Q.  Okay.  And you would've done that because you
13   were defending the restaurant bar and reasonable fore-
14   -- reasonable foreseeability is the standard related to
15   liability in those types of cases.  Fair?        0:59:34
16   A.  No.  My opinions related to the relationship
17   between the security guard who was the offender in this
18   case and the victim.        0:59:49
19   Apparently the victim had been accused of
20   raping the girlfriend of the security guard.  And the
21   security guard found the victim at the -- the
22   restaurant after closing hours and attacked him there.   1:00:19
23   Q.  Okay.  But you would've had some opinion
24   related to reasonable foreseeability in that case
25   because the bar was sued.  Right?        1:00:29

Page 44

1    A.  Yes.  The bar -- the restaurant was sued.
2    Q.  And as a part of that, you said there was
3    never an attack -- I -- my -- my guess is your opinion
4    went something like this, and tell me if I'm inaccurate
5    or accurate.        1:00:43
6    The restaurant had no reasonable
7    foreseeability of this attack due to the fact that this
8    type of attack had never been expected and the -- it
9    never happened in the past and that security guard had
10   never behaved in that manner to alert the restaurant to
11   the fact that this would occur.        1:01:01
12   Is that a good --
13   A.  No, not entirely.  It's --
14   Q.  Well, the --        1:01:05
15   A.  -- is it -- the security guard clearly held a
16   grudge against that particular customer.  And the
17   security guard was part of the company that provided
18   security for the restaurant.        1:01:28
19   The restaurant had done everything
20   appropriately, and no, they could not foresee that this
21   accusation had been made and that there was a -- a -- a
22   grudge issue between the two men.        1:01:45
23   Q.  Did you consider that incident a pre-planned
24   attack by the security guard?
25   A.  No.  It was clearly an opportunity.  One of

Page 45

1    the issues that was never resolved was what the
2    customer was doing, where he actually parked on that
3    property and why after closing.        1:02:12
4    And the security guard being part of the
5    company that provided security -- he was a supervisor
6    and he was making visits to various and sundry accounts
7    that they held --        1:02:31
8    Q.  Mm-hmm.
9    A.  -- to make sure that everybody showed up,
10   etc., etc.  And when he saw a car parked in a remote
11   area of this parking lot after closing hours, he went
12   over to check on that car, found someone sitting inside
13   the car, and then recognized him to be the individual
14   who supposedly raped his girlfriend.        1:02:55
15   And that's when the battery took place.
16   Q.  Okay.  John Doe versus Capital Fitness.
17   What's that case about?        1:03:05
18   A.  That case is a -- a case of -- of an
19   individual member of the fitness center who claimed
20   that he was sexually assaulted in the showers at the
21   fitness center.        1:03:31
22   Q.  Okay.  Who'd you testify for in that case?
23   A.  Defendant.        1:03:37
24   Q.  Trial testimony?
25   A.  No.

12  (Pages 42 to 45)

00000000-0000-0000-0000-0000000000000

Page 46

```
 1      Q.  The last case.  Price.  What's that about?    1:03:47
 2      A.  That's a -- a restaurant case where an
 3   individual employee murdered his supervisor on the
 4   night shift.
 5      Q.  Okay.  And what side were you on?            1:04:10
 6      A.  Plaintiff.
 7      Q.  And did you give trial testimony?
 8      A.  No.
 9      Q.  In that case, how did the case resolve?      1:04:20
10      A.  It did not.
11      Q.  Was it thrown out on summary judgment?
12      A.  No.  It's still active.                      1:04:29
13      Q.  Still active?  Who -- who are the attorneys
14   that hired you in that case?
15      A.  I'm -- I -- I don't -- I don't recall off the
16   top of my head.                                     1:04:47
17      Q.  And is there a trial set -- date set?
18      A.  No.  Not that I'm aware of at least.         1:04:52
19      Q.  Okay.  When was the case filed?
20      A.  When was it filed?
21      MR. MULDOON:  There's a --                       1:05:00
22      THE WITNESS:  Just by looking at the --
23   BY MR. SMITH:
24      Q.  January.  2018?
25      A.  -- citation here, it was sometime in '18.
```

Page 47

```
 1   Yeah.                                               1:05:09
 2      Q.  And are your opinion -- do your opinions in
 3   that case relate to reasonable foreseeability?
 4      A.  Yes.                                         1:05:18
 5      Q.  And why -- why did you have a -- those types
 6   of opinions in that case?
 7      A.  Well, because they hired the employee without
 8   doing a background check.                           1:05:27
 9      And then because of -- or -- or during the
10   time of his employment, it was apparent that there was
11   some discontent on behalf of the employee and he
12   ultimately stabbed his supervisor to death.         1:05:58
13      Q.  Okay.  All right.  You can set that exhibit
14   aside.  I am going to mark this as Exhibit 2.        1:06:07
15      I'm going to take a quick bathroom break for
16   the convenience of all of us.
17      A.  All right.
18      THE RECORDER:  Okay.  Going off record at
19   2:11 p.m.                                           1:06:13
20      (Off the record)
21      THE RECORDER:  Back on record at 2:18 p.m.
22      (Exhibit No. 2 marked for identification.)
23   BY MR. SMITH:
24      Q.  All right.  We're back on the record.  Do you
25   understand you're still under oath?                 1:06:22
```

Page 48

```
 1      A.  I do.
 2      Q.  I want to talk a little bit about some of the
 3   documents you looked at in this case.  And we'll get to
 4   that in a second.                                   1:06:31
 5      But first I wanted to talk about your fees in
 6   this case.  I understand from what's been marked in
 7   front of you as Exhibit 2, that's your response to my
 8   rider request for documents and materials from your
 9   expert file?                                        1:06:46
10      A.  Yes.
11      Q.  Is there anything I'm missing from the expert
12   file besides the documents I have?
13      A.  No.                                          1:06:51
14      Q.  What about, do you highlight deposition
15   transcripts at all?
16      A.  No.
17      Q.  Do you take any notes on any deposition
18   transcripts?                                        1:06:58
19      A.  No.
20      Q.  Do you have any handwritten notes from
21   reading those deposition transcripts?
22      A.  No.                                          1:07:03
23      Q.  How do you keep track of that?
24      A.  I work on the screen, the computer screen,
25   and write my opinions as I go along with the deposition
```

Page 49

```
 1   material and -- and other material.                 1:07:22
 2      Q.  Okay.  So other than your report and those
 3   materials that I have in that response there, is there
 4   anything I'm missing?
 5      A.  No, I don't believe so.  I think it's
 6   complete.                                           1:07:34
 7      Q.  Okay.  What treatises or anything else did
 8   you review to form your opinions in this case?
 9      A.  Protection of Assets, published by ASIS
10   International.  And the ANSI/ASIS/RIMS risk assessment
11   standards.                                          1:07:56
12      Also a -- a QSR web publication regarding
13   security at QSR facilities.
14      Q.  Is that all of it?                           1:08:23
15      A.  Yes.
16      Q.  Okay.  We'll talk about that in a little bit.
17   Anything else?
18      A.  No.  Not that I can recall.                  1:08:33
19      Q.  Okay.  And you reviewed the surveillance
20   video footage?
21      A.  Yes.                                         1:08:40
22      Q.  Okay.  I want to talk a little bit about your
23   background and experience.
24      What is your percentage of testimony for
25   plaintiffs versus defendants?                       1:08:48
```

13 (Pages 46 to 49)

00000000-0000-0000-0000-000000000

Page 50

1      A.  Overall, I would say it fluctuates between 45
2  percent one way or another.  It really depends on the
3  year.                                         1:09:08
4          Some years I found that I get more calls on
5  defense cases and other times I get more calls on
6  plaintiff cases.
7      Q.  And you're still charging -- it looks like in
8  these materials you gave to me, you're still charging
9  295 standard per hour?                        1:09:23
10      A.  Yes.
11      Q.  395 for court and trial testimony and
12  depositions?
13      A.  Deposition and trial.  Yes.            1:09:31
14      Q.  How much in hours have you put into this case
15  so far?
16      A.  I don't know.
17      Q.  Well, how do you get paid?             1:09:40
18      A.  I -- I -- I haven't -- I -- I haven't made an
19  invoice.  I -- I have to go back to look through the
20  times that -- that I spent on the case.        1:10:01
21      Q.  How many hours have you spent on this case in
22  total to today's date?
23      A.  I don't have an exact figure, but I would say
24  in excess of 20 hours.                         1:10:20
25      Q.  More than 25 hours?

Page 51

1      A.  Possibly.  Yes.
2      Q.  Less than 30 hours?                     1:10:28
3      A.  Perhaps.  I'm not sure.
4      Q.  All at the standard or?
5      A.  Yes.                                    1:10:40
6      Q.  And you've gotten a $3,000 retainer in this
7  case?
8      A.  Yes.
9      Q.  Would you say that's expended now?       1:10:46
10      A.  Yes.
11      Q.  Will you be generating a -- a bill shortly
12  after this?
13      A.  Yes.
14      Q.  And you're portal -- portal to portal
15  billing, meaning you --                        1:11:03
16      A.  Yes.
17      Q.  -- leave your home?  You bill until you get
18  back home?
19      A.  Yes.                                   1:11:07
20      Q.  And I know you gave me some materials.  I've
21  marked them as -- an affidavit as Exhibit 3 here.  1:11:24
22      (Exhibit No. 3 marked for identification.)
23  BY MR. SMITH:
24      Q.  It's Exhibit 3 --
25      A.  Thank you.

Page 52

1      Q.  -- I'm handing you.  Can you tell me what
2  that is?                                       1:11:37
3      A.  This was an affidavit.
4      Q.  Okay.  And it's your affidavit?          1:11:49
5      A.  Yes.
6      Q.  And it's your affidavit and you're attesting
7  to your percentage over the last, what, four years of
8  percentages of litigation versus consulting expert
9  work?                                          1:12:02
10      MR. MULDOON:  Objection.  It's five years.
11      MR. SMITH:  Five years?  Excuse me.         1:12:05
12      THE WITNESS:  Yes.
13  BY MR. SMITH:
14      Q.  And is that fair and accurate and truthful as
15  to your testimony?                             1:12:13
16      A.  Yes.
17      Q.  Percentages?  Do you earn all of your income
18  and living from consulting and litigation expert work?  1:12:20
19      A.  Yes.
20      Q.  Is there any other income that you receive
21  besides that type of work?
22      A.  No.                                    1:12:28
23      Q.  As far as litigation work, how much do you
24  make per year?
25      A.  It depends on the year.  Um --          1:12:44

Page 53

1      MR. MULDOON:  Well, I'm -- I'm going to
2  object to this.  You're -- you're -- you're entitled to
3  either -- to know the percentage or the total, and he
4  gave you the percentage, so you're not entitled to the
5  total.                                         1:12:52
6      MR. SMITH:  I'm not asking for his total
7  income.  I'm asking for his total percentage income as
8  a -- an expert in litigation per year.         1:13:02
9      MR. MULDOON:  I'm -- I'm -- maybe I'm missing
10  something.  I'm sorry.
11      MR. SMITH:  So --
12      MR. MULDOON:  Percentage.  He's given you the
13  percentage.                                    1:13:09
14  BY MR. SMITH:
15      Q.  Well, how much do you make -- how much in 20-
16  -- 2021 and 2020 have you made for litigation work each
17  year --
18      MR. MULDOON:  Well --
19  BY MR. SMITH:
20      Q.  -- individually?
21      (Certified Question)
22      MR. MULDOON:  -- I'll -- I'll -- that's what
23  I'm objecting to, Brad.  What -- you already know the
24  percentage.  Now you're going to find out the total
25  amount.                                        1:13:26

14  (Pages 50 to 53)

00000000-0000-0000-0000-000000000

Andrew Lee Camphouse 03/15/2022    www.InDemandReporting.com    (773) 239-6008

Page 54

1       And you can figure out the total. That's not
2   -- you're not entitled to that. Right? I mean, you
3   made your choice.                          1:13:31
4       MR. SMITH: No, I don't think so. I think
5   I'm --
6       MR. MULDOON: And -- and --
7       MR. SMITH: -- still entitled to --
8       MR. MULDOON: -- that's what the case law
9   that you sent me said, that you're entitled to the
10  percentage.                                 1:13:36
11      MR. SMITH: I disagree. Are you instructing
12  him not to
13      MR. MULDOON: Yeah, I'm --
14      MR. SMITH: -- to answer?
15      MR. MULDOON: -- going to instruct him not to
16  answer.                                     1:13:40
17      MR. SMITH: We'll certify that question.
18  BY MR. SMITH:
19      Q. Have you ever had a case from Mr. Muldoon's
20  office --
21      MR. MULDOON: Just --
22  BY MR. SMITH:
23      Q. -- before?                          1:13:50
24      MR. MULDOON: -- just -- before we go on.
25  Just for the record.

Page 55

1       We had a discussion about this, Mr. Smith and
2   I, on the telephone, about what financial information
3   he's entitled to regarding Mr. Hauri's work.   1:14:07
4       And I asked him to send me any authority that
5   he had regarding what we're required to disclose in
6   terms of financial information.              1:14:24
7       And Mr. Smith sent me a case from Florida,
8   and we agreed that we would provide the information in
9   the manner of the -- the percentage of work Mr. Hauri
10  does as a security consultant versus the percentage of
11  work he does as a litigation -- in -- in litigation
12  consulting.                                 1:14:50
13      And we gave him that information in the form
14  of affidavit as agreed upon for five years.
15      Okay. Let's go ahead.                   1:14:57
16  BY MR. SMITH:
17      Q. Have you ever worked on a case or consulting
18  work with Mr. Muldoon's firm before or Mr. Muldoon?
19      A. Yes.                                 1:15:09
20      Q. When was your last case with Mr. Muldoon's
21  office?
22      A. I would say five years perhaps.       1:15:20
23      Q. What was the title of that case?
24      A. I don't recall the complete title, but the --
25  and -- and I don't -- I can't recall any of the -- the

Page 56

1   details in terms of the caption.            1:15:42
2       But USRA was I think the defendant in the
3   case.
4       Q. What court was that filed in? What venue?  1:15:56
5       A. I believe Cook County.
6       Q. Okay. Have you had any other cases with him
7   or his office?
8       A. No. Not that I --                    1:16:11
9       Q. Did you have any --
10      A. -- can --
11      Q. -- cases with --
12      A. -- not that I can --
13      Q. -- him when he was at a different office?
14  Mr. Muldoon?                                1:16:15
15      A. Not that I can recall. No.
16      Q. Okay. Was that case -- were you on the
17  plaintiff side in that case?                 1:16:22
18      A. I believe so.
19      Q. What type of case was it?
20      A. I don't recall the specifics of it, but it
21  involved a -- a convenience store.          1:16:37
22      Q. Okay. Did that case go to trial?
23      A. No.
24      Q. Did you give a deposition?            1:16:53
25      A. I'm sorry?

Page 57

1       Q. Did you give a deposition in that case?
2       A. I don't -- I -- I just don't know. I -- I --
3   I don't recall if I did.                     1:17:03
4       Q. Do you advertise your services?
5       A. Occasionally.
6       Q. In what types of ways?                1:17:13
7       A. In a -- a listing with ALM Media. They --
8   they're publishers of a number of law journals. And
9   I've advertised with them in the past.      1:17:33
10      Q. Do you advertise with anyone else?
11      A. No. Not -- not that I can recall.    1:17:47
12      Q. Okay. Do you go to any association events?
13  ITLA? Anything of that nature?              1:17:55
14      A. Oh, legal associations? No.
15      Q. Okay. You work -- what company do you
16  currently work for?                         1:18:01
17      A. Bradford Garrett Group.
18      Q. Are you a partner there?
19      A. No. I'm the managing director.       1:18:07
20      Q. Okay. So it's your company?
21      A. No.
22      Q. Okay. But you -- you're the managing
23  director for the -- for the whole company or for --  1:18:15
24      A. Yes.
25      Q. -- this region or what?

15 (Pages 54 to 57)
(773) 239-6008

00000000-0000-0000-0000-000000000000

## Page 58

1    A.  For the company.

2    Q.  Okay.  And what type of certifications do you

3  currently hold?                                    1:18:27

4    A.  I hold the CPP, certified protection

5  professional, certification with ASIS International.  I

6  held the certified fraud examiner certification with

7  the Association of Certified Fraud Examiners.        1:18:57

8       And I'd have to look at my -- my CV.  Bear

9  with me here, please.  The certified business

10 continuity planner I held in 1994 for I want to say

11 about ten years.                                    1:19:41

12   Q.  Okay.  The CPP.  Did you have to take an exam

13 to belong to that organization?

14   A.  Yes.  No, not to belong to the organization,

15 but to get the certification.                        1:20:02

16   Q.  How long was the exam?

17   A.  One day.

18   Q.  Okay.  Have you had to repeat that exam at

19 all?                                                1:20:08

20   A.  No.  But I have to certify continuing

21 education on a -- a three-year basis.

22   Q.  How much continuing education do you have to

23 have?                                               1:20:23

24   A.  Do I have?

25   Q.  Do you have to have in that three-year

## Page 59

1  period.

2    A.  Oh.  I think it's 20 hours.            1:20:33

3    Q.  CFE you said you hold.  Is that --

4    A.  Right.

5    Q.  You don't have that anymore?           1:20:40

6    A.  No.  I dropped it last year.

7    Q.  Why?

8    A.  I wasn't using it.

9    Q.  And then the last one?  Do you still hold

10 that?

11   A.  No.

12   Q.  And what happened to that one?          1:20:51

13   A.  I dropped it because I wasn't using it.

14   Q.  Okay.  Any other certifications that I'm

15 missing?                                           1:21:01

16   A.  No.

17   Q.  Qualifications, training?  Is there anything

18 else as far as education?

19      MR. MULDOON:  Other than what's -- what's --   1:21:10

20 BY MR. SMITH:

21   Q.  Regarding security --

22      MR. MULDOON:  -- in the CV?

23 BY MR. SMITH:

24   Q.  -- yeah, other -- other than what's on the

25 CV?  Are we missing anything?                       1:21:13

## Page 60

1    A.  Oh.  No.

2    Q.  Okay.  All right.  One second.  I'm sorry.   1:21:21

3       On this Exhibit -- what's been marked as

4  Exhibit 2, the third page.  It has a list of all the

5  things that you reviewed in preparation of your

6  opinions in this case.                             1:21:38

7       Do you see that?

8    A.  Yes.

9    Q.  Is there anything else that -- that you've

10 reviewed that's not listed on there?               1:21:48

11   A.  I don't think so.

12   Q.  Is there anything that you would've liked to

13 have seen that you do not see in this case?        1:21:56

14   A.  When -- when -- when you say like to see in

15 -- in -- in the case, aside -- is this aside from

16 anything that might be available?  I'm --           1:22:26

17   Q.  Yeah --

18   A.  -- trying to understand --

19   Q.  -- I would --

20   A.  -- your question.

21   Q.  -- I would just like to know anything that

22 you think would've been important to see that you

23 didn't see in this case.                           1:22:31

24   A.  Well, CPD has a a -- a pod video.  I

25 haven't seen any of that.

## Page 61

1    Q.  Did you see any of the body camera footage?  1:22:44

2    A.  No.

3    Q.  Could that video footage potentially have the

4  ability to change your opinions in some way?

5    A.  I -- I have no idea.                         1:22:58

6    Q.  Is it possible that that video footage, if it

7  showed you something that you weren't expecting --

8  could that have the ability to change your opinions in

9  some way?                                          1:23:09

10      MR. MULDOON:  Objection.  It's asked,

11 answered, and speculation.

12      THE WITNESS:  I --

13      MR. MULDOON:  Foundation.                     1:23:14

14      THE WITNESS:  I would have to see it in order

15 to answer that question.

16 BY MR. SMITH:

17   Q.  Okay.  Anything else you'd like to see that

18 you did not see in this case?                       1:23:24

19   A.  Well, in terms of records, there aren't any

20 records apparently in regards to the history of that

21 location.

22   Q.  Well, are there not any records, or is it

23 just that there is not any history?                1:23:48

24   A.  Well, it's that there's not any records.

25   Q.  Okay.  And in what way do you know that?     1:23:55

00000000-0000-0000-0000-000000000000

---

Page 62

1    A.  From the depositions.
2    Q.  Do you know if there's any history?
3    A.  Yes.  I know there's history.          1:24:05
4    Q.  How do you know there's history?
5    A.  From the depositions.  And from the Chicago
6  PD calls for service.                         1:24:16
7    Q.  And those calls for service and -- and
8  analysis -- I didn't get any materials provided in
9  those calls for service.  Do -- do you know where that
10  came from?                                   1:24:24
11    A.  Well, it came from CPD.  I don't know how it
12  came to me, but -- other than it was provided to me as
13  part of the information.                      1:24:35
14    Q.  Well, if I haven't seen that, is it in your
15  file?
16    A.  Yes.
17    Q.  Okay.  And why wasn't it produced in those
18  materials?                                   1:24:57
19    A.  I don't know.  I thought it was.
20    Q.  Are you able to give that to me after the
21  deposition?                                  1:25:12
22    A.  I don't have it with me, but it can be
23  provided.
24    Q.  What --
25        MR. MULDOON:  I think I provided it to you.     1:25:20

---

Page 63

1        MR. SMITH:  Okay.
2        MR. MULDOON:  If you look at the additional
3  Rule 226 disclosures, I believe it was in there.
4        MR. SMITH:  Okay.                       1:25:27
5  BY MR. SMITH:
6    Q.  What does that particular report show?
7    A.  It shows a list of the calls over a period of
8  I believe two years -- no, three years potentially.
9  Calls for service to the restaurant.          1:25:47
10    Q.  And what types of things did that report
11  reflect?
12    A.  Any number of -- of, well, calls for service.
13  They show some -- what -- what would be characterized
14  as criminal activity.                        1:26:04
15      So, for instance, disturbances, batteries.
16  Guns.  EMS calls.
17    Q.  I'm asking what did that particular report
18  that you pulled for that area show.           1:26:26
19        MR. MULDOON:  That's what he's answering.
20  BY MR. SMITH:
21    Q.  What did it show?
22    A.  That -- what I just said is what it shows.     1:26:33
23    Q.  What area does that cover, the report?
24    A.  The report targets the address of the
25  restaurant.  Calls to that location.          1:26:43

---

Page 64

1    Q.  Okay.  Is there anything else it shows?
2    A.  Well, it's -- it's a log.  It's dates and
3  times and the nature of the call.             1:27:02
4      Then there are any number of columns
5  regarding their internal tracking mechanisms.  So you
6  may have six to eight set of digits that refer to other
7  documents --                                 1:27:24
8    Q.  Other --
9    A.  -- such as --
10    Q.  Go ahead.
11    A.  Such as a police report.              1:27:27
12    Q.  Other than the date of this shooting, which
13  was December 31st of 2018, does that report show any
14  other shootings at that Wendy's restaurant in the two
15  years prior to this shooting that we're talking about
16  today?                                       1:27:46
17    A.  No.
18    Q.  Does it show any criminal predatory attempted
19  homicide shootings?  In the --               1:28:00
20    A.  No.
21    Q.  -- two years prior to this incident?
22    A.  No.
23    Q.  Does it show any combat military style
24  carried-out homicide attempts for that location within
25  the two years prior to this shooting that we're talking

---

Page 65

1  about today?                                 1:28:23
2        MR. MULDOON:  Well, objection as to relevance
3  and speculation.
4  BY MR. SMITH:
5    Q.  Go ahead.
6    A.  No.                                    1:28:30
7    Q.  You reviewed the surveillance footage in
8  preparation for your report.
9    A.  Yes.
10    Q.  The surveillance footage was pretty good.  Or
11  at least as far as the location and the outside.     1:28:45
12      I mean, it showed all the events that we're
13  looking at here.
14    A.  Yes.  Not with great clarity, for instance,
15  but yes.                                     1:28:58
16    Q.  And in that video footage -- and -- and we'll
17  look at it in fairness later, okay.  But in that video
18  footage, you can see an SUV stalking or at least in the
19  back area of the restaurant in an alleyway prior to
20  this attack occurring.  Fair?                1:29:23
21        MR. MULDOON:  Objection to the
22  characterization of the vehicle stalking anything or
23  anybody.
24        THE WITNESS:  Are -- are you referring to the
25  car that drives -- if you're looking at the frame --

---

17 (Pages 62 to 65)

00000000-0000-0000-0000-0000000000

Page 66

```
1   car that drives through the back of the parking lot.    1:29:41
2        It's actually Wendy's parking lot.  It comes
3   in from an alleyway and goes from right to left?        1:29:48
4   BY MR. SMITH:
5        Q.  It's an SUV-looking vehicle --
6        A.  No --
7        Q.  -- crossover --                                1:29:50
8        A.  -- I -- I --
9        Q.  -- SUV.
10       A.  -- I don't remember if it was an SUV.  But it
11  was -- I think it was light color, whether it was light
12  gray or white, I'm not sure right now.                  1:29:59
13       But yeah.  I don't -- I -- I -- I don't
14  recall if it was an SUV type vehicle or not.
15       Q.  Did that vehicle -- did the shooters
16  eventually appear to get out from that vehicle at some
17  point?                                                  1:30:15
18       MR. MULDOON:  Objection.  Speculation.
19       THE WITNESS:  I didn't see that because that
20  wasn't footage that was provided.  If it exists.        1:30:22
21  BY MR. SMITH:
22       Q.  Okay.  You can see that SUV hiding in the
23  alleyway and then crossing the back north lot of the
24  Wendy's and then pulling out onto a side street on the
25  east side of the Wendy's.  In --                        1:30:34
```

Page 67

```
1        MR. MULDOON:  Objection --
2   BY MR. SMITH:
3        Q.  -- the video footage that we provided.  Is --
4        MR. MULDOON:  Objection --
5   BY MR. SMITH:
6        Q.  -- that fair?                                  1:30:37
7        MR. MULDOON:  -- as to the characterization
8   of the vehicle hiding.
9        THE WITNESS:  Yeah, I don't know what you
10  mean by hiding.  The -- the -- what I saw on the video
11  was the vehicle drove through that parking lot.         1:30:47
12  BY MR. SMITH:
13       Q.  Did you see the video -- on the video clip
14  that the -- the vehicle -- the SUV crossover, whatever
15  you want to call it, that vehicle that you described,
16  that crossed the parking lot and went out onto the east
17  roadway and turned north -- did you see that vehicle at
18  any point in time pull in from the west side of -- of
19  whatever that street is over there towards the Dan Ryan
20  and then park behind a dumpster in the alleyway for a
21  period of time?                                         1:31:14
22       A.  No, I didn't.
23       Q.  Okay.  When I show that to you in a little
24  bit, and I will, in the video footage, it does pause
25  for a period of time.                                   1:31:23
```

Page 68

```
1        Do you have any disagreement with that?
2        MR. MULDOON:  Objection as to speculation,
3   foundation.  You're asking --                          1:31:27
4        MR. SMITH:  Mm-hmm.
5        MR. MULDOON:  -- if -- if he is -- agrees
6   with a video he hasn't seen?
7        MR. SMITH:  Mm-hmm.                                1:31:31
8        THE WITNESS:  I -- I can't agree or disagree.
9   BY MR. SMITH:
10       Q.  Well --
11       A.  I haven't --
12       Q.  -- you've seen --
13       A.  -- seen --
14       Q.  -- the video footage in the past, haven't
15  you?                                                    1:31:36
16       A.  I saw the video where the vehicle comes
17  through the parking lot of --
18       Q.  Don't --
19       A.  -- I --
20       Q.  -- you believe that all the video footage
21  surrounding the outside is important?                   1:31:48
22       A.  Yes.
23       Q.  And it shows that SUV turning north on the
24  side street on the east side of the building just
25  before the shooting.  Yes?                              1:31:57
```

Page 69

```
1        A.  Yes.  Princeton Avenue.
2        Q.  And then you see two individuals come
3   slightly jogging and running up to the black vehicle in
4   the -- on the east of the building in the drive-through
5   lane.                                                   1:32:09
6        A.  Yes.
7        Q.  And then two shooters carry out a military
8   combat style attack on the vehicle, shooting into both
9   sides of the vehicle --                                 1:32:18
10       MR. MULDOON:  Objection --
11  BY MR. SMITH:
12       Q.  -- fair?
13       MR. MULDOON:  -- as to the characterization
14  of a military type attack.                              1:32:23
15       THE WITNESS:  I wouldn't call it a military
16  attack.  There's -- there's no basis for me to call it
17  that.                                                   1:32:31
18  BY MR. SMITH:
19       Q.  Would you call it an execution attempt?
20       MR. MULDOON:  Objection as to
21  characterization.
22       THE WITNESS:  I can't speak for their
23  motivation.                                             1:32:37
24  BY MR. SMITH:
25       Q.  Did it look like they were meant to -- to
```

00000000-0000-0000-0000-000000000000

Page 70

1   kill?
2        MR. MULDOON: Objection as to speculation as
3   to what the shooters were thinking.          1:32:45
4        THE WITNESS: I -- I can't speculate on their
5   -- on their motivation. It was -- it looked very
6   dangerous, and they were firing into the car.          1:32:54
7   BY MR. SMITH:
8        Q.  Would you expect that someone fires in a car
9   has a reasonable expectation that they are -- could hit
10  someone and kill them?          1:33:02
11       MR. MULDOON: Objection as to, again, what
12  the shooters are thinking.
13       THE WITNESS: Again, motivation I don't know,
14  but that -- that could be one of their motivations.
15  Yes.          1:33:13
16  BY MR. SMITH:
17       Q.  Well you were a detective, weren't you, sir?
18       A.  Yes.
19       Q.  And so you've analyzed footage and films of
20  people carrying out targeted attacks and shootings.
21  Correct?          1:33:22
22       A.  Yes.
23       Q.  And in your estimation, did these two
24  individual gunmen have the intent to kill when they
25  fired multiple, multiple gunshots into a car from

Page 71

1   multiple angles?          1:33:36
2        MR. MULDOON: Again, objection as to the
3   shooters' intentions.
4        THE WITNESS: Yes. It looked like they were
5   attempting to seriously harm or kill the occupants of
6   that vehicle.          1:33:49
7   BY MR. SMITH:
8        Q.  Did they have -- look to have any mistake in
9   their mind as to where they were going to be shooting
10  at that night?
11       MR. MULDOON: Objection as to what their
12  intent was.          1:34:00
13       MR. SMITH: I'm asking this expert --
14       THE WITNESS: It --
15       MR. SMITH: -- on his experience as a --
16       THE WITNESS: It --
17       MR. SMITH: -- as a policeman and as a --          1:34:06
18       MR. MULDOON: Well, then --
19       MR. SMITH: -- detective --
20       MR. MULDOON: -- why --
21       MR. SMITH: -- in analyzing video footage of
22  a crime.
23       MR. MULDOON: And I'm making my objection as
24  to your -- the characterization of your question.          1:34:12
25       THE WITNESS: I can say they were shooting

Page 72

1   into the car, and -- and you -- you -- you don't shoot
2   into a car for the fun of it. It's -- it's an attempt
3   to seriously injure or kill the occupants in that car
4   in --          1:34:33
5   BY MR. SMITH:
6        Q.  And --
7        A.  -- my opinion.
8        Q.  And -- and they knew -- based on your review
9   of the video footage from that east side of the
10  building, as those two shooters come jogging up towards
11  that black vehicle in the drive-through lane, they're
12  not mistaken as to what vehicle is their target based
13  on where they go and what they do.          1:34:50
14       Is that fair?
15       MR. MULDOON: Objection as to what they knew
16  and whether or not they were making a mistake. That's
17  just pure speculation.          1:34:55
18       THE WITNESS: Yeah, I can't say. It could've
19  been a mistake on their part.
20  BY MR. SMITH:
21       Q.  If it was a mistake, they definitely had some
22  sort of colored vehicle target in mind and they went
23  straight to that vehicle. Fair?          1:35:07
24       MR. MULDOON: Objection as to whether or not
25  they had -- the -- the color of the vehicle had

Page 73

1   anything to do with their intention.
2        THE WITNESS: I -- I don't know. It's
3   possible.          1:35:16
4   BY MR. SMITH:
5        Q.  They didn't spend any time looking for which
6   particular vehicle they were going to shoot at, did
7   they?
8        A.  No. I don't believe they did.          1:35:29
9        Q.  They just approached the black vehicle
10  quickly and -- and draw their weapons and began firing.
11       A.  Yes.
12       Q.  In rapid succession.          1:35:40
13       A.  Rapid succession of what?
14       Q.  The firing.
15       A.  Yes.          1:35:46
16       Q.  Both -- both individuals rapidly fired their
17  -- their handguns, unloading multiple, multiple shots.
18  Fair?
19       A.  Yes.          1:35:55
20       Q.  And then they retreated quickly?
21       A.  Yes.
22       Q.  Up the north street where that SUV had been
23  seen going out of the camera footage?          1:36:05
24       A.  Yes.
25       Q.  And that's the last we see of them.

Andrew Lee Camphouse 03/15/2022          www.InDemandReporting.com          (773) 239-6008

Page 74

1      A. Correct.
2      Q. Do you believe that whole attack to have
3  taken less than two minutes or more than two minutes?    1:36:19
4      MR. MULDOON: Objection to what he believes.
5  We can look at the videotape and see how long they
6  take.
7      MR. SMITH: I'm asking. He's reviewed it.    1:36:25
8      THE WITNESS: From what point to what point?
9  I -- I --
10  BY MR. SMITH:
11     Q. When --
12     A. -- assume your end point is --    1:36:31
13     Q. -- the two --
14     A. -- firing on --
15     Q. -- individuals --
16     A. -- the car.
17     Q. When you can see the individuals jogging up
18  on the camera screen on the east of the building. That
19  time from the time they jog off and you can't see them
20  anymore.    1:36:41
21     A. Yes. Less than two minutes.
22     Q. It was a quick targeted attack.
23     MR. MULDOON: Objection as to --    1:36:50
24  BY MR. SMITH:
25     Q. Yes?

Page 75

1      MR. MULDOON: -- the term targeted.
2      THE WITNESS: Again, I -- I can't speak for
3  their motive or if they carried out -- if they had an
4  order to carry out a -- an attack on that particular
5  vehicle.    1:37:07
6      But they -- they definitely tried to injure
7  or kill the occupants in that vehicle.
8  BY MR. SMITH:
9      Q. They had a goal in mind based on what you saw
10  from the footage.    1:37:21
11     MR. MULDOON: Objection as to what they had
12  in mind. It's -- it's pure speculation what they had
13  in mind.    1:37:27
14     THE WITNESS: Again, I -- I don't know, and
15  the police department in its investigation couldn't
16  come up with a motive.
17  BY MR. SMITH:
18     Q. Based on what you saw, do you have any
19  reasonable belief whether or not the shooters may have
20  or may have not known in the -- in -- prior to this
21  incident the two individuals that were in the -- the
22  black car that was shot -- shot?    1:37:50
23     MR. MULDOON: Objection as to what the
24  shooters knew. Speculation.
25     THE WITNESS: Again, I don't know if they

Page 76

1  knew these people or targeted these people in
2  particular.    1:38:07
3      But I know they attacked the car in order to
4  create the injuries or death. And the police
5  department could not come up with a -- a motive.    1:38:22
6      For all we know, they shot up the wrong car.
7  They could have very easily made a mistake picking that
8  particular vehicle.    1:38:41
9      And there's no evidence that I have seen that
10  connects the victims to the shooters.
11  BY MR. SMITH:
12     Q. Based on your experience, training,
13  education, qualifications -- by the way, any questions
14  I asked you today -- would they be -- if -- if I'm
15  asking for your opinion or your conclusions, would they
16  be to a reasonable degree of professional security
17  certainty?    1:39:06
18     A. Yes.
19     Q. Tell me how you reasoned professional
20  security certainty as it relates to reasonable
21  foreseeability.
22     A. Can -- sorry.    1:39:17
23     Q. Of a criminal event.
24     MR. MULDOON: Yeah, could you repeat the
25  question? I didn't get it.

Page 77

1      THE WITNESS: Can you repeat it --    1:39:21
2      MR. SMITH: Can you read it back --
3      THE WITNESS: -- please?
4      MR. MULDOON: -- please? Can you play it back?    1:39:24
5      THE RECORDER: One moment.
6      (Recording replayed)
7      MR. MULDOON: Brad, can you help me --
8      THE WITNESS: I don't --    1:39:38
9      MR. SMITH: Can you play it back again,
10  please?
11     MR. MULDOON: Well, you're just -- you're
12  speaking too fast, Brad. Could you break it down a
13  little bit and --    1:39:42
14     MR. SMITH: Just play it back one time,
15  please.
16     THE RECORDER: One more time? Okay.    1:39:47
17     (Recording replayed)
18     MR. MULDOON: I'm not even hearing all the
19  words.
20     MR. SMITH: Yeah, I'll -- I'll --    1:39:58
21     THE WITNESS: I --
22     MR. SMITH: -- repeat it.
23  BY MR. SMITH:
24     Q. How do you reason as a professional security
25  expert as to what particular events or criminal

20  (Pages 74 to 77)

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com          (773) 239-6008

00000000-0000-0000-0000-000000000000

Page 78

1   activities are reasonably foreseeable?     1:40:14
2       A. Through conducting a risk assessment.
3       Q. What are required to conduct a risk
4   assessment?     1:40:27
5       A. Well, there are three primary elements. One
6   is location. The environment, if you will, of the
7   specific facility.     1:40:44
8       And then its history. What has happened
9   there in the past. And lastly, it's operations. What
10   -- what does that facility do.     1:41:01
11       So you collect that information and make an
12   assessment as to what could happen there.
13       Q. And in this case, in the -- in the two years
14   predating this shooting in January -- or excuse me --
15   December of 2018, there were no attempted homicide
16   military or tactical style attacks on any individuals
17   at that Wendy's location --     1:41:53
18       MR. MULDOON: Objection --
19   BY MR. SMITH:
20       Q. -- fair?
21       MR. MULDOON: -- to the term military
22   tactical attacks.     1:41:58
23       THE WITNESS: Not that I'm aware of.
24   BY MR. SMITH:
25       Q. Okay. That's important to your assessment.

Page 79

1   Fair?     1:42:07
2       A. The history is. Yes.
3       Q. And in fact, the history is the -- one of the
4   more important factors. Fair?     1:42:16
5       A. Depends on the history, but yes. It can be
6   more important than something else. But you need a
7   complete history in order to make an accurate
8   assessment.     1:42:38
9       Q. I want to talk to you a little bit about
10   reasonable foreseeability. Is that a legal
11   standard or is that a -- a professional security
12   standard?     1:43:00
13       A. Both.
14       Q. And in the legal standard, what does it mean?
15       A. My understanding of it is that you take steps
16   that are reasonable. In other words, you're -- you're
17   not expecting someone to create Fort Knox as a -- as a
18   facility in the retail space.     1:43:35
19       Which is what this is. It's a quick service
20   restaurant. And it doesn't have to be protected by the
21   military or a -- a lot of police officers.     1:43:56
22       That would not -- it -- to expect that kind
23   of -- of mitigation would -- would be unreasonable.
24   You don't want to drive the facility out of business or
25   make it impossible for them to make a profit, because

Page 80

1   that would be unduly burdensome on them.     1:44:21
2       And my understanding, from what I've read
3   over many years, the courts agree with that. However,
4   there is the duty of care that when you know that you
5   have some specific issues in terms of risk, that you
6   address them.     1:44:49
7       And if you don't address them, that's not
8   reasonable.
9       Q. Is reasonable foreseeability a legal -- legal
10   standard for entities or folks to follow within a legal
11   setting?     1:45:07
12       A. To my understanding, yes.
13       Q. Okay. And that is a -- a legal conclusion
14   standard. Fair?     1:45:15
15       A. I believe so.
16       Q. Okay. Let me ask you this. Is there
17   different security assessments when a property is
18   closed, like a restaurant -- when a restaurant is
19   closed versus open?     1:45:46
20       A. I don't understand what you mean by a
21   different assessment.
22       Q. I mean, say the restaurant is closed at 4
23   a.m. and this shooting occurs in the parking lot.     1:45:59
24       What's your assessment in that circumstance?
25       MR. MULDOON: Is this a hypothetical?

Page 81

1       MR. SMITH: It can be.     1:46:07
2       MR. MULDOON: Well, is it?
3       MR. SMITH: Yes.
4       MR. MULDOON: Okay. And so objection,
5   incomplete hypothetical.     1:46:12
6       But go ahead and answer.
7       THE WITNESS: So in order to answer your
8   question, I need more information. Are there people
9   around? Customers?     1:46:21
10   BY MR. SMITH:
11       Q. Sure.
12       A. Employees?
13       Q. Well, no. No. The restaurant's closed.     1:46:25
14       A. The restaurant is closed.
15       Q. The parking lot is open, but there could be a
16   loiterer or something. But the restaurant's closed.
17   No one's there.     1:46:33
18       A. Okay.
19       Q. What is your assessment if a shooting were to
20   happen at the property in that situation, similar type
21   of shooting, assault, like we saw on this video
22   footage, without anyone there?     1:46:48
23       What is reasonable under these circumstances
24   as far as security measures?
25       MR. MULDOON: Objection. Again, it's an

00000000-0000-0000-0000-0000000000000

Page 82

1    incomplete hypothetical.                    1:46:56
2        MR. SMITH: Sure.
3        THE WITNESS: Well, what you're describing
4    sounds like vandalism quite frankly. You know, if --
5    if somebody comes in and fires shots in the -- in the
6    parking lot when the restaurant is closed, certainly
7    the risk of harm to the employees and the customers
8    doesn't exist.                              1:47:24
9        So what you would do and -- and which I think
10   is where you're going with the question, correct me if
11   I'm wrong -- but what you would do at that point is
12   make sure that your alarm systems work in the building,
13   in the facility, and that your cameras, your
14   surveillance cameras, are functional and recording the
15   event.                                     1:47:54
16       Clearly, without the presence of any people,
17   the risk of harm to anyone there is -- because there's
18   no one there, the risk of harm would be lower.   1:48:09
19       However, those rounds, when they're fired --
20   the question is, where do they go? And you can read
21   that in a newspaper every day in the City of Chicago,
22   how, you know, the four-year-old is sitting in her
23   bathtub, is shot in the head because somebody was
24   having a shooting party outside and one of the rounds
25   went astray.                               1:48:35

Page 83

1        So same thing at the restaurant. You could
2    certainly have those rounds go into the residential
3    units that are right behind the -- the restaurant.   1:48:51
4        And about all you can do is make sure that
5    your cameras working and that your alarm system is
6    working. You could have security officers conducting
7    patrols there to prevent that kind of thing or try to
8    prevent it, at least deter it.             1:49:14
9        But that's about all you could do. That
10   would be reasonable.
11       Q. If a similar type of shooting happened with
12   no one working in the restaurant, no one at the
13   restaurant, in the parking lot, like we see on the
14   video footage, similar type of shooting, would you lay
15   blame at Wendy's feet for causing that issue? If
16   restaurant was closed.                     1:49:45
17       MR. MULDOON: Is this a hypothetical?
18       MR. SMITH: Yes.
19       MR. MULDOON: And objection, incomplete
20   hypothetical.                              1:49:49
21       THE WITNESS: I don't know, because we don't
22   know if the alarm system was working and if the
23   surveillance cameras were -- were working and if the
24   parking lot was properly lighted.          1:50:06
25   BY MR. SMITH:

Page 84

1        Q. Do you believe this particular restaurant had
2    a properly lit parking lot?
3        A. I don't know.                       1:50:13
4        Q. Well, based on your security assessment in
5    this case, do you have any reason to believe that the
6    lighting in the Wendy's parking lot either contributed
7    to or caused this shooting incident?       1:50:26
8        MR. MULDOON: Okay, so are we flipping back
9    now to this case? Because you're flipping between
10   hypotheticals and this case. It'd be -- it'd be good
11   if you could signal which one you're talking about when
12   you're asking a question.                  1:50:34
13   BY MR. SMITH:
14       Q. Go ahead, sir.
15       A. Let -- let's read the question back.
16       THE RECORDER: One moment.             1:50:44
17       (Recording replayed)
18       THE WITNESS: So the lighting in the
19   restaurant -- and I -- I don't know if it was lighting
20   that should've been better or if it's the cameras that
21   they were using in their surveillance equipment.   1:51:23
22       But the -- the images are a bit grainy, and
23   with proper lighting and cameras that can take
24   advantage of good lighting, those images could've been
25   clearer.                                   1:51:40

Page 85

1        So the -- the -- the question of the
2    assessment is -- goes right back to the question of the
3    capability of the equipment that they're using.   1:51:55
4    BY MR. SMITH:
5        Q. Okay. I guess what I'm asking you is, did
6    the lighting outside in the restaurant parking lot
7    cause or contribute, as you've said other things did,
8    to this shooting?                          1:52:06
9        A. Possibly. I would have to see the lighting
10   as it was in 2018.
11       Q. Do you -- so you have no basis ability to
12   formulate an adequate support reasoned opinion on
13   whether the lighting caused or contributed to the
14   shooting in -- on December 31st, 2018. Fair?   1:52:33
15       A. Not exactly. As I said, the -- the images
16   are a bit grainy, and better lighting would increase
17   the possibility of identifying those individuals.   1:52:53
18       And if the lighting is up -- up to par, then
19   it might be a question of the cameras, the lenses that
20   are being used -- and the -- the type of camera
21   that they're using.                        1:53:10
22       So it's -- I -- I -- I can't say one way or
23   the other without actually seeing the lighting in that
24   parking lot as it was when the shooting happened.   1:53:25
25       Q. So you don't have enough information,

22 (Pages 82 to 85)

Page 86

1    evidence, support to make any opinion on whether or not
2    the lighting did or did not contribute to the shooting
3    on January -- or on December 31st, 2018.  Correct?      1:53:38
4         A.  Yes.  I did not make an opinion based on the
5    lighting.
6         Q.  And you don't have enough information to do
7    so.  Correct?                        1:53:48
8         A.  At this point, that's correct.
9         Q.  When you're doing a security assessment, risk
10   assessment for a quick serve fast food restaurant like
11   this Wendy's on Garfield in this case, versus work --
12   versus bars and nightclubs, what are the differences to
13   you as to the those risk assessments?      1:54:14
14        A.  Well, the three -- the three elements that I
15   mentioned before are still important.  And that doesn't
16   change.                            1:54:29
17        You -- you need that information for all
18   those three elements in order to facilitate a good
19   assessment.  And one of the things that you look at is
20   -- is the operations, the difference, if you will,
21   between a Q-- a QSR operation and a bar, nightclub,
22   tavern.                            1:55:01
23        The -- I think that the -- the operational
24   difference is what really needs to be addressed in
25   order to provide a good assessment.  So when you add in

Page 87

1    something like dancing you mentioned before, when you
2    -- there's no -- there's no dancing in -- in a QSR.      1:55:37
3         Generally speaking.  The -- you don't have
4    necessarily competitive games.  You don't turn the
5    lights down in the QSR.                  1:55:50
6         You want the -- the lights in the dining room
7    to be bright and -- and welcoming.  So you look at
8    those differences, and -- and that assessment then as
9    to its needs changes in the procedural areas.      1:56:07
10        So I -- those are some of the differences
11   between them.  And -- and when you're not serving
12   alcohol, you're much less likely to have
13   alcohol-related problems.                1:56:29
14        Q.  Can alcohol generally cause or contribute to
15   criminal activity at a particular establishment?
16        A.  Yes.  Under certain circumstances.  Sure.      1:56:43
17        Q.  Do burgers and fries cause or contribute to a
18   -- a criminal activity at a certain quick serve
19   restaurant?
20        A.  Not generally.  No.                1:56:53
21        Q.  Okay.  Is there anything else that goes into
22   your risk assessment in a QSR versus a bar nightclub?
23        A.  Sure.  So when you look at operations.      1:57:13
24        A QSR, especially in late night operations,
25   has customers that are on-site for a relatively short

Page 88

1    period of time.  When you look at a bar or restaurant,
2    those customers, again generally speaking, are there to
3    go in and sit down and -- and either have a meal or
4    consume some alcoholic beverages.            1:57:48
5         So there's a time difference where your
6    customers are -- are going to be in one of those
7    facilities for a much longer period of time.      1:57:58
8         And then you have your transaction.
9    Transactions in a restaurant, a plain restaurant,
10   happen at the end of the visit.            1:58:17
11        Transactions at the QSR happens either at the
12   front counter in the dining room or at the
13   drive-through window.  So that's -- that's a different
14   set of circumstances that requires paying attention to
15   the -- the mitigation strategies that you have.      1:58:48
16        So, for instance, your drive-up window can be
17   held up.  So do you -- if -- if you have a high risk
18   operation, do you get some ballistically rated glass to
19   protect your employee so that someone can't just drive
20   up and put a gun in their face and say hand over the
21   money.                            1:59:22
22        In a regular sit-down -- what I'll call a
23   sit-down restaurant, they can still be robbed.
24   However, you have a lot of people, which means a lot of
25   witnesses, sitting in that establishment.      1:59:45

Page 89

1         So it's less likely to have an armed robbery
2    at -- I don't know -- pick a restaurant of -- of any
3    kind, where the clients come in and sit down for a
4    meal.                            2:00:04
5         It's much less likely that an armed robbery
6    would happen there while at least the customers are
7    there.  It might happen at the end of the night when
8    they're closing up, when there are no customers or
9    maybe just a few employees.                2:00:18
10        But a QSR late night operation is vulnerable
11   to those kinds of issues all the time.  Their
12   operational hours create that situation.      2:00:36
13        And they're trying to solve for adverse
14   events by shutting down the dining room, which makes a
15   lot of sense.  They close the dining room, they only
16   have the one window to make transactions through.      2:00:56
17        And their customers are constantly driving
18   around that -- that establishment.  It's in and out.
19   It's not I'll go in there and sit for an hour and a
20   half with somebody else to have a meal.      2:01:13
21        Q.  Let me ask you at this restaurant in
22   particular on Garfield.  In the four years prior to
23   this shooting in December of 2018, were there any
24   holdups in the drive-through window that you're aware?      2:01:29
25        A.  No.  However, it was mentioned in deposition

00000000-0000-0000-0000-000000000000

Andrew Lee Camphouse 03/15/2022          www.InDemandReporting.com                    (773) 239-6008

Page 90

1  testimony that that was a fear on behalf of the
2  employees.                                    2:01:44
3          But there's nothing on the record that I've
4  seen that indicates that.  Because the employees also
5  testified that they didn't call the police when they
6  had incidents.                                2:02:00
7          They didn't necessarily call the police.
8  Which actually is a -- a violation of their own
9  policies and procedures.  Apparently no one was --
10 management wasn't enforcing the policies and
11 procedures.                                   2:02:18
12         And there's a bit of confusion when you
13 review the materials.  You find their policies and
14 procedures -- on one, it says you can't go out the back
15 door.                                         2:02:30
16         You -- you can't put out the trash after 6
17 p.m.  And then you read another one of their documents
18 -- I think they were calling them hot sheets.  2:02:41
19         You read another one of their documents and
20 they say you can't go out and dump the trash after
21 10:00 p.m.  So which is it?                    2:02:53
22         You -- you want to keep your employees inside
23 at 6 p.m. or do you want to keep them inside at 10
24 p.m.?  So there's some confusion there on -- their
25 -- on behalf of their policies and procedures.  2:03:08

Page 91

1      Q.  Are you opining that the policy and procedure
2  related to taking out the garbage that might be
3  conflicting based on your testimony is a cause or a
4  contributing factor to this particular combat style
5  shooting at that Wendy's location?            2:03:25
6          MR. MULDOON:  Objection --
7          THE WITNESS:  I haven't --
8          MR. MULDOON:  -- to the phrase combat style
9  shooting.                                     2:03:28
10         THE WITNESS:  I haven't opined that.  But it
11 tells me when -- when -- when there's conflict between
12 employees in terms of things like training -- did you
13 get training?  No.                            2:03:44
14         Did you get training?  Yes.  Would -- is it 6
15 p.m. or is it 10 p.m.?  That tells me that management
16 is not doing a good job in managing their security
17 procedures.                                   2:04:03
18 BY MR. SMITH:
19     Q.  Are you -- do you have any experience in
20 management as an expert witness?  Are you making any
21 opinions about management as an expert witness here as
22 far as conflicting policy about taking out the trash?  2:04:18
23     A.  I haven't opined on that in this report.
24     Q.  Do you plan on opining on that?
25     A.  It depends on what other information I can

Page 92

1  get access to.                                2:04:31
2      Q.  Well, we're in federal court now and not
3  state court, so I'm entitled to disclosures ahead of
4  time.  So I'm asking you, are you going to opine in
5  some way that taking out the garbage somehow caused or
6  contributed to this assault -- combat style assault
7  shooting in the parking lot?                   2:04:50
8          MR. MULDOON:  Objection --
9          THE WITNESS:  No.
10         MR. MULDOON:  -- to the phrase combat assault
11 style shooting.                               2:04:54
12         THE WITNESS:  No.
13 BY MR. SMITH:
14     Q.  Okay.  What is your risk -- have we talked
15 all -- all about your risk assessment related to QSRs
16 and bar -- versus bars and nightclubs?        2:05:07
17     A.  I believe so.
18     Q.  Is there anything else?
19     A.  Not that I can think of right at the moment.  2:05:14
20     Q.  I want to talk about parking lots versus
21 indoors.  Your risk assessments in those situations.
22 How do they differ; how are they similar?     2:05:24
23         And let's say for restaurants in particular.
24     A.  For just a restaurant?  Are we talking about
25 a sit-down restaurant, a --                    2:05:35

Page 93

1      Q.  Let's say a --
2      A.  -- white tablecloth restaurant?
3      Q.  Let's say a QSR restaurant.           2:05:39
4      A.  Okay.  So you're asking me what's the
5  difference between --
6      Q.  Your risk assessments for both settings.  2:05:53
7      A.  Okay.  We're talking about a QSR restaurant.
8      Q.  Yes.                                 2:05:59
9      A.  And both settings would be what?  Indoors
10 versus outdoors?
11     Q.  Yes.
12     A.  So if you have a population that wants to sit
13 in their vehicle and eat their meal in the parking lot,
14 that's a whole lot different than mom and her two kids
15 in the middle of the day coming through and buying a
16 couple of Happy Meals.                        2:06:31
17         Because they're -- they're gone quickly.  So
18 when you have people that tend to stay in the parking
19 lot, the difference would be that you want to --
20 especially -- especially in a high risk environment,
21 you want that patrolled by security guards.    2:07:01
22     Q.  Can a security guard -- one security guard,
23 armed, prevent a -- a combat styled what you'd termed
24 in the past -- I'll use criminal predatory attempted
25 homicide attack?                              2:07:33

24  (Pages 90 to 93)
(773) 239-6008

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com

00000000-0000-0000-0000-000000000

Page 94

1      MR. MULDOON: I'll object to the phrase --
2  object to the phrase criminal predatory homicide
3  attempt.
4      THE WITNESS: Again, I go back to it depends
5  on their capability, the offender's capability and --
6  and motivation.              2:07:58
7      And I -- I will say that the presence of an
8  armed security guard patrolling in a parking lot would
9  serve as a deterrent. Criminals want to commit their
10 acts and get away.            2:08:18
11     So when they see an armed security guard,
12 that may keep them from attempting to do what it is
13 that they came to do. Can that guard prevent it? I
14 don't know.                  2:08:39
15     It depends on how well-trained they are and
16 what the circumstances are. Certainly you don't want
17 to have a shoutout at the OK Corral with people sitting
18 in their cars and -- and being put in harm's way.    2:08:57
19     Yet a decision has to be made by that guard
20 as to what to do to stop that attempt once it starts.
21 So the major issue with the guards is deterrents.    2:09:16
22     Wearing a uniform, having a company car there
23 that has security tag on the side of it. Those are the
24 kinds of things that will deter a -- a criminal.    2:09:31
25 BY MR. SMITH:

Page 95

1      Q. Let me ask you this. If you were the
2  security guard, hypothetically speaking, and the
3  criminal -- the military styled combat attack by these
4  criminal predators were to occur in the drive-through,
5  like it did on the video footage that you saw, what
6  would you do to prevent that in that circumstance?    2:09:55
7      MR. MULDOON: Objection to the
8  characterization. Objection to the incomplete
9  hypothetical. Objection to the speculation.    2:10:03
10     THE WITNESS: I would try to get their
11 attention and divert them from their intended target.
12 BY MR. SMITH:
13     Q. So you would ask them to come and shoot you?    2:10:18
14     MR. MULDOON: Objection.
15 BY MR. SMITH:
16     Q. I mean, I'm -- I guess I'm not understanding.
17 You said you would try to get their attention and
18 divert them.                  2:10:24
19     A. Yeah. So you get their attention. Hey, you,
20 drop the gun. Hello? And see what happens.    2:10:34
21     And make sure that potentially you have some
22 cover when you do that so that you don't get yourself
23 killed or injured. Those are decisions that are made
24 -- and this is something people just don't understand.    2:10:47
25     When you get into a confrontation, a lethal

Page 96

1  confrontation, you're making decisions in literally
2  fractions of a second. And that's very difficult for
3  people who've never lived under that kind of stress or
4  operated under that kind of stress to really understand
5  it and -- and do whatever it is that they have to do.    2:11:13
6      So you confront, you try to divert, and maybe
7  they'll run off. Or maybe they'll just start shooting
8  at you. That's part of the job.              2:11:27
9      Q. And if a security guard, hypothetically
10 speaking, was on the west side -- or excuse me -- the
11 east side of the Wendy's at the time that this combat
12 criminal military style attack were to have occurred in
13 the drive-through that you saw in the video footage,
14 would that security guard prevent that attack?    2:11:56
15     MR. MULDOON: Objection --
16 BY MR. SMITH:
17     Q. From happening.
18     MR. MULDOON: Objection to the
19 characterization of the attack.              2:12:00
20     THE WITNESS: Very possibly. In -- in this
21 case, what we have is a disturbance in the parking lot.
22 Prior to the shooting.                  2:12:10
23     A disturbance in the parking lot in the line
24 going to the drive-up window.
25     Q. What was the disturbance?              2:12:20

Page 97

1      A. Cars honking, people yelling and swearing at
2  each other. Sounded -- it sounded to the employee like
3  a confrontation of some sort, a hostile confrontation
4  of some sort that was taking place.              2:12:39
5      So that's an indicator to the guard there's a
6  problem somewhere up in the line here. I'll go check
7  it. So he comes from the east side and works his way
8  around to the drive-up lane.                  2:12:57
9      Now, because it's closed and because people
10 are only in the drive-through, they're not sitting in
11 the parking lot. If they are, the guard should already
12 be talking to them and saying what are you doing here.    2:13:15
13     Either get in line or move along. And the
14 guard doesn't have to -- if -- if this represents the
15 restaurant footprint, the alley is back here, drive-up
16 window is over here, the guard doesn't have to walk up
17 and down here unless he's attracted by something that's
18 going on, like an argument or a confrontation.    2:13:45
19     But the guard is going to be back here more
20 so that he can see this line all the time, and if he
21 hears what's going on, he's going to come up and he can
22 respond much more quickly than if he's standing at the
23 front corner where there's no one.              2:14:03
24     Q. Did you ever get any indication in this case
25 about the honking or incident in the drive-through --

25 (Pages 94 to 97)

00000000-0000-0000-0000-000000000

Andrew Lee Camphouse 03/15/2022          www.InDemandReporting.com                    (773) 239-6008

Page 98

1  was that related to the shooters?          2:14:15
2     A.  Don't know.
3     Q.  How do you not know that?
4     A.  There was no explanation for it.          2:14:20
5     Q.  Were the shooters in the drive-through at any
6  point in time in the video footage you saw?
7     A.  No.  In -- in the testimony, this happened
8  several minutes before the shooting.          2:14:33
9     Q.  And there was no indication at any point in
10 time that there was any physical altercation or
11 fighting happening outside in the drive-through prior
12 to this shooting.  Fair?          2:14:42
13    A.  Yes.  Because they couldn't see it.  They
14 could hear it but couldn't see it.          2:14:50
15    Q.  Is there an indication at some points in time
16 that there is yelling over the intercoms at -- at
17 drive-throughs at restaurants?
18    A.  Not that I recall.          2:14:59
19    Q.  Okay.  If that stopped and there was no
20 indication of a physical altercation or shooting or any
21 issues, is that something that warrants calling the
22 police or a security guard?          2:15:10
23    A.  Calling a security guard, yes.  To check on
24 it and make sure everything was okay.
25    Q.  If it died down and someone felt it was okay,

Page 99

1  there was no screaming, honking, or anything of that
2  nature in the three minutes before this shooting, does
3  that change your opinion in any way?          2:15:31
4     A.  No.
5     Q.  Why?
6     A.  Because they couldn't see what was going on.
7  You don't know what's going to happen as these folks
8  come around.          2:15:43
9        So it's important that those kinds of issues
10 are addressed in the parking lot before they get to the
11 window.
12    Q.  And if there was some issue in the
13 drive-through line beforehand, do you believe a
14 security guard still would've prevented this combat
15 style military attack on the other side of the
16 restaurant, on the east side of the restaurant?          2:16:20
17    A.  Again, I -- I --
18        MR. MULDOON:  Objection.
19        Let me --          2:16:23
20        Objection to the characterization of the
21 attack.
22        THE WITNESS:  I'll -- I'll go back to what I
23 said earlier about the capabilities of that guard.
24 That would make the difference.          2:16:40
25        And the presence of the guard is there to

Page 100

1  deter.  Whether or not that guard could ultimately
2  prevent the situation, I can't say.          2:16:54
3        But his mere presence would at least act as a
4  deterrent.  Whether that deterrent is strong enough or
5  not, I don't know.          2:17:04
6  BY MR. SMITH:
7     Q.  Do you believe that two Chicago police
8  officers or one Chicago police officer could've
9  prevented the incident if they were in the vicinity?          2:17:14
10        MR. MULDOON:  Objection as to relevance.
11 Objection as to speculation.  Objection -- objection as
12 to foundation.          2:17:24
13        THE WITNESS:  I would say it's very possible.
14 BY MR. SMITH:
15    Q.  And is it also possible there could've been a
16 shootout with these two individuals?          2:17:33
17    A.  Yes.
18    Q.  In fact, with the way these individuals were
19 looking to attack this black car, do you expect that
20 they would've followed the car somewhere else and
21 carried out their action?          2:17:46
22        MR. MULDOON:  Objection as to speculation.
23        THE WITNESS:  They could have.  Sure.          2:17:51
24 BY MR. SMITH:
25    Q.  Okay.  Would you expect that given the

Page 101

1  circumstances?
2        MR. MULDOON:  Objection as to speculation.          2:17:56
3        THE WITNESS:  That they would've followed the
4  car out?
5  BY MR. SMITH:
6     Q.  Just like they followed it in?
7        MR. MULDOON:  Objection as to the
8  characterization that they followed the car in.          2:18:07
9        MR. SMITH:  We'll see it on the video.
10        MR. MULDOON:  Well, it's speculation.  And
11 I'll object to the characterization.          2:18:14
12        THE WITNESS:  I really can't say.  I mean, I
13 -- again, I can't put myself in their heads.
14 BY MR. SMITH:
15    Q.  I want -- I want to talk to you about people
16 in a parking lot in a drive-through lane versus perhaps
17 loitering.          2:18:28
18        Did you have any indication from your review
19 of the video footage that on the night of this shooting
20 that there were loiterers -- loiterers in the parking
21 lot or not?          2:18:38
22    A.  No, I don't.
23    Q.  Do you have any opinion as to any loiterers
24 being in the parking lot?
25    A.  Well, earlier, prior to the shooting, there

26 (Pages 98 to 101)
(773) 239-6008

Andrew Lee Camphouse 03/15/2022     www.InDemandReporting.com     (773) 239-6008

## Page 102

1 were a couple of people walking in the parking lot
2 along the line of cars.                    2:18:58
3         And at one point, as I recall, the -- one
4 individual gets out of the back seat of one of the
5 vehicles in line and greets another person walking in
6 the parking lot.                          2:19:15
7         They have a conversation.  Then they both get
8 in the car.  The car advances, as I recall, in the
9 parking lot, and then one person -- the -- the one
10 person who was originally walking in the parking lot
11 gets out of the car and walks away.          2:19:32
12        So what does that represent?  Could be a lot
13 of things.
14    Q.  What's your definition of loitering?    2:19:42
15    A.  Hanging around without a purpose to be there.
16 Very simple.
17    Q.  Okay.  Does that usually involve someone
18 hanging around more than a certain period of time?  2:19:52
19    A.  Yes.  You know, somebody that walks into the
20 parking lot and -- and looks around for a couple of
21 minutes, doesn't contact anyone, and then walks off.  2:20:10
22        That's not loitering.
23    Q.  I seem to understand that, in your opinions,
24 you're offering opinions on deterrence versus
25 prevention.  Is that a fair assessment?      2:20:20

## Page 103

1    A.  Deterrence is prevention.
2    Q.  Okay.  What other terms -- what ways is
3 prevention different from deterrence?        2:20:28
4    A.  Well, you have an active person there that
5 knows how to deal with those kinds of situations.  As
6 opposed to the French fry cook inside the restaurant.  2:20:46
7    Q.  Is there any guaranteed way in this
8 circumstance to have prevented a -- a criminal homicide
9 attack of a military style that occurred in -- In the
10 parking lot on the night that this accident occurred?
11 Or this shooting.                         2:21:06
12        MR. MULDOON:  Objection as to the
13 characterization of the attack.  And also speculation.
14        THE WITNESS:  There are no guarantees.    2:21:14
15 BY MR. SMITH:
16    Q.  Do you have any way of indicating one way or
17 the other to a reasonable degree of certainty as to
18 whether or not anything could prevent a criminal
19 military style attack like occurred on the night in
20 question here?                            2:21:31
21        MR. MULDOON:  Objection as to the
22 characterization of the attack and speculation.
23        THE WITNESS:  The question that I'm trying to
24 answer here is what's reasonable.           2:21:49
25        And a reasonable step in this instance would

## Page 104

1 have been to have an armed security guard there on the
2 overnight shift, patrolling the parking lot and the --
3 well, the parking area and the -- the traffic areas for
4 the cars.                                 2:22:07
5 BY MR. SMITH:
6    Q.  Do you --
7    A.  And --
8    Q.  -- think -- go ahead.  Sorry.          2:22:11
9    A.  Sorry.
10    Q.  No, you can go ahead.
11    A.  I -- I said earlier we can't guarantee
12 perfection.  It's just -- you know, you -- prevention
13 is -- is a goal.                           2:22:25
14        But you can't give perfection.
15    Q.  Okay.  Do you -- are you able within a
16 reasonable degree of certainty to opine that this
17 military style shooting could've been prevent -- or
18 would've been prevented on the night in question?   2:22:58
19        MR. MULDOON:  Objection as to the
20 characterization of the attack.  Speculation.
21        You can answer.                      2:23:06
22        THE WITNESS:  I -- I -- I -- I'm -- I'm not
23 going to tie this as to a -- a military combat style
24 tactical -- I think is another phrase that you've used
25 on this.                                  2:23:20

## Page 105

1         What we see on the video these folks can pick
2 up in a video game.  They can pick it up in -- on a --
3 on a YouTube channel.                      2:23:34
4         They're -- they're not -- most likely,
5 they're not combat trained.
6 BY MR. SMITH:
7    Q.  What term would you use then, sir?      2:23:45
8    A.  An attack.
9    Q.  Okay.  The same question, and substitute the
10 word attack.
11        MR. MULDOON:  Do you under- -- do you
12 remember his original question?            2:23:58
13        THE WITNESS:  No.
14 BY MR. SMITH:
15    Q.  Can you opine to a reasonable degree of
16 certainty as to whether or not this attack that
17 occurred on December 31st, 2018 at this Wendy's would
18 have been prevented?                      2:24:14
19    A.  I can't guarantee that it would've been
20 prevented.  But I can say and opine that there was --
21 there would -- if there would've been a guard there, it
22 would've served as a deterrent to this event.  2:24:34
23    Q.  I'm asking you, though, do you have any way
24 to opine to a reasonable degree of certainty that this
25 event could've been prevented -- or I mean this -- this

27  (Pages 102 to 105)
(773) 239-6008

In Demand Electronic Court Reporting, Inc    www.InDemandReporting.com

00000000-0000-0000-0000-000000000

Andrew Lee Camphouse 03/15/2022        www.InDemandReporting.com                    (773) 239-6008

Page 106

1  shooting attack could've been prevented on the night in
2  question?                                          2:24:49
3        MR. MULDOON: Objection. Asked and answered.
4  It's the exact same question he just answered.      2:24:54
5        THE WITNESS: No. No one can give us that
6  guarantee.
7  BY MR. SMITH:
8     Q. Okay. I want to talk about --               2:25:03
9        MR. MULDOON: You switching gears here?
10 Because --
11       MR. SMITH: You need a --
12       MR. MULDOON: -- if you're done, take --
13       MR. SMITH: -- break?
14       MR. MULDOON: -- a break?                      2:25:07
15       MR. SMITH: Yeah. We can take a break.
16       MR. MULDOON: Which -- yeah, are we going to
17 go til 5?
18       MR. SMITH: Yeah. For sure. Maybe a --        2:25:12
19       THE RECORDER: All right --
20       MR. SMITH: -- little after.
21       THE RECORDER: -- going off record at 3:37
22 p.m.                                                2:25:14
23            (Off the record)
24       THE RECORDER: Back on record at 3:44 p.m.
25 BY MR. SMITH:

Page 107

1     Q. I wanted to talk to you quickly about
2  speculation in your field, Mr. Hauri.              2:25:29
3        What do you consider as speculation expert in
4  the premises liability field? Or I mean premises
5  security field.                                     2:25:36
6     A. I'm not sure I understand. What do I?
7     Q. There's -- there's difference in between a
8  reasoned opinion, right, and -- with bases and con---
9  and reasoning and conclusions in your field versus one
10 that just is kind of guessing or speculating.      2:25:53
11       Is that -- is that a fair assessment?
12    A. Yes.
13    Q. What do you consider is speculation in your
14 field? Or guess -- guessing.                        2:26:02
15    A. It's making a statement or coming to a
16 conclusion without any basis or evidence for that
17 conclusion.
18    Q. Is it also coming to a conclusion without
19 reasoned assessment?                                2:26:31
20       Because you have to reason to that
21 conclusion. Fair?
22    A. Yes.
23    Q. Is it also guessing as to outcomes?          2:26:40
24    A. Speculation?
25    Q. Yes.

Page 108

1     A. Yes.
2     Q. Is it also guessing as to prevention
3  deterrence?                                         2:26:47
4     A. No.
5     Q. Okay.
6     A. No.
7     Q. Why not?                                      2:26:55
8     A. Because you're -- with deterrence, you're
9  using evidence that it has an impact and effect on the
10 outcome.
11    Q. And how do you reason in your field that
12 something is well-reasoned on a deterrence issue?   2:27:27
13    A. How do you reason that?
14    Q. Yeah. How do you get from Point A with your
15 first assessment to Point B with your bases and to
16 Point C, your actual conclusions?                   2:27:41
17       How do you get there? For a deterrence issue
18 in the security field.                              2:27:47
19    A. You look at what's taken place in the past in
20 -- in the issue of deterrence and -- and see what
21 evidence there is that certain actions or even
22 equipment or signage has an impact being deterred from
23 having something happen.                            2:28:21
24    Q. Does a restaurant have a -- a -- a duty to
25 deter something that is not reasonably foreseeable to

Page 109

1  them?
2     A. If it's not reasonably foreseeable, they
3  don't plan or can't plan against it.               2:28:50
4     Q. So does a restaurant have a duty to deter
5  something that they have no reasonable foreseeability
6  of?
7        MR. MULDOON: Are you asking from a legal
8  perspective, or a -- from a security industry
9  practice standard?                                  2:29:07
10       What -- what standard are you asking?
11 BY MR. SMITH:
12    Q. From your standard, sir, from the security
13 industry.                                           2:29:13
14    A. From the security industry, I -- I -- well, I
15 think I mentioned this before. You -- you take the
16 reasonable steps to mitigate what you should know or do
17 know.                                               2:29:35
18       And -- and there's plenty of help to -- to
19 get that done. The -- the security solutions that are
20 put into place, as I've said before, are not going to
21 be perfect necessarily.                             2:30:01
22       But we know that they have an impact on
23 criminal activity, in reducing criminal activity or out
24 and out preventing criminal activity.
25    Q. Does a restaurant have a duty to deter

28 (Pages 106 to 109)
(773) 239-6008

00000000-0000-0000-0000-000000000000

Page 110

1  something that is not reasonably foreseeable to them?
2  Yes --                               2:30:24
3      MR. MULDOON: Objection --
4  BY MR. SMITH:
5      Q.  -- or no?
6      MR. MULDOON: -- asked and answered.
7      THE WITNESS: If they don't know it -- it --
8  reasonable foreseeability is based on what you know
9  and/or what you should know.              2:30:46
10      When you operate in a high rise -- a -- a
11  high risk business, you should know what the risks are.
12  And if you don't know, then you find out what those
13  risks are, and you work to deter the activity, the
14  negative activity that can come out of those risks.  2:31:15
15  BY MR. SMITH:
16      Q.  And what I'm asking you is, based on that
17  definition you've just -- just given me of reasonable
18  foreseeability, does a restaurant have a duty in the
19  law to deter something, a criminal act or some sort of
20  act, that is not reasonably foreseeable under the law
21  to it?                               2:31:34
22      MR. MULDOON: Well, I'm going to object.
23  You're asking a question about what's required under
24  the law. Because before you're asking about security
25  standards and practices.              2:31:42

Page 111

1      And now you're asking about -- is it Illinois
2  law?  Is it federal law?  Is it another state law?  2:31:47
3  BY MR. SMITH:
4      Q.  Illinois law, sir.
5      A.  Well, I'm not an attorney, so I can't speak
6  to the -- the legal issue there.              2:31:56
7      Q.  Are you not allowed to opine on legal
8  conclusions, sir?
9      A.  I've never had anyone tell me that.    2:32:03
10      Q.  Okay. Then can you tell me then?  Can you
11  answer my question?
12      A.  No.                          2:32:08
13      MR. MULDOON: He answered your question.
14      MR. SMITH: No, he didn't.
15      MR. MULDOON: Asked and answered.    2:32:12
16  BY MR. SMITH:
17      Q.  Is a restaurant required under the law to
18  deter -- to -- to do some deterrence as to a criminal
19  activity if they have no reasonable foreseeability
20  under the law of that particular act?        2:32:27
21      MR. MULDOON: Same objections.
22  BY MR. SMITH:
23      Q.  Or event.
24      A.  Can we read back my last answer, please?  2:32:39
25      Q.  Why?

Page 112

1      MR. MULDOON: Let -- let him -- he can ask
2  the next question after he gives it.         2:32:50
3      THE RECORDER: Just tell me if I need to go
4  further back.
5      (Recording replayed)
6      THE RECORDER: Was that it?             2:33:29
7      MR. MULDOON: Is there a question pending?
8      MR. SMITH: Yes, there was.
9      MR. MULDOON: What's the question?        2:33:35
10  BY MR. SMITH:
11      Q.  Does a restaurant have a duty under the law
12  to deter a criminal act or action if that criminal act
13  or action is not reasonable foreseeable under the law
14  to the restaurant?                     2:33:47
15      MR. MULDOON: Objection. Asked and answered
16  again. And incomplete hypothetical.
17      THE WITNESS: Yes.                   2:33:53
18  BY MR. SMITH:
19      Q.  A restaurant has a duty -- okay. That's
20  fine. Okay. Sir, are there any exhibits that you plan
21  on using at trial that were not provided in your file
22  materials or in what you've told me about today?  2:34:15
23      A.  No.
24      Q.  Would you be using the video footage?  Is
25  that likely?

Page 113

1      A.  It's likely.                    2:34:22
2      Q.  Is there anything else you'd be using?  Any
3  schematics, demographics, anything sort of as a -- a --
4  a -- a demonstrative aid?                2:34:30
5      A.  Possibly.
6      Q.  What would you expect to use as -- as a
7  demonstrative aid?
8      MR. MULDOON: Well, he said possibly. He
9  didn't say what he expected.              2:34:42
10      THE WITNESS: Perhaps a diagram of the
11  placement of the facility and the adjoining streets.
12  BY MR. SMITH:
13      Q.  Sort of like a Google map?           2:34:56
14      A.  Yes.
15      Q.  And what would that help you with in your
16  testimony?
17      A.  Well, it would help the trier of fact see the
18  layout.                             2:35:13
19      Q.  And how would that help you explain your
20  testimony to the trier of fact?
21      A.  By walking through what took place.    2:35:26
22      Q.  Okay. I want to show you the video footage.
23  Okay?
24      A.  All right.                       2:35:35
25      MR. MULDOON: Are we going to identify this

Page 114

1   by exhibit number or?
2        MR. SMITH: This is going to be Exhibit No.
3   4. I —                              2:35:40
4        MR. MULDOON: Okay.
5        MR. SMITH: -- will put a place marker in,
6   and it will be the video footage we've used in other
7   depositions.                        2:35:45
8        MR. MULDOON: Okay.
9        MR. SMITH: The short clips.
10       MR. MULDOON: Okay. And is it -- can you
11  just identify the camera? The camera and the time. So
12  --                                  2:35:51
13       MR. SMITH: I can do it --
14       MR. MULDOON: Yeah.
15       MR. SMITH: -- by sides, yeah, and the time,
16  for sure.                           2:35:55
17       MR. MULDOON: All right.
18       MR. SMITH: Because I can do west side, north
19  side, east side --
20       MR. MULDOON: Oh --
21       MR. SMITH: -- you know.              2:35:57
22       MR. MULDOON: -- you don't have it by camera
23  number?
24       MR. SMITH: I don't know if I do or not.
25       MR. MULDOON: Oh. Okay.            2:36:00

Page 115

1        MR. SMITH: Yeah, this is what I've used at
2   all the deps though, so I don't know --
3        MR. MULDOON: Okay.                2:36:03
4        MR. SMITH: All right. Okay.
5   BY MR. SMITH:
6        Q. So I'm going to hand you -- I'm just going to
7   stick my computer in front of you right here.    2:36:17
8        A. Sure.
9        Q. Okay, one second, and I am going to stand
10  next to you. I'll try to be loud.
11       MR. SMITH: Is this all right?        2:36:31
12       THE RECORDER: It'll reach, Brad.
13       MR. SMITH: Okay. It's okay. I'll get that.  2:36:35
14  BY MR. SMITH:
15       Q. All right. I'm going to show you what's been
16  marked -- what's going to be marked with a placeholder
17  as deposition Exhibit 4.               2:36:43
18            It is select images from different sides of
19  the building, and we'll describe them as we go through
20  them. Okay?
21       A. All right.                    2:36:50
22       (Exhibit No. 4 marked for identification.)
23  BY MR. SMITH:
24       Q. Okay. As we're looking at -- what's going on
25  here?                              2:36:58

Page 116

1        This is the —
2        MR. MULDOON: Okay.
3   BY MR. SMITH:
4        Q. -- well, let's start at a different one. I'm
5   sorry.                             2:37:02
6        MR. MULDOON: That's Camera 13.
7   BY MR. SMITH:
8        Q. We're going to do the east side of the
9   building first. Okay?                 2:37:08
10            All right. This is starting at -- this is
11  the east side camera of the building. It's starting at
12  about 3:11:33 on the -- on the timing on the video
13  footage.                           2:37:23
14            Do you see that?
15       A. Yes.
16       Q. Okay. I'm going to ask you if you see a
17  vehicle coming from near the Dan Ryan into the back
18  alleyway here in a bit.                2:37:38
19            And parking behind the dumpsters. You let me
20  know when you see that. Okay?          2:37:45
21       A. All right.
22       Q. Okay. Do you see that car kind of creeping
23  in the back alleyway there?            2:38:06
24       MR. MULDOON: Objection --
25       THE WITNESS: Yes.

Page 117

1        MR. MULDOON: -- to the characterization
2   creeping.
3   BY MR. SMITH:
4        Q. What was your answer, sir?         2:38:10
5        A. Yes.
6        Q. Do you see it parked behind the dumpster for
7   a period of time now?
8        A. Yes.                          2:38:16
9        Q. And that started at about 3:12, maybe roughly
10  29 on the clock? Correct?
11       A. Yes.                          2:38:22
12       Q. It's still sitting there? Yes?
13       A. Yes.
14       Q. Why would they --              2:38:31
15       MR. MULDOON: Can you see it?
16  BY MR. SMITH:
17       Q. -- be sit -- now it's moving across the back
18  lot. Do you see that, at about 3:12:50 on the clock?  2:38:37
19       A. Yes.
20       Q. All right. Was that the vehicle that you
21  believe that you saw that drove across the back parking
22  lot and up the side street and parked on that side
23  street on the west side of Wendy's?    2:38:48
24            Out of sight.
25       A. I -- I would say probably yes. However, if

00000000-0000-0000-0000-000000000000

Andrew Lee Camphouse 03/15/2022          www.InDemandReporting.com                    (773) 239-6008

Page 118

1    we look at the next camera or the next --          2:39:03
2        Q.  The north side?
3        A.  -- view of the north side, we can see if it's
4    the same that I mentioned before.          2:39:13
5        Q.  Okay.  Okay.  We're showing you that north
6    side camera starting at about 3 --          2:39:21
7            MR. MULDOON:  This is the north side?  Does
8    it say north side?
9            MR. SMITH:  It doesn't.  But we see the menu
10   ordering boards --          2:39:25
11           MR. MULDOON: If you could --
12           THE WITNESS:  Okay.  Order --
13   BY MR. SMITH:
14       Q.  -- DT menu board, 3950 roughly it starts,
15   this particular clip.          2:39:32
16           And is that the black car in the
17   drive-through line that was shot up later from your
18   memory of the footage?
19       A.  Yeah, it appears to be similar.  Yes.          2:39:43
20       Q.  Okay.
21           MR. MULDOON:  Are we looking for something?          2:40:02
22           MR. SMITH:  If I fast forward, it may mess it
23   up.
24           MR. MULDOON:  Oh.  Got it.
25           MR. SMITH:  It's only a couple minutes here.          2:40:09

Page 119

1    BY MR. SMITH:
2        Q.  So now the black car's pulling around the
3    drive-through at about 3:10:36, 37.  Yes?
4        A.  Yes.          2:40:15
5        Q.  It's still in sight, but it's -- it's pulling
6    way from the menu board.  Fair?
7        A.  Correct.          2:40:21
8        Q.  Now, keep your eyes peeled for me for that
9    SUV and just let me know when you see it.  Okay?
10       A.  Yes.          2:40:30
11       Q.  Now the black car is totally out of view.
12   Yes?
13       A.  Yes.
14       Q.  At this time on this video footage so far,
15   have you seen anybody fighting, cussing, screaming at
16   anybody that you can see with your eyes?          2:41:56
17       A.  No.
18       Q.  Anybody get out of vehicles to -- to fight or
19   to approach each other or any sort of thing like that?
20       A.  No.          2:42:06
21       Q.  On any of the video surveillance footage that
22   you've reviewed in the past, have you seen that?
23           MR. MULDOON:  Seen what?          2:42:16
24   BY MR. SMITH:
25       Q.  Seen any individuals in the drive-through

Page 120

1    line get out of their cars or screaming at each other.
2    What you could view with your eyes.          2:42:22
3        A.  So the --
4        Q.  SUV?
5        A.  -- SUV just passed through.
6        Q.  And that was 3:12:57?  Yes?          2:42:34
7        A.  Yes.
8        Q.  Okay.  And we're going to switch the east
9    side camera.  Now, that's what I was asking a second
10   ago.          2:42:40
11           Can you answer my other question though, that
12   -- whether or not you've ever seen in the video
13   surveillance footage anybody in the drive-through line
14   appear to be arguing or confronting anybody else at any
15   point in time?          2:42:50
16       A.  No.  But the -- as I recall, the -- one of
17   the -- one of the people that was walking in the
18   parking -- or in -- yeah, in the parking lot had gotten
19   into the back seat with a -- of a car with another
20   individual.          2:43:06
21           I believe he gets out of that car then near
22   the drive-up window.
23       Q.  And I guess that's not what I'm asking.  I'm
24   asking you at any point in time in the video footage,
25   have you ever seen two individuals get in what you

Page 121

1    believe to be a confrontation in the drive-through lane
2    at any point in time on the surveillance footage?          2:43:25
3        A.  No.
4        Q.  Okay.  Sorry.  One second.  Okay.  I'm
5    showing you now the east side camera.  If it pops up
6    here for us.          2:43:40
7            Starting on about 3:11:36 on the clock.  Do
8    you see that?
9        A.  Yes.
10       Q.  And it's the DT lane back, is what it's
11   described at on the footage, yes?          2:43:51
12       A.  Yes.
13       Q.  Okay.  You tell me when you see the SUV
14   cross.  Okay?
15       A.  All right.          2:44:01
16       Q.  Do we now believe that to be an SUV or some
17   crossover type of SUV?
18       A.  Yes.
19       Q.  Do you believe that that's the car that the
20   shooters got out of and -- and came to the Wendy's --          2:44:12
21           MR. MULDOON:  To the --
22   BY MR. SMITH:
23       Q.  -- to shoot?
24           MR. MULDOON:  Objection.  Speculation.
25           THE WITNESS:  I believe that's what the

31 (Pages 118 to 121)
(773) 239-6008

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com

00000000-0000-0000-0000-000000000

Page 122

```
 1   police investigation discussed.          2:44:23
 2   BY MR. SMITH:
 3      Q.  Did you see the SUV?
 4      A.  Yes.
 5      Q.  Is that the one?                   2:45:00
 6      A.  It appears to be the same vehicle.
 7      Q.  And it's about 3 -- coming across at about
 8   3:13 on the clock.  Where does it go?     2:45:08
 9      A.  North on Princeton.
10      Q.  Okay.  And out of the -- out -- you can't see
11   it any longer in the video footage, can you?  2:45:16
12      A.  No.  Cannot.
13      Q.  And as these two individuals approach,
14   describe for me what you're seeing.       2:45:29
15      A.  I see two individuals walking up through the
16   parking lot from Princeton.
17      Q.  At 3:13:40 on the clock?           2:45:48
18      A.  Yes.  Now they're in a trot.  And they're
19   firing on the car.  Now they're running away.  2:45:59
20      Q.  Where are they going?
21      A.  Back to -- the same direction they came from
22   over on Princeton.
23      Q.  And that's at about 3:14:03 on the clock
24   they're gone.  Correct?                   2:46:12
25      A.  Yes.
```

Page 123

```
 1      Q.  So do you believe now that the -- the actual
 2   maneuver by these two individuals of the attack took
 3   less than a minute?
 4      A.  Yes.                               2:46:27
 5      Q.  Do you believe this to be a pre-planned
 6   attack based on your expertise and review of this video
 7   footage?
 8          MR. MULDOON:  Objection.  Speculation.  2:46:34
 9          THE WITNESS:  I can't tell you whether it was
10   pre-planned or not.
11   BY MR. SMITH:
12      Q.  As a -- as an expert in your field and in
13   being a former detective and police officer, do you
14   believe that this attack by these two individuals was
15   carried out for the purposes of killing the people in
16   the black car?  Or the person in the black car?  2:47:03
17      A.  Well, seriously injuring or killing them.
18   Yes.
19      Q.  Do you believe based on your review of the
20   video footage that these two individuals were in that
21   SUV that was in the alleyway on the north side -- north
22   and east side of Wendy's?                 2:47:20
23          MR. MULDOON:  Objection.  Speculation.
24   BY MR. SMITH:
25      Q.  And I'm asking you as a detective and a
```

Page 124

```
 1   police officer.  Do you believe that?     2:47:27
 2          MR. MULDOON:  And same objection.
 3          THE WITNESS:  I haven't seen the -- the --
 4   the -- the police video.  But I think that's definitely
 5   possible.                                 2:47:37
 6   BY MR. SMITH:
 7      Q.  Okay.  And do you believe that they were --
 8   had some intent, based on their positioning in the
 9   alley -- they remained there for a period of time,
10   doing something.  Fair?                   2:47:49
11      A.  Yes.
12      Q.  Do you believe that to be engaging in some
13   sort of stalking behavior of the black car?
14          MR. MULDOON:  Oh.  Objection.  Speculation.  2:47:58
15   BY MR. SMITH:
16      Q.  Based on your experience, training as a
17   detective, what type of a conclusion would you reach in
18   reviewing that type of footage as to that fact?  2:48:07
19          MR. MULDOON:  Same objection.
20   BY MR. SMITH:
21      Q.  And issues.
22      A.  I wouldn't go to a conclusion, because they
23   could've been sitting there loading their guns.  2:48:17
24          So I really don't know what they were doing
25   there.  And there -- and there hasn't been any -- any
```

Page 125

```
 1   evidence of explaining what they were doing there.  2:48:31
 2      Q.  Do you have any reason to doubt that those
 3   two individuals were the shooters or that those -- that
 4   that SUV contained the two individuals that were the
 5   shooters in this -- this circumstance?    2:48:41
 6          MR. MULDOON:  Objection.  Speculation and
 7   asked and answered.  He said it was possible.  2:48:47
 8          THE WITNESS:  Again, it's -- it was possible
 9   that -- that those are the same two people coming out
10   of that car.
11   BY MR. SMITH:
12      Q.  And they had no intent based on -- well, I
13   guess I'll ask it like this.              2:49:06
14          They never stopped in the Wendy's parking lot
15   at any point within the vicinity of the Wendy --
16   Wendy's parking lot.  Fair?               2:49:13
17      A.  They drove through the Wendy's parking lot.
18      Q.  They never stopped in any part of the parking
19   lot on Wendy's property.  Fair?           2:49:21
20          MR. MULDOON:  Objection.
21          THE WITNESS:  I'm trying to think back to the
22   -- the trash containers there.
23   BY MR. SMITH:
24      Q.  That was a common alleyway, though, wasn't
25   it?                                       2:49:35
```

32  (Pages 122 to 125)

00000000-0000-0000-0000-0000000000

Andrew Lee Camphouse 03/15/2022          www.InDemandReporting.com          (773) 239-6008

Page 126

1   A.  Well, the alley -- the alley intersects with
2   a northbound alley.  And it's at that point where that
3   property is Wendy's.  That's their parking lot.      2:49:52
4       So they entered from the alley onto their
5   parking lot, the Wendy's parking lot, and drove through
6   that.
7   Q.  But they stopped on the alleyway to do
8   whatever they were doing for that period of time that
9   they didn't move their vehicle.  Fair?      2:50:08
10  A.  Correct.
11  Q.  And then they -- when they took off, they
12  drove straight across the Wendy's north parking lot
13  onto Princeton and turned north.  Fair?      2:50:15
14  A.  Yes.
15  Q.  Okay.  Have you ever in your -- in your past
16  history as a detective or -- or a -- an expert, have
17  you ever witnessed an attack on a vehicle similar to
18  this one?      2:50:38
19      MR. MULDOON:  Eye -- eyewitness?
20  BY MR. SMITH:
21  Q.  Either -- either you've reviewed something
22  from it or in person saw it.  Any -- any way have you
23  ever seen anything like that?      2:50:49
24  A.  I've not.  I've not witnessed it personally.
25  I -- and I can't -- I can't recall a specific shooting

Page 127

1   case that was similar to this one off the top of my
2   head.  It's --      2:51:13
3   Q.  Did you find the way that these shooters
4   carried out this aggressive attack, of a military
5   style, to be extremely heinous in the way it was
6   carried out?      2:51:27
7       MR. MULDOON:  Objection as to the
8   characterization of the attack and --
9       THE WITNESS:  I would call them highly
10  motivated in their attack.      2:51:40
11  BY MR. SMITH:
12  Q.  Okay.  And would you call it a targeted style
13  attack?
14      MR. MULDOON:  Objection as to --
15  BY MR. SMITH:
16  Q.  Based on --
17      MR. MULDOON:  -- speculation.      2:51:48
18  BY MR. SMITH:
19  Q.  -- your -- your history as a detective and a
20  -- and a police officer, would you call that attack,
21  based on your review of the footage, a -- a targeted
22  attack?      2:51:57
23      MR. MULDOON:  Objection.  Speculation.
24      THE WITNESS:  I'd be guessing.  I -- I'm -- I
25  -- there is -- there is no evidence in the record that

Page 128

1   -- that I've seen that indicates any reason to believe
2   this was a targeted attack on the two individuals in
3   the car.      2:52:17
4   BY MR. SMITH:
5   Q.  Do you believe, based on your experience as a
6   detective, police officer and your review of the
7   footage and your basis and all -- all the reasons that
8   you're an expert in this area or -- or -- or presented
9   as an expert in this area or -- do you believe that, after
10  review of the footage, that this was a targeted attack
11  by these two individuals on the black car?      2:52:37
12      Not the individuals but the black car.
13      MR. MULDOON:  Same objection.
14      THE WITNESS:  Well, they certainly selected
15  the black car to shoot into.  It -- the reason that
16  they did this, the motivation for doing this, we can't
17  say.      2:53:00
18      There's just no information with that at all.
19  For all we know, it could have been a gang initiation.
20  And that car just happened to be the car that they
21  picked in line.      2:53:15
22  BY MR. SMITH:
23  Q.  And that could be a -- but that's still a
24  targeted attack if it is a gang initiation and they
25  picked that car.  Fair?      2:53:22

Page 129

1       MR. MULDOON:  No -- objection.  Speculation.
2       THE WITNESS:  Well, it's --
3   BY MR. SMITH:
4   Q.  I mean, that's --
5   A.  -- it --
6   Q.  -- fair and logical, right?      2:53:26
7   A.  But then -- then it would --
8       MR. MULDOON:  Same objection.
9       THE WITNESS:  Then it would fall into a crime
10  of opportunity.  They could've picked a white car.  Or
11  the black car.      2:53:41
12  BY MR. SMITH:
13  Q.  But that's still a targeted attack.  When
14  they make that selection --
15  A.  Well --
16  Q.  -- whether it be white or black, the car
17  color, they are targeting a particular car.      2:53:51
18      MR. MULDOON:  Well --
19  BY MR. SMITH:
20  Q.  Fair?
21      MR. MULDOON:  -- objection to the term
22  targeted attack.  I mean --
23      THE WITNESS:  I -- I'm -- I'm trying to
24  answer your question, but I'm wrestling with -- with
25  your use of the word targeted attack.      2:54:02

33 (Pages 126 to 129)

Page 130

1       In my mind, a targeted attack is I'm after
2   you and I'm going to shoot up your car.  Versus a crime
3   of opportunity, where, for whatever reason, they
4   decided to shoot into a car and it happened to be the
5   black car.                          2:54:25
6   BY MR. SMITH:
7       Q.  Based on your experience as a detective and a
8   police officer, would you deem it to be premeditated?
9       MR. MULDOON:  Deem what to be premeditated?   2:54:35
10  BY MR. SMITH:
11      Q.  This shooting --
12      A.  A --
13      Q.  -- this -- this attempted homicide by these
14  two individuals, these two African-American
15  individuals.                        2:54:40
16      MR. MULDOON:  Well, again, it's speculation.
17      THE WITNESS:  I -- you -- as -- as one of
18  many possibilities, sure.  But there's no way to tell
19  at this point.                      2:54:50
20      We don't have any information that -- that
21  explains how that selection process was made.
22  BY MR. SMITH:
23      Q.  Yet it was made.  Correct?     2:55:01
24      A.  Yes.
25      Q.  And it was selected.  Fair?

Page 131

1       A.  They selected the black car.   2:55:08
2       Q.  Had you ever seen in the past years at the
3   particular restaurant on Garfield an attack similar to
4   this attack based on your research in this case?   2:55:25
5       A.  I didn't do any research looking for that
6   kind of shooting incident.
7       Q.  Did you find anything in your research that
8   happened at this restaurant that was similar to this
9   attack in the drive-through?         2:55:47
10      A.  No.
11      Q.  Okay.  I want you to get back out for me
12  Exhibit 1 if you can, sir.           2:56:00
13      MR. MULDOON:  I'm sorry.  What, what?
14      MR. SMITH:  Exhibit 1.
15  BY MR. SMITH:
16      Q.  I think it's over there --      2:56:05
17      A.  Exhibit 1.
18      Q.  -- Ron.  Okay.  I want you to turn to me, if
19  you can, page 9 of that, where your report starts.   2:56:21
20      Before we get into that report, I -- I do
21  have two questions for you.  Did you do any
22  calculations of criminal statistics at that restaurant
23  in your research and analysis of this case?   2:56:57
24      A.  Calculations regarding?
25      Q.  Criminal statistics at that location.  Did

Page 132

1   you do any calculation to try to come up with some
2   percentage or -- of types of crimes or issues or -- or
3   anything?                           2:57:16
4       A.  Well, I looked at the -- the OEMC report of
5   -- of the called-for service.  And I believe there were
6   29 --                               2:57:31
7       Q.  I'm just asking you, sir -- we -- you already
8   told me about the OEMC stuff.  Did you do any
9   calculations of criminal statistics --   2:57:37
10      MR. MULDOON:  Like --
11  BY MR. SMITH:
12      Q.  -- for that --
13      MR. MULDOON:  -- mathematical calculation?
14  BY MR. SMITH:
15      Q.  Yeah, anything --              2:57:40
16      A.  No.
17      Q.  -- for that location.
18      A.  No.
19      Q.  Did you do any analysis of anything other
20  than the OEMC report for that location?  As far as
21  looking at the criminal statistics.     2:57:49
22      A.  No.
23      Q.  Okay.  I want you to talk about your report.  And
24  you have that in front of you.  That's Exhibit 1.  Page
25  9 I believe it starts on.            2:58:01

Page 133

1       And I'm going to page 10, and I see that
2   you've expressed an opinion on page 10, that your
3   report is held to a reasonable degree of professional
4   certainty.                          2:58:22
5       What does that mean to you?  That term.
6       A.  Based on my experience and education, in
7   reviewing the materials, I came to these conclusions
8   and opinions.                       2:58:46
9       Q.  What kind of treatises do you deem to be used
10  by experts in your field that are just top of the line?
11      A.  Protection of assets and the standards that
12  are promulgated by ASIS International.   2:59:03
13      Q.  Is that something that experts in your field
14  reasonably rely on in forming opinions, conclusions?
15      A.  Yes.
16      Q.  Is there anything else?  Any other ones that
17  you deem to be important treatises in your field?   2:59:16
18      A.  Well, there's the NFPA.
19      Q.  What does that mean?
20      A.  National Fire Protection Association.   2:59:29
21      Q.  Anything else?
22      A.  The accident prevention treatise.
23      Q.  Anything else?                 2:59:40
24      A.  Bear with me a moment here.  I'm --
25      Q.  Sure.

00000000-0000-0000-0000-000000000000

Andrew Lee Camphouse 03/15/2022     www.InDemandReporting.com                    (773) 239-6008

Page 134

```
 1        A.  -- cataloguing.  Well, there are any number
 2   of textbooks that discuss security practices and
 3   principles.                           3:00:15
 4        Q.  Which ones do you use in your daily practice?
 5   Just the ones you've discussed with me?
 6        A.  Yeah, the ones I've discussed and -- and
 7   mentioned.  And --
 8        Q.  Okay.                        3:00:27
 9        A.  -- sometimes I look at a specific textbook or
10   publication that narrowly discusses specific practices
11   or standards.  But on a very narrow basis as opposed to
12   a broad standard, if you will.          3:00:58
13        Q.  I -- I'm just asking the treatises you use
14   day to day in your -- in your expertise to form
15   opinions, conclusions, and I've heard about certain
16   ones by name.                        3:01:09
17        Are there any other ones that you use?
18        A.  There are, but I -- I -- I can't tell you how
19   -- how much I use them or which ones I've used
20   recently.                            3:01:22
21        These -- the ones that I've mentioned are the
22   ones that I use most frequently.
23        Q.  And are they ones that other experts in your
24   field of expertise reasonably rely on in forming their
25   opinions, conclusions?                3:01:34
```

Page 135

```
 1        A.  Yes.
 2        Q.  Okay.  I see here you -- on page 10 going to
 3   11, you name all the items that you looked at in
 4   reviewing your opinions.              3:01:47
 5        I believe that matches the other part.  But
 6   in -- in reviewing those things, is there anything else
 7   that you missed that you reviewed?    3:01:55
 8        A.  Not that I can think of.
 9        Q.  Okay.  And I see your Introduction starts on
10   page 11.  And you talk about a description of the
11   shooting and other matters.           3:02:13
12        Is there anything you'd like to change in --
13   on -- on page 11 of this PDF?  Or I mean of this
14   document you're looking at, Exhibit 1.  3:02:24
15        MR. MULDOON:  What page of the report is it
16   that we're talking about?
17        MR. SMITH:  This would be page --
18        MR. MULDOON:  It's on the bottom.     3:02:28
19        MR. SMITH:  Yeah.  3 of 7.
20        MR. MULDOON:  Okay.  Thank you.      3:02:33
21        THE WITNESS:  No.  Not at this point.
22   BY MR. SMITH:
23        Q.  Okay.
24        A.  I don't -- I don't see anything that needs to
25   be changed.                          3:02:44
```

Page 136

```
 1        Q.  Okay.  On page 4 of 7, you state an opinion
 2   there.  You state that the criminal activity that
 3   resulted -- and I'm paraphrasing          3:02:59
 4        Tell me if I'm wrong.  (As read):  The
 5   criminal activity that resulted in the Plaintiff's
 6   injuries was reasonably foreseeable to Wendy's, that
 7   Wendy's failed to use reasonable care and follow the
 8   applicable standards and established security practices
 9   to prevent the criminal activity that resulted in
10   Plaintiff's injuries, that the burden to use reasonable
11   care and follow the applicable security standards and
12   established practices to prevent the criminal activity
13   would've been minimal for Wendy's, and that Wendy's
14   failure to use reasonable care and follow the
15   applicable security standards and established practices
16   and was a proximate cause of the injuries suffered by
17   Plaintiff.                            3:03:34
18        Did I read that correctly?
19        A.  Yes.
20        Q.  Are those your opinions in this case?      3:03:40
21        A.  Yes.
22        Q.  As far as -- working out way down here, I
23   think you get into more detail, but the basis for the
24   opinion that the criminal activity was reasonably
25   foreseeable to Wendy's.               3:03:54
```

Page 137

```
 1        And you use the term reasonably foreseeable
 2   there.  And you use that as a legal term or are you
 3   using that term from a security perspective?    3:04:03
 4        A.  Both, actually.  I think that the reasonable
 5   foreseeability is -- is demonstrated here by what
 6   Wendy's was doing in terms of security and security
 7   mitigation.                          3:04:29
 8        Q.  Okay.  And what do you base that opinion on?
 9        A.  The depositions.  Primarily Rocco Prate.   3:04:44
10        Q.  Okay.  Is there anything else?
11        A.  Well, in -- in some of the other deposition
12   material, talking about their procedures and the -- the
13   event as it took place.              3:05:07
14        Q.  Okay.  Anything else?
15        MR. MULDOON:  What's -- what's the original
16   question?                            3:05:25
17        MR. SMITH:  I'm --
18        THE WITNESS:  No.
19        MR. SMITH:  -- just asking him if -- what his
20   basis are.
21        MR. MULDOON:  Other than what's listed?     3:05:28
22   BY MR. SMITH:
23        Q.  Yeah, is there any other basis that you have
24   for the opinion of --
25        MR. MULDOON:  Other than --
```

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com
                                                          (773) 239-6008

00000000-0000-0000-0000-000000000000

Andrew Lee Camphouse 03/15/2022          www.InDemandReporting.com                    (773) 239-6008

Page 138

```
1   BY MR. SMITH:
2      Q. -- reasonable --                    3:05:31
3         MR. MULDOON: -- what's listed on the report.
4   BY MR. SMITH:
5      Q. Other than reasonably foreseeable, do you
6   have any other basis to support that opinion?   3:05:37
7         MR. MULDOON: Other than what's listed in
8   here.
9   BY MR. SMITH:
10     Q. Other than what's listed.            3:05:40
11        MR. MULDOON: Okay.
12        THE WITNESS: No.
13  BY MR. SMITH:
14     Q. And anywhere there -- and then your next
15  opinion's about reasonable care and -- and Wendy's
16  failed to use reasonable care to follow applicable
17  security standards and established practices to protect
18  Plaintiff and other customers from the reasonable
19  foreseeable -- foreseeable criminal activity.   3:06:10
20        And then you go on to say include (as
21  read): Wendy's failed to have a security survey
22  conducted by a competent professional to assess it
23  security needs.                          3:06:19
24        And all the things you say in there. You
25  know, what are your basis for forming those opinions?
```

Page 139

```
1   Other than what's listed in this document.   3:06:27
2      A. I think that's -- that's complete.
3      Q. Why do you deem this attempted homicide
4   attack as a reasonably foreseeable?          3:06:43
5         MR. MULDOON: Going back to --
6         THE WITNESS: Because of the nature of the
7   environment. You have a high risk environment for --
8   for this facility to operate in.            3:07:03
9   BY MR. SMITH:
10     Q. Well --
11        MR. MULDOON: Are you -- are you -- are you
12  asking other than what's in the report?      3:07:10
13        MR. SMITH: No, I'm -- I'm asking him
14  specifically what his thoughts are on reasonable
15  foreseeability and why he's deemed that it's reasonably
16  foreseeable that this attack would've happened in the
17  parking lot.                             3:07:18
18        MR. MULDOON: All right. Do you want him to
19  read his report to you?
20        MR. SMITH: No. I'm asking him right now.
21  We're just talking.                      3:07:22
22        MR. MULDOON: Well, you're not just talking.
23  You're asking him questions about his bases that are
24  listed on the report, Brad.               3:07:26
25        Do you want him to read them to you?
```

Page 140

```
1         MR. SMITH: No.
2         MR. MULDOON: Or do you want to ask him if
3   there's --                               3:07:30
4         MR. SMITH: No, I --
5         MR. MULDOON: -- any others?
6         MR. SMITH: -- just want -- I want to direct
7   my deposition and ask my questions. That's --   3:07:33
8         MR. MULDOON: Okay.
9         MR. SMITH: -- what I want to do.
10        MR. MULDOON: Do you understand the question?
11  He's asking you what the bases are for your opinions,
12  which are listed on pages 4 and 5 of -- of your report.   3:07:42
13        THE WITNESS: Right.
14        MR. SMITH: Yeah.
15        MR. MULDOON: So I don't know if he wants you
16  to read them, read --
17        THE WITNESS: I --                   3:07:45
18        MR. MULDOON: -- that into the record or
19  what.
20  BY MR. SMITH:
21     Q. No, I'm asking you, why do you conclude that
22  it's reasonably foreseeable that this criminal homicide
23  attack -- why is that reasonably foreseeable?   3:08:00
24     A. Well, again, they're operating in a high risk
25  environment and they know it. Wendy's vis-à-vis Rocco
```

Page 141

```
1   Prate knew that they were in a high risk environment.   3:08:19
2         And he had discussions with management about
3   the environment. And the -- the risks. They installed
4   --                                       3:08:34
5      Q. Well, let's -- hang on just one second.
6   Let's boil that down a little bit.          3:08:39
7         When you say a high risk environment, are you
8   basing that off of the reports from the OEMC or the CPD
9   about the neighborhood?                   3:08:51
10        What are you -- what are you basing that off
11  of?
12     A. Well, part of what I'm using is the OEMC
13  information. But they went to CAP Index and asked for
14  a report and used that as their assessment tool.   3:09:14
15        CAP Index as well as Wendy's rated this
16  location --
17     Q. No.
18     A. -- as a number 3 in terms of risk.      3:09:29
19     Q. No, no. I think you're getting that wrong.
20  CAP Index rated the neighborhood as a number 3 --
21        MR. MULDOON: Whoa --                3:09:33
22  BY MR. SMITH:
23     Q. -- risk.
24        MR. MULDOON: -- whoa. Let him finish his
25  answer, and then you can argue with him.      3:09:36
```

00000000-0000-0000-0000-0000000000

Page 142

1   BY MR. SMITH:
2       Q. Go ahead.
3       A. Well, according to the documents that I
4   reviewed, the CAP Index report, which was completely
5   incomplete, showed boxes where they rated the risk
6   profile as a 3.                        3:10:04
7           At one point in that document, it -- it says
8   that -- or they -- they characterize it as 1 to 3, and
9   then in another box in that document, 3 to 6.      3:10:16
10          And -- and those are their mileage indicators
11  --
12      Q. No, no --
13      A. -- from the center.              3:10:21
14      Q. Let me ask you this, though. Is that CAP
15  Index score for a certain geographic location of the
16  neighborhood or is that specific to that Garfield
17  location based on your knowledge of these CAP Index
18  scores?                                3:10:32
19      A. It's based on the address and then radiuses
20  of 1 to 3 miles out from that address and then 3 to 6
21  miles out from that address. And they characterize
22  those as the highest risk, a number 3.         3:10:49
23          Rocco Prate testified that they -- they
24  classified it as a number 3.
25      Q. Okay.

Page 143

1       A. So you have a high risk environment.     3:11:00
2       Q. And you understand that that's not just --
3   I'm not -- I'm -- what I'm trying to get at here is,
4   that a 1- to 3-mile radius CAP score. Correct?   3:11:08
5       A. Yes.
6       Q. So any activity that might go into that CAP
7   score does not necessarily have to occur on the
8   Garfield Wendy's location. Fair?               3:11:18
9       A. Correct.
10      Q. It could be 3 miles down the street in
11  Chicago. Right?
12      A. That's right.                    3:11:24
13      Q. And any 3 miles you go on the South Side in
14  Chicago, particularly if you get into certain
15  neighborhoods, can have high degrees of robbery, gang
16  activity, that sort of thing. Right?           3:11:37
17      A. Absolutely.
18      Q. Now, on this particular location, you've
19  never -- you testified earlier you never saw or heard
20  of a similar type of execution style shooting in the
21  drive-through or parking lot area of the Wendy's.  3:11:52
22          MR. MULDOON: Objection --
23  BY MR. SMITH:
24      Q. Correct?
25          MR. MULDOON: -- to the characterization.  3:11:55

Page 144

1           THE WITNESS: Yes.
2   BY MR. SMITH:
3       Q. Okay. And so you based the reasonable
4   foreseeability on the CAP score, the OEMC, and some
5   other stuff.                           3:12:01
6           I'm -- in fairness, what's in your report --
7   I'm not -- I'm not stepping around that. But you --
8   you -- it sounds like you're saying that CAP Index
9   report's pretty important to you.              3:12:10
10      A. It is important, because they're using it as
11  their -- and characterizing it as their assessment
12  tool. And quite frankly, the -- the -- the heart of
13  the CAP Index report was not -- was not provided here.  3:12:36
14          The CAP Index report -- and I've used these
15  over the years frequently. CAP Index reports give you
16  a map, and it's -- and it's very nice.          3:12:51
17          It comes in beautiful colors. And it starts
18  at the -- the -- the zero point and then moves out.  3:13:00
19          So everything that goes on in the area that's
20  covered, not just that specific location, if -- if
21  crime is taking place in the area that they're
22  covering, that has an impact on your location that
23  you're talking about.                      3:13:20
24          Those -- those folks, if they commit a crime
25  a mile or two or three away -- it's likely that they

Page 145

1   might commit the crime at the location, at the specific
2   location.                              3:13:36
3       Q. And where do you come up with that
4   conclusion? How do you base that conclusion?
5       A. On my training, experience, and education.  3:13:45
6       Q. Okay. And how do you reason that somebody
7   that commits a crime 3 miles down the road would likely
8   commit a crime at that Wendy's location?        3:13:54
9       A. Because I've seen it happen in my experience.
10      Q. Okay. Has it happened every time in your
11  experience, that that type of issue happens, that
12  automatically these criminals go down the street and
13  then they rob the Wendy's too or something happens at
14  the Wendy's that happens 3 miles?              3:14:11
15      A. And -- and the question was, have I seen
16  that?
17      Q. Yeah.
18      A. Yes.                           3:14:18
19      Q. And let me ask you this. In the Chicago --
20  in the South Side neighborhood, when you go 3 miles,
21  you're pretty far away from something on -- in the
22  South Side. Fair?                        3:14:25
23      A. Yes.
24      Q. It's not like a country road or something.
25  Right? It's a city block. And you go 3 miles, you're

00000000-0000-0000-0000-0000000000

### Page 146

```
1    pretty far distance from that location that you're at.    3:14:33
2        A.   If you look at the -- if you look at the CAP
3    Index report, if you -- number one, if you know what --
4    what the CAP Index report is based on, and you look at
5    the index report and -- and their mapping shows 90
6    percent of the area in red, not pink but red, not green
7    but red, those neighborhoods adjoin one another.    3:15:01
8        There's -- you mentioned it -- gang activity,
9    for instance.  There's a lot of crime that goes on in
10   those kinds of high risk environments.    3:15:16
11       Q.   Did you --
12       A.   That's --
13       Q.   Did you look at this particular CAP Index
14   score in these red zones that you're talking about in
15   this case?    3:15:21
16       MR. MULDOON:  Well, I'll just state for the
17   record it wasn't turned over.
18       MR. SMITH:  No, I'm asking him.  He did it,
19   so he can get it from his police training, experience
20   --    3:15:28
21       MR. MULDOON:  Or -- or --
22       MR. SMITH:  -- he can get it --
23       MR. MULDOON:  -- or it could be turned over
24   in the course of discovery.    3:15:31
25       MR. SMITH:  Well, we turned over what we had.
```

### Page 147

```
1        MR. MULDOON:  Well --
2        MR. SMITH:  So.
3        MR. MULDOON:  -- maybe -- well, I'm -- that's
4    -- that's very doubtful, Brad, and you know it.    3:15:36
5        I'm not blaming you.  I'm blaming your
6    client.
7        MR. SMITH:  Well --
8        MR. MULDOON:  They --
9        MR. SMITH:  -- that's not true.    3:15:38
10       MR. MULDOON:  -- got the whole index, but
11   they didn't give it --
12       MR. SMITH:  This is --
13       MR. MULDOON:  -- to you.
14       MR. SMITH:  -- my dep.  Please stop.    3:15:41
15       MR. MULDOON:  Well, I'm just saying.
16       THE WITNESS:  I'm -- I'm sorry.
17   BY MR. SMITH:
18       Q.   Did you look --    3:15:45
19       THE WITNESS:  The question was?
20       Q.   Did you look at any sort of CAP Index map of
21   the area in this case?
22       A.   No.    3:15:51
23       Q.   You also indicate that the -- that the burden
24   to protect Plaintiff from reasonable foreseeable
25   criminal activity in this case was minimal.    3:16:14
```

### Page 148

```
1        And you include some things that you could do
2    that --
3        A.   Which -- which page are we on --    3:16:16
4        Q.   We are --
5        A.   -- please?
6        Q.   -- on page 6 of 7 of your report.  Do you see
7    that?  It's --
8        A.   Okay.  Yes.    3:16:44
9        Q.   Okay.  And is there anything else that --
10   besides what you've listed there that you would support
11   that opinion or base that opinion on?    3:16:52
12       A.   Well, the -- the armed guard service that was
13   stopped at 10:30 -- had they expanded it to take care
14   of the overnight shift until 4 a.m., represented five
15   and a half hours of additional coverage.    3:17:26
16       MR. MULDOON:  No, he's asking if there's
17   anything else other than what's in the report.
18       THE WITNESS:  Other than.  No.    3:17:38
19   BY MR. SMITH:
20       Q.   Okay.  And your last opinion there on that
21   same page.  It says (as read):  The bases for the
22   opinion that Wendy's failure to use reasonable care and
23   follow the applicable security industry standards and
24   established security practices was a proximate cause of
25   Plaintiff's injuries include.    3:18:04
```

### Page 149

```
1        And then you go on to say some things.  Is
2    there anything else that you base that opinion in other
3    than what's listed in this document?    3:18:10
4        A.   No.
5        Q.   You believe that this attack or what you deem
6    as Wendy's reasonable foresee -- that you -- you deem
7    this as a reasonable foreseeable criminal attack.
8    Fair?    3:18:56
9        A.   Yes.
10       Q.   A reasonable foreseeable military style
11   combat style attack.  Fair?    3:19:03
12       MR. MULDOON:  Objection to --
13       THE WITNESS:  No.
14       MR. MULDOON:  -- to the characterization.
15       Go ahead.    3:19:06
16       THE WITNESS:  No.  I -- I -- I -- there's no
17   reason for me to think that that was a military style
18   attack.    3:19:15
19   BY MR. SMITH:
20       Q.   You believe -- were -- were the individuals
21   shooting the gun in a -- in a shooting stance?  In the
22   video.
23       A.   Well, sort of.    3:19:26
24       Q.   Did they have one leg behind the other in a
25   shooting stance?  Is that how you're trained to shoot a
```

38  (Pages 146 to 149)

00000000-0000-0000-0000-000000000

Andrew Lee Camphouse 03/15/2022          www.InDemandReporting.com          (773) 239-6008

Page 150

1   handgun?                                    3:19:33
2       A.  Most of the time.  Yes.
3       Q.  Okay.  Did they appear to be aiming where
4   they were shooting?                         3:19:42
5       A.  Yes.
6       Q.  Okay.  Do you believe them -- that -- that
7   this was a reasonably foreseeable criminal predatory
8   attack?                                     3:19:53
9           MR. MULDOON:  Objection as to the term
10  predatory.
11          But if you know what he's referring to, go
12  ahead.                                      3:20:00
13          THE WITNESS:  Well, as -- as predators, as
14  criminal predators, yeah, I -- it could be viewed as --
15  as that.  Whether or not it was a crime of opportunity
16  is what hasn't been determined.             3:20:19
17  BY MR. SMITH:
18      Q.  Do you believe this to be an attack, a
19  criminal attack, that was carried out in -- in -- in a
20  rapid nature?
21      A.  It was short.  It was quick.         3:20:34
22      Q.  Was it quickly carried out?
23          MR. MULDOON:  Well --
24          THE WITNESS:  Yes.
25          MR. MULDOON:  -- he just said that.   3:20:39

Page 151

1   BY MR. SMITH:
2       Q.  I'm sorry.  What was your answer, sir?
3       A.  Yes.
4       Q.  Was it something that happened -- I'm going
5   to strike that.                             3:20:56
6           Do you believe that the shooters caused these
7   bullets to enter the victims' bodies?
8       A.  Yes.                                 3:21:27
9       Q.  Excuse -- can you say that again, sir?
10      A.  Yes.  They were shot.                3:21:30
11      Q.  Do you believe the shooters proximally caused
12  these bullets to enter the individuals' bodies?
13      A.  Yes.                                 3:21:42
14      Q.  Okay.  Do you know how many times each
15  individual was shot?
16      A.  I believe there was a reference in the police
17  report that there were 16 shell casings recovered.   3:22:08
18      Q.  And so you take that to be at least they were
19  shot at 16 times.
20      A.  Their firearms discharged 16 times.   3:22:20
21      Q.  Okay.  Do you -- you described the applicable
22  standards and established security practices to prevent
23  the criminal activity.                       3:22:43
24          What are those applicable --
25      A.  Wait --

Page 152

1       Q.  -- standards --
2       A.  -- wait --
3       Q.  -- and --
4       A.  -- a second.  Where --               3:22:45
5           MR. MULDOON:  Yeah --
6           THE WITNESS:  -- are you?
7           MR. MULDOON:  -- you're jumping around.
8   Where are you --
9   BY MR. SMITH:
10      Q.  I'm sorry.  This is on the last page where
11  your signature line is.                      3:22:49
12      A.  Okay.
13      Q.  You described there that (as read):  Wendy's
14  failed to use reasonable care, follow the applicable
15  standards and established security practices to prevent
16  the criminal activity that resulted in Plaintiff's
17  injuries.                                    3:23:03
18          What are the applicable standards and
19  established security practices that you're talking
20  about?
21      A.  Conducting a -- a -- a -- a proper risk
22  assessment and then taking actions to mitigate your
23  findings.                                    3:23:30
24      Q.  And to do that, you would deem, from a legal
25  perspective, that this criminal attack, this military

Page 153

1   style criminal attack, was reasonable foreseeable.   3:23:48
2           MR. MULDOON:  Well, I'm going to object.  He
3   already testified he didn't think it was a military
4   style attack.  And I'm --                    3:23:51
5           MR. SMITH:  Okay.
6           MR. MULDOON:  -- going to object to that
7   characterization.
8   BY MR. SMITH:
9       Q.  Go ahead, sir.                       3:23:55
10      A.  Well, again, there's no reason to believe
11  that -- that this was a military style attack.  And
12  there's plenty of evidence that the security program
13  did not follow the standards and practices to prevent
14  or deter something like this.                3:24:34
15      Q.  Let me ask you again.  This particular
16  attack.  Do you believe it to be a -- a -- under the
17  legal definition a reasonably foreseeable criminal
18  attack?                                      3:24:51
19      A.  Yes.
20      Q.  And you base that on the CAP score for the
21  area.
22      A.  The CAP score.                       3:25:01
23      Q.  All the things discussed in your report.
24      A.  All the things in my report.  Yes.    3:25:05
25      Q.  Okay.  And you cannot base that on any prior

39 (Pages 150 to 153)

00000000-0000-0000-0000-000000000

Andrew Lee Camphouse 03/15/2022       www.InDemandReporting.com       (773) 239-6008

Page 154

```
1    similar styled shootings at that Wendy's. Fair?      3:25:13
2        A. There were no reported shootings at that
3    Wendy's to the police department.
4        Q. Okay. And so you have no basis to say --
5    that's not one of your bases here. Correct?          3:25:28
6        A. Correct.
7        Q. Are there any laws in that area that require
8    the Wendy's to provide the measures that you're
9    recommending here?                                   3:25:43
10       A. Not that I'm aware of.
11       Q. Okay. Other than what's stated in Exhibit 1
12   here, your report that's contained in Exhibit 1, do you
13   have any other opinions, conclusions outside of those
14   that are stated in that report?                      3:25:59
15       A. No.
16       Q. Have we --
17           MR. MULDOON: Wait, wait, wait.
18           Could you read that question and answer back,
19   please? I'm sorry.                                   3:26:05
20           (Recording replayed)
21           MR. MULDOON: Well, I'll object. He's given
22   many opinions and conclusions during the course of his
23   deposition.                                          3:26:29
24           MR. SMITH: Okay. That's fair.
25   BY MR. SMITH:
```

Page 155

```
1        Q. Outside of your report that's contained in
2    Exhibit 1 and the testimony you've given today, are
3    there any other opinions or conclusions that you have
4    -- we have not talked about or saw in your report?   3:26:44
5        A. Not that I can think of at the time -- at
6    this time. No.
7        Q. Okay. Have we discussed all your bases today
8    and in your report?                                  3:26:59
9        A. Yes. I believe so.
10       Q. And just, if you can for me, describe how in
11   your bases as to this -- when you get to opining that
12   this is a reasonable -- reasonably foreseeable criminal
13   act, describe for me how you get from your bases in
14   your report, ones you've described today to that
15   conclusion opinion.                                  3:27:27
16           How do you reason that out as an expert?
17       A. By reviewing the materials and the -- the --
18   the evidence, the depositions, and -- and just
19   generally the materials that I was provided to read.  3:27:49
20           That's how I got to those opinions.
21       Q. But how do you get from Point A to Point B?
22   Did you reason those in any way, saying this is --
23   these are factors I look at?                         3:28:00
24           This is how I reasoned to this conclusion?
25   Did you do that with any of your opinions? Or did you
```

Page 156

```
1    just say I'm looking at these transcripts and this
2    stuff and I'm just coming to conclusions?            3:28:10
3        A. Well, I -- when I think through -- when I
4    read and -- and look at the evidence, the -- that's
5    reasoning. When -- when Wendy's is informed that
6    they're operating and they know they're operating in a
7    high risk environment and they don't take reasonable
8    steps to mitigate those risks, that's much like two
9    plus two equals four.                                3:29:02
10           And -- and -- and that's -- that's the
11   reasoning that goes into it. There's just a lot of
12   information here in terms of the bases and the
13   activities by Wendy's in regard to their security
14   program that don't add up when you look at the
15   standards and the established practices.             3:29:32
16       Q. Do you believe -- do you base the fact that
17   you're concluding that it's a high risk environment on
18   the CAP Index score solely?                          3:29:43
19           Or what do you base that on?
20       A. No. No.
21       Q. Tell me.
22       A. The CAP -- the CAP Index score -- I -- I'm
23   basing it on the fact that they used the CAP Index
24   store -- score as their assessment tool, which falls
25   far short of a -- of an assessment.                  3:30:04
```

Page 157

```
1            It's -- it's just not an assessment. It's a
2    part of an assessment. And -- and it puts them on
3    notice that they're operating in a high risk
4    environment.                                         3:30:16
5        Q. Within 3 to 4 miles. Fair?
6        A. With?
7        Q. Within --
8        A. I'm --
9        Q. -- 3- to 4-mile --                            3:30:20
10       A. No --
11       Q. -- radius.
12       A. -- within 1 --
13       Q. Fair?
14       A. -- to -- within 1 to 6 miles.                 3:30:24
15       Q. Within 1- to 6-mile radius. Fair?
16       A. Yes. Yes.                                     3:30:28
17       Q. Okay. What else do you base on that it's a
18   high risk environment?
19           MR. MULDOON: Other than what's in the
20   report?                                              3:30:34
21   BY MR. SMITH:
22       Q. Other than what's in the report.
23       A. I think what's in the report is -- is the
24   rest of it. I can't think of anything else right now
25   to -- that -- that's missing.                        3:30:47
```

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com       (773) 239-6008

00000000-0000-0000-0000-000000000000

Page 158

1    Q. Okay. What did you do to prepare for today?
2    A. I reread the file and my report specifically
3    along with, you know, deposition material and some of
4    the discovery.                           3:31:10
5    Q. Okay. Anything else?
6    A. Not that I can think of.              3:31:20
7    Q. Did you meet with Mr. Muldoon?
8    A. Today. Yes.
9    Q. What'd you guys go over?              3:31:25
10   A. The report.
11   Q. Okay. Did he ask you any questions that I
12   haven't asked you today?                 3:31:35
13   A. No. No, not that I can think of.
14   Q. Okay. All right. I don't think I have any
15   further questions for you at this time.  3:31:53
16        MR. MULDOON: Just some quick follow-up.
17             CROSS EXAMINATION
18   BY MR. MULDOON:
19   Q. Just so we're clear. Exhibit No. 1. More
20   specifically, the report contained in Exhibit No. 1.  3:32:04
21   That report contains the opinions that you've
22   reached in this case and the bases for all those
23   opinions. Correct?
24   A. Correct.                              3:32:19
25   Q. And you also gave some other opinions and

Page 159

1    other bases today in your deposition. Correct?
2    A. Yes.                                  3:32:24
3    Q. Okay. Earlier you were asked about -- a
4    question about reasonable -- something -- what was
5    reasonable, and you started talking about Fort Knox.  3:32:33
6        Okay. Do you remember that --
7    A. Yes.
8    Q. -- earlier? Were -- were you talking about
9    -- during that answer, were you talking about
10   reasonable care?                        3:32:42
11        Like what would -- what would constitute
12   reasonable care?
13   A. Yes.
14   Q. It -- it wouldn't be Fort Knox. It would be
15   what you outlined in your report.       3:32:51
16   A. Correct.
17   Q. And --
18        MR. SMITH: Just objection --
19   BY MR. MULDOON:
20   Q. -- you testified --
21        MR. SMITH: -- asked and --
22   BY MR. MULDOON:
23   Q. -- here today --
24        MR. SMITH: -- answered.
25   BY MR. MULDOON:

Page 160

1    Q. -- correct?                    3:32:54
2    A. Yes.
3    Q. Okay. As far as reasonable foreseeability,
4    again, the basis for that's in your report when you
5    testified today. Correct?            3:33:05
6    A. Yes.
7    Q. The reasonable foresee- -- foreseeability
8    would be what one would -- should reasonably expect,
9    what -- as you said, what they knew or should know.  3:33:13
10   A. Yes.
11   Q. Okay. Okay. You testified earlier about a
12   incident in the drive-through line on the night of --
13   in the morning of the occurrence, where there was
14   honking and arguing and cursing.     3:33:37
15   A. Correct.
16   Q. And I believe you testified that that
17   would've brought the security guard, if he wasn't there
18   in the drive-through line -- it would've brought him
19   over there. Correct?                 3:33:46
20   A. Yes.
21   Q. And based upon -- and again, a properly
22   trained security guard. How long would he have stayed
23   in that area, say, between the menu board and the
24   drive-up window, the cashier window, after that
25   dispute?                             3:34:06

Page 161

1    A. Well, he would've stayed there to monitor the
2    situation until those people were off the property.
3    Q. Okay. And that would've put him in that area
4    between the menu board and the drive-through window
5    when those two gunmen approached from the -- approached
6    onto the parking lot. Correct?        3:34:29
7    A. Correct.
8    Q. Okay. When you were -- when you were asking
9    question -- asked questions about the CAP Index report,
10   you identified it as one of the -- one of the important
11   factors that you looked at. Correct?  3:35:16
12   A. Yes.
13   Q. And is that because that's the only
14   documentation that Wendy's looked at?
15   A. Yes. Apparently.                   3:35:23
16   Q. You were -- you were asked about whether or
17   not -- you -- you were asked about what you -- strike
18   that.
19        You gave opinions to what you thought Wendy's
20   should've done had they -- had they used reasonable
21   care, certain measure they should've taken in -- in --
22   in -- had they used reasonable care. Correct?  3:36:04
23   A. Yes.
24   Q. And those measures that would've constituted
25   reasonable care, in your opinion, again, based on your

41 (Pages 158 to 161)

Page 162

1    experience, knowledge, training, and things like that.
2    Correct?                              3:36:17
3        A.  Yes.
4        Q.  The standards and the established practices.
5    Correct?
6        A.  Yes.                          3:36:20
7        Q.  Okay.  I think you were asked if you knew if
8    there were any specific laws that related to the -- to
9    those measures.  Correct?             3:36:31
10       A.  Correct.
11       Q.  And what did you mean when you said you
12   didn't know of any specific laws that related to -- to
13   those measures?                       3:36:37
14       A.  Well, I haven't done the research to -- to
15   determine that -- that there's a law that says you need
16   to have a -- a security guard on the overnight shift,
17   for instance.                         3:36:49
18       Q.  Okay.  So there -- you're not aware of any
19   statutes that say that.
20       A.  That's correct.              3:36:51
21       Q.  But you -- you're aware that under the law, a
22   -- a -- a -- a -- a -- a business has to use
23   reasonable care.
24       A.  Yes.                          3:36:58
25       Q.  Okay.

Page 163

1        MR. MULDOON:  Okay.  That's all I have.    3:37:14
2            REDIRECT EXAMINATION
3    BY MR. SMITH:
4        Q.  As for the standard of reason -- reasonable
5    foreseeability of a -- of a criminal attack, if that's
6    the legal standard, are you able to opine on that
7    standard?                             3:37:33
8        A.  As a legal standard?
9        Q.  Yes.
10       MR. MULDOON:  I'll --
11       THE WITNESS:  Yeah.
12       MR. MULDOON:  -- object.          3:37:43
13       THE WITNESS:  I -- I -- I think so.  Yes.
14       MR. SMITH:  Okay.  I don't have anything
15   further for you.
16       MR. MULDOON:  Okay.               3:37:51
17       MR. SMITH:  Waive signature or reserve?
18       MR. MULDOON:  You do that in federal court?
19       MR. SMITH:  Yeah.                 3:37:55
20       MR. MULDOON:  You do?  Okay.  We'll reserve
21   signature.
22       MR. SMITH:  Okay.
23       THE RECORDER:  Going off record at 4:56 p.m.
24           (Off the record)
25

00000000-0000-0000-0000-000000000000

Andrew Lee Camphouse 03/15/2022          www.InDemandReporting.com                    (773) 239-6008

Page 164

1                          CERTIFICATION

2          I, Allyson Pritchard, do hereby certify that the

3    foregoing transcript of said deposition is a true,

4    complete and correct report of the entire testimony so

5    given by said witness, together with such other matters

6    and things as counsel for the parties present at the

7    taking of said deposition desire to have appear of

8    record.

9              I further certify that on March 30, 2022 said

10   witness, S. RONALD HAURI was first duly sworn to

11   testify to the truth, the whole truth and nothing but

12   the truth in the cause aforesaid; that the testimony

13   then was recorded by audio/visual recording device, by

14   me in the presence of said witness and thereafter

15   transcribed into typewriting under my direction and

16   control.

17             I further certify that I am not counsel for,

18   nor attorney for any of the parties to the aforesaid

19   cause, nor am I related to any of the parties to the

20   aforesaid cause, nor am I interested in any manner in

21   the said cause or in its outcome.

22

23

24

25

00000000-0000-0000-0000-00000000000C

Andrew Lee Camphouse 03/15/2022        www.InDemandReporting.com                    (773) 239-6008

Page 165

1            I further certify that the signature to the

2    foregoing deposition was reserved by the witness.

3            IN TESTIMONY WHEREOF:  I have hereunto set

4    my hand and affixed my notarial seal:

5

6

7                    Allyson Pritchard

8                    April 12, 2022

9

00000000-0000-0000-0000-0000000000000

Andrew Lee Camphouse  03/15/2022      www.InDemandReporting.com      (773) 239-6008

Page 166

---

**A**

**a.m** 80:23 148:14
**ability** 20:16 61:4,8
  85:11
**able** 62:20 104:15
  163:6
**Absolutely** 143:17
**access** 92:1
**accident** 103:10
  133:22
**accomplish** 7:15
**accounts** 45:6
**accurate** 44:5
  52:14 79:7
**accusation** 44:21
**accused** 43:19
**act** 12:1 14:5 100:3
  110:19,20 111:20
  112:12,12 155:13
**action** 100:21
  112:12,13
**actions** 108:21
  152:22
**active** 46:12,13
  103:4
**activities** 78:1
  156:13
**activity** 8:3,5,10
  12:22 19:7 63:14
  87:15,18 109:23
  109:23,24 110:13
  110:14 111:19
  136:2,5,9,12,24
  138:19 143:6,16
  146:8 147:25
  151:23 152:16
**acts** 11:11 94:10
**actual** 108:16
  123:1
**add** 86:25 156:14
**additional** 63:2
  148:15
**address** 63:24 80:6
  80:7 142:19,20,21
**addressed** 86:24
  99:10
**adequate** 85:12

**adjoin** 146:7
**adjoining** 113:11
**administration**
  27:2
**administrator**
  32:14
**advances** 102:8
**advantage** 23:2,6
  84:24
**adverse** 89:13
**advertise** 57:4,10
**advertised** 57:9
**advise** 7:8
**affidavit** 51:21
  52:3,4,6 55:14
**affixed** 165:4
**aforesaid** 164:12
  164:18,20
**Africa** 28:4,6
**African-American**
  130:14
**afternoon** 4:1 31:7
**aggressive** 127:4
**ago** 17:23 26:23
  27:8,24 120:10
**agree** 68:8 80:3
**agreed** 55:8,14
**agrees** 68:5
**ahead** 11:14 55:15
  64:10 65:5 81:6
  84:14 92:3 104:8
  104:10 142:2
  149:15 150:12
  153:9
**aid** 113:4,7
**aiming** 150:3
**al** 1:11 4:7
**alarm** 82:12 83:5
  83:22
**alcohol** 24:21 25:10
  26:8 30:10,11,12
  31:8,10 32:21
  37:20 38:4,10
  87:12,14
**alcohol-related**
  87:13
**alcoholic** 88:4

**alert** 44:10
**alley** 97:15 124:9
  126:1,1,2,4
**alleyway** 65:19
  66:3,23 67:20
  116:18,23 123:21
  125:24 126:7
**allowed** 111:7
**Allyson** 4:15 164:2
  165:7
**ALM** 57:7
**altercation** 98:10
  98:20
**Americans** 17:23
**Amoco** 7:19 10:9
**amount** 20:11
  53:25
**analysis** 62:8
  131:23 132:19
**analyzed** 70:19
**analyzing** 71:21
**and/or** 110:9
**angles** 71:1
**ANSI/ASIS/RIMS**
  49:10
**answer** 5:21 14:11
  17:22 18:18 36:22
  54:14,16 61:15
  81:6,7 103:24
  104:21 111:11,24
  117:4 120:11
  129:24 141:25
  151:2 154:18
  159:9
**answered** 13:13
  14:8 21:11 61:11
  106:3,4 110:6
  111:13,15 112:15
  125:7 159:24
**answering** 63:19
**anticipated** 8:24
**anybody** 65:23
  119:15,16,18
  120:13,14
**anymore** 59:5
  74:20
**apartment** 36:2

38:21
**apparent** 47:10
**apparently** 43:19
  61:20 90:9 161:15
**appear** 66:16
  120:14 150:3
  164:7
**appearances** 2:1
  4:22
**appears** 118:19
  122:6
**applicable** 5:11
  136:8,11,15
  138:16 148:23
  151:21,24 152:14
  152:18
**applies** 11:23
**apply** 8:1
**approach** 119:19
  122:13
**approached** 73:9
  161:5,5
**appropriately**
  44:20
**April** 165:8
**Aragon** 34:3,5
**ARC** 34:12
**area** 7:19,25 23:11
  45:11 63:18,23
  65:19 104:3 128:8
  128:9 143:21
  144:19,21 146:6
  147:21 153:21
  154:7 160:23
  161:3
**areas** 8:2 87:9
  104:3
**argue** 141:25
**arguing** 120:14
  160:14
**argument** 97:18
**arm** 17:24
**armed** 8:12 89:1,5
  93:23 94:8,11
  104:1 148:12
**aside** 47:14 60:15
  60:15

**ASIS** 49:9 58:5
  133:12
**asked** 13:12 14:7
  21:10 55:4 61:10
  76:14 106:3 110:6
  111:15 112:15
  125:7 141:13
  158:12 159:3,21
  161:9,16,17 162:7
**asking** 13:15 41:18
  53:6,7 63:17 68:3
  71:13 74:7 76:15
  84:12 85:5 92:4
  93:4 105:23 109:7
  109:10 110:16,23
  110:24 111:1
  120:9,23,24
  123:25 132:7
  134:13 137:19
  139:12,13,20,23
  140:11,21 146:18
  148:16 161:8
**aspects** 9:5
**assault** 30:20 81:21
  92:6,6,10
**assaulted** 34:15
  36:2 45:20
**assess** 138:22
**assessing** 11:1
**assessment** 7:11,11
  49:10 78:2,4,12
  78:25 79:8 80:21
  80:24 81:19 84:4
  85:2 86:9,10,19
  86:25 87:8,22
  92:15 102:25
  107:11,19 108:15
  141:14 144:11
  152:22 156:24,25
  157:1,2
**assessments** 27:3
  27:12 80:17 86:13
  92:21 93:6
**assets** 11:8 49:9
  133:11
**assigned** 19:7
**Associates** 1:21

---

Andrew Lee Camphouse 03/15/2022     www.InDemandReporting.com     (773) 239-6008

Page 167

2:14 4:4
**association** 57:12
58:7 133:20
**associations** 57:14
**assu-** 42:8
**assume** 26:16
74:12
**assumes** 23:13
**assuming** 5:16 40:1
40:25
**astray** 82:25
**at-** 1:19
**atmosphere** 38:14
38:17
**attack** 6:5 13:19
15:6 40:12 41:3
42:11,16 44:3,7,8
44:24 65:20 69:8
69:14,16 74:2,22
75:4 93:25 95:3
96:12,14,19 99:15
99:21 100:19
103:9,13,19,22
104:20 105:8,10
105:16 106:1
123:2,6,14 126:17
127:4,8,10,13,20
127:22 128:2,10
128:24 129:13,22
129:25 130:1
131:3,4,9 139:4
139:16 140:23
149:5,7,11,18
150:8,18,19
152:25 153:1,4,11
153:16,18 163:5
**attacked** 37:9
38:23 40:19 42:2
42:3 43:22 76:3
**attacking** 16:24
43:9
**attacks** 70:20 78:16
78:22
**attempt** 17:18 18:4
22:11,14 69:19
72:2 94:3,20
**attempted** 7:8 12:3

13:8 14:4 18:22
25:19 64:18 78:15
93:24 130:13
139:3
**attempting** 19:17
20:7 71:5 94:12
**attempts** 64:24
**attention** 88:14
95:11,17,19
**attesting** 52:6
**attorney** 111:5
164:18
**attorneys** 4:21 33:2
33:3 46:13
**attracted** 97:17
**audience** 27:21
**audio/visual**
164:13
**authority** 55:4
**automatically**
145:12
**availability** 20:17
**available** 60:16
**Avenue** 69:1
**average** 13:9
**aware** 46:18 78:23
89:24 154:10
162:18,21

_____
**B**
_____
**B** 108:15 155:21
**Babich** 35:12
**back** 7:18 21:4,6
23:8 25:12 36:18
36:20 38:22 47:21
47:24 50:19 51:18
65:19 66:1,23
77:2,4,9,14 84:8
84:15 85:2 90:14
94:4 97:15,19
99:22 102:4
106:24 111:24
112:4 116:17,23
117:17,21 120:19
121:10 122:21
125:21 131:11
139:5 154:18
**background** 6:3,24

20:10 29:25 47:8
49:23
**bad** 8:11 13:22
**ballistically** 88:18
**Ballroom** 34:6
**bar** 30:13,17,18
31:1 32:16 33:11
33:12 39:15,16,16
40:2,6,10,18 41:2
42:4,5,15 43:3,7
43:10,13,25 44:1
86:21 87:22 88:1
92:16
**barred** 39:8
**Barriga** 40:17
41:14
**bars** 24:6,20 25:10
25:25 86:12 92:16
**base** 137:8 145:4
148:11 149:2
153:20,25 156:16
156:19 157:17
**based** 9:1 72:8,12
75:9,18 76:12
84:4 86:4 91:3
110:8,16 123:6,19
124:8,16 125:12
127:16,21 128:5
130:7 131:4 133:6
142:17,19 144:3
146:4 160:21
161:25
**bases** 27:10 107:8
108:15 139:23
140:11 148:21
154:5 155:7,11,13
156:12 158:22
159:1
**basically** 7:22
35:25
**basing** 141:8,10
156:23
**basis** 22:25 23:21
58:21 69:16 85:11
107:16 128:7
134:11 136:23
137:20,23 138:6

138:25 154:4
160:4
**bathroom** 47:15
**bathtub** 82:23
**batter** 36:20
**battered** 29:17 ·
31:4 32:18,20
33:16 35:15
**batteries** 63:15
**battering** 30:3
**battery** 45:15
**Bay** 29:24 32:2
**Bear** 58:8 133:24
**beaten** 42:3
**beautiful** 144:17
**began** 23:22 73:10
**behalf** 4:12,25
47:11 90:1,25
**behaved** 44:10
**behavior** 124:13
**belief** 75:19
**believe** 9:16,22
10:3 15:16,21
28:17 29:12 30:18
32:13 49:5 56:5
56:18 63:3,8
68:20 73:8 74:2
80:15 84:1,5
92:17 99:13 100:7
117:21 120:21
121:1,16,19,25
123:1,5,14,19
124:1,7,12 128:1
128:5,9 132:5,25
135:5 149:5,20
150:6,18 151:6,11
151:16 153:10,16
155:9 156:16
160:16
**believes** 74:4
**belong** 53:1 58:13
58:14
**Berman** 35:22
**better** 84:20 85:16
**beverages** 88:4
**Biery** 1:21 2:14 4:3
**biggest** 19:9

**bill** 51:11,17
**billing** 51:15
**bit** 7:8 38:5 48:2
49:16,22 67:24
77:13 79:9 84:22
85:16 90:12
116:18 141:6
**black** 69:3 72:11
73:9 75:22 100:19
118:16 119:2,11
123:16,16 124:13
128:11,12,15
129:11,16 130:5
131:1
**blame** 83:15
**blamed** 42:22
**blaming** 147:5,5
**Bliss** 33:13
**block** 145:25
**board** 118:14 119:6
160:23 161:4
**boards** 118:10
**bodies** 151:7,12
**body** 61:1
**boil** 141:6
**books** 28:17
**bottom** 135:18
**box** 142:9
**boxes** 142:5
**Brad** 53:23 77:7,12
115:12 139:24
147:4
**Bradford** 57:17
**Bradley** 2:13 4:25
**branch** 6:8
**break** 47:15 77:12
106:13,14,15
**Breaking** 25:21
**bright** 87:7
**broad** 11:12 134:12
**brought** 35:14
160:17,18
**build** 7:22
**building** 34:7 68:24
69:4 72:10 74:18
82:12 115:19
116:9,11

**bullets** 151:7,12
**burden** 136:10
　147:23
**burdensome** 80:1
**burgers** 87:17
**burglaries** 25:20
**burglary** 12:22
　13:9 14:5
**Burke** 32:25 33:5
**Burke's** 32:25
**business** 9:6 58:9
　79:24 110:11
　162:22
**businesses** 23:10
**buying** 93:15

**C**

**C** 108:16
**calculation** 132:1
　132:13
**calculations** 131:22
　131:24 132:9
**call** 64:3 67:15
　69:15,16,19 88:22
　90:5,7 127:9,12
　127:20
**called-for** 132:5
**calling** 90:18 98:21
　98:23
**calls** 50:4,5 62:6,7
　62:9 63:7,9,12,16
　63:25
**camera** 61:1 73:23
　74:18 85:20
　114:11,11,22
　116:6,11 118:1,6
　120:9 121:5
**cameras** 82:13,14
　83:5,23 84:20,23
　85:19
**Campbell** 1:21
　2:14 4:3
**CAP** 141:13,15,20
　142:4,14,17 143:4
　143:6 144:4,8,13
　144:14,15 146:2,4
　146:13 147:20
　153:20,22 156:18

156:22,22,23
　161:9
**capabilities** 13:16
　99:23
**capability** 14:15
　85:3 94:5,5
**Capital** 45:16
**caption** 56:1
**capture** 6:11 8:16
**car** 45:10,12,13
　65:25 66:1 70:6,8
　70:25 72:1,2,3
　74:16 75:22 76:3
　76:6 94:22 100:19
　100:20 101:4,8
　102:8,8,11 116:22
　118:16 119:11
　120:19,21 121:19
　122:19 123:16,16
　124:13 125:10
　128:3,11,12,15,20
　128:20,25 129:10
　129:11,16,17
　130:2,4,5 131:1
**car's** 119:2
**care** 80:4 136:7,11
　136:14 138:15,16
　148:13,22 152:14
　159:10,12 161:21
　161:22,25 162:23
**carried** 75:3
　100:21 123:15
　127:4,6 150:19,22
**carried-out** 64:24
**carry** 20:16 69:7
　75:4
**carrying** 70:20
**cars** 20:21 21:9
　94:18 97:1 102:2
　104:4 120:1
**case** 1:9 4:7 8:21
　20:18 24:1 25:3
　26:25 27:11,17
　28:7,11,18,20
　29:6,7,13,14,16
　29:23 30:2,3,5,24
　31:15,21,22,25

32:2,6,9,11,15,16
　32:17 33:2,8,14
　33:20,22 34:2,4
　34:20,22 35:10,12
　35:13,20 36:1,8,8
　37:4,13,15 38:19
　39:13,14 40:1,10
　40:10,15,17,18,25
　41:1,7,10 42:11
　42:19,23 43:7,18
　43:24 45:17,18,18
　45:22 46:1,2,9,9
　46:14,19 47:3,6
　48:3,6 49:8 50:14
　50:20,21 51:7
　54:8,19 55:7,17
　55:20,23 56:3,16
　56:17,19,22 57:1
　60:6,13,15,23
　61:18 78:13 84:5
　84:9,10 86:11
　96:21 97:24 127:1
　131:4,23 136:20
　146:15 147:21,25
　158:22
**cases** 24:2,6,19
　25:1,2,7,12,18,24
　25:25 26:7 29:7
　31:18 37:19 39:4
　43:15 50:5,6 56:6
　56:11
**cashier** 160:24
**casings** 151:17
**casual** 12:15
**cataloguing** 134:1
**caught** 27:9
**cause** 38:10 39:21
　85:7 87:14,17
　91:3 136:16
　148:24 164:12,19
　164:20,21
**caused** 84:7 85:13
　92:5 151:6,11
**causing** 83:15
**center** 45:19,21
　142:13
**Central** 32:15

**certain** 7:17 16:9
　20:11 87:16,18
　102:18 108:21
　134:15 142:15
　143:14 161:21
**certainly** 7:10 22:1
　82:6 83:2 94:16
　128:14
**certainty** 76:17,20
　103:17 104:16
　105:16,24 133:4
**certification** 58:5,6
　58:15 164:1
**certifications** 58:2
　59:14
**certified** 3:6 53:21
　58:4,6,7,9
**certify** 54:17 58:20
　164:2,9,17 165:1
**CFE** 59:3
**CHA** 34:22
**change** 61:4,8
　86:16 99:3 135:12
**changed** 9:19 32:11
　135:25
**changes** 87:9
**channel** 105:3
**characterization**
　65:22 67:7 69:13
　69:21 71:24 95:8
　96:19 99:20 101:8
　101:11 103:13,22
　104:20 117:1
　127:8 143:25
　149:14 153:7
**characterize** 142:8
　142:21
**characterized**
　63:13
**characterizing**
　144:11
**charging** 50:7,8
**check** 45:12 47:8
　97:6 98:23
**Chicago** 1:24 2:9
　2:17 4:5,12 37:8
　62:5 82:21 100:7

100:8 143:11,14
　145:19
**chief** 9:24 10:1,11
**Chime** 29:25
**choice** 54:3
**circumstance**
　80:24 95:6 103:8
　125:5
**circumstances**
　15:18 24:20 26:25
　43:8 81:23 87:16
　88:14 94:16 101:1
**citation** 46:25
**city** 82:21 145:25
**Civil** 5:10
**claimed** 45:19
**clarity** 65:14
**Clark** 31:20
**class** 27:10
**classes** 26:12,13
**classified** 142:24
**clear** 24:16 158:19
**clearer** 84:25
**clearly** 22:21 44:15
　44:25 82:16
**client** 147:6
**clients** 7:9,17 89:3
**Clinton** 1:22 2:15
　4:4
**clip** 67:13 118:15
**clips** 114:9
**clock** 117:10,18
　121:7 122:8,17,23
**close** 30:23 89:15
**closed** 80:18,19,22
　81:13,14,16 82:6
　83:16 97:9
**closing** 36:17,19
　40:20 43:22 45:3
　45:11 89:8
**club** 37:9
**collect** 78:11
**Colombia** 7:20
**Colombian** 7:21
**color** 66:11 72:25
　129:17
**colored** 72:22

colors 144:17
columns 64:4
combat 6:4 7:25
    12:6,20 13:8,23
    14:3 15:23 64:23
    69:8 91:4,8 92:6
    92:10 93:23 95:3
    96:11 99:14
    104:23 105:5
    149:11
combatants 8:9
come 8:12 69:2
    72:10 75:16 76:5
    89:3 95:13 97:21
    99:8 110:14 132:1
    145:3
comes 23:1,1 66:2
    68:16 82:5 97:7
    144:17
coming 18:9,14
    19:10 36:20 93:15
    107:15,18 116:17
    122:7 125:9 156:2
commit 8:13 12:16
    13:22 16:12 19:17
    22:20 94:9 144:24
    145:1,8
commits 145:7
common 125:24
companies 7:1
company 7:1 19:4
    35:2 44:17 45:5
    57:15,20,23 58:1
    94:22
competent 138:22
competitive 38:14
    38:16 87:4
complete 49:6
    55:24 79:7 139:2
    164:4
completely 142:4
completes 5:2
complex 38:21
complexes 25:16
complicated 13:3,6
    13:7
computer 48:24

115:7
con- 107:8
conclude 140:21
concludes 17:6
concluding 156:17
conclusion 80:13
    107:16,17,18,21
    124:17,22 145:4,4
    155:15,24
conclusions 76:15
    107:9 108:16
    111:8 133:7,14
    134:15,25 154:13
    154:22 155:3
    156:2
conduct 78:3
conducted 138:22
conducting 27:3
    78:2 83:6 152:21
conflict 7:6,17 8:6
    8:7 91:11
conflicting 91:3,22
confront 96:6
confrontation
    95:25 96:1 97:3,3
    97:18 121:1
confronting 120:14
confusion 90:12,24
connects 76:10
consider 20:9
    44:23 107:3,13
consideration 38:6
considering 16:14
constantly 89:17
constitute 159:11
constituted 161:24
consultant 55:10
consulting 23:11
    23:18,21 24:13
    52:8,18 55:12,17
consume 88:4
contact 17:3
    102:21
contained 125:4
    154:12 155:1
    158:20
containers 125:22

contains 158:21
Continental 28:3,6
continuing 58:20
    58:22
continuity 58:10
contractor 42:20
    42:22
contribute 85:7
    86:2 87:14,17
contributed 84:6
    85:13 92:6
contributing 91:4
control 164:16
convenience 47:16
    56:21
conversation 102:7
cook 56:5 103:6
corner 97:23
corporate 10:23,25
    23:16 27:3
corporation 11:9
corporations 23:19
Corral 94:17
correct 5:14 9:25
    12:1,2,4,8 13:10
    14:6,12 15:19
    32:10 33:11 42:9
    70:21 74:1 82:10
    86:3,7,8 117:10
    119:7 122:24
    126:10 130:23
    143:4,9,24 154:5
    154:6 158:23,24
    159:1,16 160:1,5
    160:15,19 161:6,7
    161:11,22 162:2,5
    162:9,10,20 164:4
correctly 136:18
could've 72:18
    84:24 100:8,15
    104:17 105:25
    106:1 124:23
    129:10
counsel 164:6,17
counted 24:23
counter 88:12
countries 7:2 28:5

country 145:24
County 56:5
couple 93:16 102:1
    102:20 118:25
course 6:20 146:24
    154:22
court 1:1 4:11 39:6
    50:11 56:4 92:2,3
    163:18
courts 80:3
cover 63:23 95:22
coverage 148:15
covered 144:20
covering 144:22
CPD 60:24 62:11
    141:8
CPP 58:4,12
crazy 19:11
create 76:4 79:17
    89:12
creating 7:19
creeping 116:22
    117:2
crime 8:14 12:17
    13:9,22 22:20
    71:22 129:9 130:2
    144:21,24 145:1,7
    145:8 146:9
    150:15
crimes 132:2
criminal 8:2,5,10
    11:11 12:1,13,15
    12:21 14:5 15:24
    16:17,24 17:16
    18:20,23,24,25
    19:16,17 20:7,20
    21:8,17 22:10,22
    22:23 63:14 64:18
    76:23 77:25 87:15
    87:18 93:24 94:2
    94:24 95:3,4
    96:12 103:8,18
    109:23,23,24
    110:19 111:18
    112:12,12 131:22
    131:25 132:9,21
    136:2,5,9,12,24

138:19 140:22
147:25 149:7
150:7,14,19
151:23 152:16,25
153:1,17 155:12
163:5
criminal's 18:5
criminals 94:9
    145:12
cross 3:3 121:14
    158:17
crossed 67:16
crossing 66:23
crossover 66:7
    67:14 121:17
currently 26:13,21
    57:16 58:3
curriculum 9:16
cursing 160:14
cussing 119:15
customer 29:17
    30:3,4 31:4 32:16
    33:16,16 40:19
    44:16 45:2
customers 11:9
    31:3 34:5 81:9
    82:7 87:25 88:2,6
    89:6,8,17 138:18
CV 1:9 4:7 58:8
    59:22,25

### D

daily 134:4
Dan 67:19 116:17
dancing 37:21 38:4
    38:9 87:1,2
dangerous 70:6
darts 38:15
date 46:17 50:22
    64:12
dates 64:2
day 30:20 31:5
    58:17 82:21 93:15
    134:14,14
deal 28:5 103:5
dealt 11:4 25:12
death 32:18 47:12
    76:4

deceased 35:4
December 64:13
  78:15 85:14 86:3
  89:23 105:17
decided 130:4
decision 94:19
decisions 95:23
  96:1
deem 130:8,9 133:9
  133:17 139:3
  149:5,6 152:24
deemed 139:15
defeat 13:24
defeating 12:13
defendant 2:11
  4:13,14 5:1 9:14
  30:6 32:24 34:17
  35:8,18 36:4,11
  37:1 39:1,24
  40:22 45:23 56:2
defendants 1:13
  35:23 49:25
defending 40:10
  43:13
defense 17:25 42:8
  50:5
define 6:1,2,4 8:18
  18:21,25 22:21
definitely 72:21
  75:6 124:4
definition 6:12,17
  8:19,20,20,22
  13:6 18:24 102:14
  110:17 153:17
degree 76:16
  103:17 104:16
  105:15,24 133:3
degrees 143:15
Deist 39:13
Demand 4:11
demographics
  113:3
demonstrated
  137:5
demonstrative
  113:4,7
dep 147:14

department 75:15
  76:5 154:3
departments 11:4
  11:5,5
depending 6:10
depends 6:7,7
  13:16,25 14:14
  20:15 50:2 52:25
  79:5 91:25 94:4
  94:15
deposition 1:15 4:6
  4:10,17 29:8 32:8
  48:14,17,21,25
  50:13 56:24 57:1
  62:21 89:25
  115:17 137:11
  140:7 154:23
  158:3 159:1 164:3
  164:7 165:2
deposition's 5:9
depositions 5:13,17
  50:12 62:1,5
  114:7 137:9
  155:18
deps 115:2
deranged 19:5,10
Derek 36:7
describe 18:20
  115:19 122:14
  155:10,13
described 67:15
  121:11 151:21
  152:13 155:14
describing 22:2
  82:3
description 135:10
descriptors 25:23
designed 8:15
desire 164:7
detail 136:23
details 56:1
detective 70:17
  71:19 123:13,25
  124:17 126:16
  127:19 128:6
  130:7
deter 83:8 94:24

100:1 108:25
  109:4,25 110:13
  110:19 111:18
  112:12 153:14
determine 162:15
determined 150:16
deterred 108:22
deterrence 102:24
  103:1,3 108:3,8
  108:12,17,20
  111:18
deterrent 94:9
  100:4,4 105:22
deterrents 94:21
device 4:16 164:13
diagram 113:10
died 34:9 35:5
  98:25
differ 92:22
difference 86:20,24
  88:5 93:5,19
  99:24 107:7
differences 86:12
  87:8,10
different 8:1 12:11
  23:18 25:13 38:5
  56:13 80:17,21
  88:13 93:14 103:3
  115:18 116:4
differentiating
  25:9
difficult 12:7,9
  13:7 14:4 16:1
  96:2
digits 64:6
dining 87:6 88:12
  89:14,15
direct 3:3 5:4 140:6
direction 122:21
  164:15
director 57:19,23
disagree 54:11 68:8
disagreement 31:3
  33:17 35:2 68:1
disallowed 39:6
discharged 151:20
disclose 55:5

disclosures 9:14
  63:3 92:3
discontent 47:11
discovery 146:24
  158:4
discuss 134:2
discussed 31:18
  32:3 122:1 134:5
  134:6 153:23
  155:7
discusses 134:10
discussion 55:1
discussions 141:2
dispute 160:25
distance 146:1
District 1:1,2 4:8
  5:12 15:1
disturbance 96:21
  96:23,25
disturbances 63:15
divert 95:11,18
  96:6
Division 1:3 4:9
document 9:15,17
  9:21 135:14 139:1
  142:7,9 149:3
documentation
  161:14
documents 48:3,8
  48:12 64:7 90:17
  90:19 142:3
Doe 35:22 45:16
doing 16:16 19:10
  23:24 24:2 43:3
  45:2 47:8 86:9
  91:16 97:12
  124:10,24 125:1
  126:8 128:16
  137:6
door 90:15
doubt 125:2
doubtful 147:4
draw 73:10
drilling 7:19
drive 79:24 88:19
drive-through 69:4
  72:11 88:13 89:24

95:4 96:13 97:10
  97:25 98:5,11
  99:13 101:16
  118:17 119:3,25
  120:13 121:1
  131:9 143:21
  160:12,18 161:4
drive-throughs
  98:17
drive-up 88:16
  96:24 97:8,15
  120:22 160:24
drives 65:25 66:1
driving 89:17
drop 95:20
dropped 59:6,13
drove 67:11 117:21
  125:17 126:5,12
DT 118:14 121:10
due 44:7
duly 164:10
dump 90:20
dumpster 67:20
  117:6
dumpsters 116:19
duties 10:22
duty 35:15 80:4
  108:24 109:4,25
  110:18 112:11,19

--- E ---

earlier 99:23
  101:25 104:11
  143:19 159:3,8
  160:11
earn 52:17
easier 13:24
easily 76:7
east 66:25 67:16
  68:24 69:4 72:9
  74:18 96:11 97:7
  99:16 114:19
  116:8,11 120:8
  121:5 123:22
Eastern 1:3 4:8
eat 93:13
education 58:21,22
  59:18 76:13 133:6

Andrew Lee Camphouse 03/15/2022     www.InDemandReporting.com     (773) 239-6008

Page 171

| | | | | |
|---|---|---|---|---|
| 145:5 | 93:20,20 | 47:13,14,22 48:7 | **face** 88:20 | 119:14 132:20 |
| **effect** 108:9 | **established** 136:8 | 51:21,22,24 60:3 | **facilitate** 86:18 | 136:22 145:21 |
| **efforts** 19:23 | 136:12,15 138:17 | 60:4 114:1,2 | **facilities** 49:13 88:7 | 146:1 156:25 |
| **eight** 64:6 | 148:24 151:22 | 115:17,22 131:12 | **facility** 9:3 78:7,10 | 160:3 |
| **either** 8:9 16:16 | 152:15,19 156:15 | 131:14,17 132:24 | 79:18,24 82:13 | **fashion** 16:25 |
| 53:3 84:6 88:3,11 | 162:4 | 135:14 154:11,12 | 113:11 139:8 | 22:13 23:4 |
| 97:13 126:21,21 | **establishment** | 155:2 158:19,20 | **fact** 44:7,11 79:3 | **fast** 33:15 77:12 |
| **electronically** 22:5 | 32:20 39:21 40:20 | **exhibits** 112:20 | 100:18 113:17,20 | 86:10 118:22 |
| **elements** 9:1 78:5 | 41:24,25 87:15 | **exist** 82:8 | 124:18 156:16,23 | **fault** 39:11 40:2 |
| 86:14,18 | 88:25 89:18 | **exists** 66:20 | **factor** 91:4 | **fear** 90:1 |
| **eliminate** 6:11,18 | **establishments** | **expanded** 148:13 | **factors** 79:4 155:23 | **fears** 19:9 |
| **else's** 39:11 | 38:3 | **expect** 70:8 79:22 | 161:11 | **federal** 5:10,11 |
| **emotions** 38:17 | **estate** 35:23 | 100:19,25 113:6 | **facts** 23:13 | 14:16 15:11 92:2 |
| **employee** 23:17 | **estimation** 70:23 | 160:8 | **factual** 24:19 25:6 | 111:2 163:18 |
| 29:16 35:13 46:3 | **et** 1:11 4:7 | **expectation** 70:9 | 26:25 | **fees** 48:5 |
| 47:7,11 88:19 | **evening** 30:22 | **expected** 44:8 | **Factually** 25:4 | **feet** 83:15 |
| 97:2 | **event** 76:23 82:15 | 113:9 | **failed** 136:7 138:16 | **fell** 34:8 |
| **employees** 11:9 | 105:22,25 111:23 | **expecting** 61:7 | 138:21 152:14 | **felt** 98:25 |
| 42:21 81:12 82:7 | 137:13 | 79:17 | **failure** 136:14 | **field** 24:11,18 |
| 89:9 90:2,4,22 | **events** 57:12 65:12 | **expended** 51:9 | 148:22 | 107:2,4,5,9,14 |
| 91:12 | 77:25 89:14 | **experience** 9:16,20 | **fair** 7:3 10:12 12:19 | 108:11,18 123:12 |
| **employment** 47:10 | **eventually** 66:16 | 20:11 23:8 49:23 | 12:25 15:2,14 | 133:10,13,17 |
| **EMS** 63:16 | **everybody** 45:9 | 71:15 76:12 91:19 | 16:3,18,25 17:18 | 134:24 |
| **ended** 32:18 | **everyday** 13:9 | 124:16 128:5 | 17:25 18:6 19:11 | **fight** 119:18 |
| **enforcing** 90:10 | **evidence** 5:11 76:9 | 130:7 133:6 145:5 | 23:6 26:2 28:11 | **fighting** 98:11 |
| **engaging** 124:12 | 86:1 107:16 108:9 | 145:9,11 146:19 | 28:12 32:9 40:4,7 | 119:15 |
| **enter** 151:7,12 | 108:21 125:1 | 162:1 | 40:12 41:3 42:12 | **figure** 50:23 54:1 |
| **entered** 34:15 | 127:25 153:12 | **expert** 23:11 48:9 | 42:18 43:10,15 | **file** 48:9,12 62:15 |
| 126:4 | 155:18 156:4 | 48:11 52:8,18 | 52:14 65:20 67:6 | 112:21 158:2 |
| **entering** 25:21 | **Evitt** 36:7 | 53:8 71:13 77:25 | 69:12 72:14,23 | **filed** 46:19,20 56:4 |
| **entire** 164:4 | **exact** 50:23 106:4 | 91:20,21 107:3 | 73:18 78:20 79:1 | **films** 70:19 |
| **entirely** 44:13 | **exactly** 33:25 85:15 | 123:12 126:16 | 79:4 80:14 85:14 | **financial** 55:2,6 |
| **entities** 80:10 | **exam** 58:12,16,18 | 128:8,9 155:16 | 98:12 102:25 | **find** 17:16 22:18 |
| **entitled** 53:2,4 54:2 | **EXAMINATION** | **expertise** 123:6 | 107:11,21 119:6 | 53:24 90:13 |
| 54:7,9 55:3 92:3 | 3:1 5:4 158:17 | 134:14,24 | 124:10 125:16,19 | 110:12 127:3 |
| **environment** 7:12 | 163:2 | **experts** 133:10,13 | 126:9,13 128:25 | 131:7 |
| 9:3 78:6 93:20 | **examiner** 58:6 | 134:23 | 129:6,20 130:25 | **findings** 152:23 |
| 139:7,7 140:25 | **Examiners** 58:7 | **explain** 113:19 | 143:8 145:22 | **fine** 112:20 |
| 141:1,3,7 143:1 | **excess** 31:11 50:24 | **explaining** 125:1 | 149:8,11 154:1,24 | **finish** 141:24 |
| 156:7,17 157:4,18 | **excuse** 8:19 9:18 | **explains** 130:21 | 157:5,13,15 | **fire** 35:5 133:20 |
| **environments** | 38:3 41:9 52:11 | **explanation** 98:4 | **fairness** 65:17 | **firearms** 151:20 |
| 146:10 | 78:14 96:10 151:9 | **expressed** 133:2 | 144:6 | **fired** 70:25 73:16 |
| **equals** 156:9 | **execute** 6:18 | **extremely** 127:5 | **fall** 129:9 | 82:19 |
| **equate** 39:17 | **execution** 6:5 69:19 | **Eye** 126:19 | **falls** 156:24 | **fires** 70:8 82:5 |
| **equipment** 84:21 | 143:20 | **eyes** 119:8,16 120:2 | **far** 7:3,24 8:2 50:15 | **firing** 70:6 73:10 |
| 85:3 108:22 | **exhibit** 3:11,13 9:7 | **eyewitness** 126:19 | 52:23 59:18 65:11 | 73:14 74:14 |
| **especially** 87:24 | 9:10 28:21,25 | | 81:24 91:22 | 122:19 |
| | | **F** | | |

Andrew Lee Camphouse 03/15/2022     www.InDemandReporting.com     (773) 239-6008

Page 172

firm 55:18
first 24:1 29:13
 48:5 108:15 116:9
 164:10
fitness 45:16,19,21
five 27:8,15,20
 28:14 52:10,11
 55:14,22 148:14
flipping 84:8,9
Florida 55:7
fluctuates 50:1
folks 80:10 99:7
 105:1 144:24
follow 22:2 80:10
 136:7,11,14
 138:16 148:23
 152:14 153:13
follow-up 158:16
followed 100:20
 101:3,6,8
food 33:15 86:10
footage 49:20 61:1
 61:3,6 65:7,10,16
 65:18 66:20 67:3
 67:24 68:14,20
 70:19 71:21 72:9
 73:23 75:10 81:22
 83:14 95:5 96:13
 98:6 101:19
 112:24 113:22
 114:6 116:13
 118:18 119:14,21
 120:13,24 121:2
 121:11 122:11
 123:7,20 124:18
 127:21 128:7,10
footprint 97:15
fore- 43:13
foregoing 164:3
 165:2
foresee 41:2 44:20
 149:6
foresee- 160:7
foreseeability 40:7
 40:11 42:15 43:3
 43:8,14,24 44:7
 47:3 76:21 79:10

80:9 109:5 110:8
 110:18 111:19
 137:5 139:15
 144:4 160:3,7
 163:5
foreseeable 8:20,25
 9:1 78:1 108:25
 109:2 110:1,20
 112:13 136:6,25
 137:1 138:5,19,19
 139:4,16 140:22
 140:23 147:24
 149:7,10 150:7
 153:1,17 155:12
form 18:22 26:8
 49:8 55:13 134:14
former 123:13
forming 133:13
 134:24 138:25
formulate 85:12
Fort 79:17 159:5
 159:14
Fortune 7:1
forward 118:22
found 25:24 43:21
 45:12 50:4
foundation 61:13
 68:3 100:12
four 27:8,24 29:9
 52:7 89:22 156:9
four-year-old
 82:22
fractions 96:2
frame 65:25
frankly 82:4
 144:12
fraud 58:6,7
French 103:6
frequently 134:22
 144:15
fries 87:17
front 48:7 88:12
 97:23 115:7
 132:24
fry 103:6
full-on 8:8
full-time 23:21

fun 72:2
function 27:4
functional 82:14
further 112:4
 158:15 163:15
 164:9,17 165:1

## G

game 38:15,18
 105:2
games 38:10,10
 87:4
gang 6:22 128:19
 128:24 143:15
 146:8
garbage 91:2 92:5
Garfield 86:11
 89:22 131:3
 142:16 143:8
Garrett 57:17
Gastelum 41:13,19
gathering 34:25
gears 106:9
generally 10:21
 16:23 20:10 22:12
 87:3,14,20 88:2
 155:19
generating 51:11
geographic 142:15
getting 11:25
 141:19
girlfriend 35:14
 43:20 45:14
give 18:17 28:21
 31:15,17,25 32:5
 33:7,20 34:18
 35:9,19 36:5,10
 37:2,13 39:2,25
 40:14,23 46:7
 56:24 57:1 62:20
 104:14 106:5
 144:15 147:1
given 5:13 27:14,19
 29:7 32:8 40:9
 53:12 100:25
 110:17 154:21
 155:2 164:5
gives 112:2

giving 29:21 30:8
glass 88:18
go 11:14 17:9 21:1
 22:7 48:25 50:19
 54:24 55:15 56:22
 57:12 64:10 65:5
 72:13 81:6 82:20
 83:2 84:14 88:3
 89:19 90:14,20
 94:4 97:6 99:22
 104:8,10 106:17
 112:3 115:19
 122:8 124:22
 138:20 142:2
 143:6,13 145:12
 145:20,25 149:1
 149:15 150:11
 153:9 158:9
goal 15:24 16:1
 75:9 104:13
goes 66:3 85:2
 87:21 144:19
 146:9 156:11
going 5:9 7:11 8:11
 11:18 21:2,6,15
 22:6 47:14,15,18
 53:1,24 54:15
 71:9 73:6,23
 82:10 88:6 92:4
 96:24 97:18,19,21
 97:21 99:6,7
 104:23 106:16,21
 109:20 110:22
 113:25 114:2
 115:6,6,9,15,16
 115:24 116:8,16
 120:8 122:20
 130:2 133:1 135:2
 139:5 151:4 153:2
 153:6 163:23
good 4:1 13:23
 44:12 65:10 84:10
 84:24 86:18,25
 91:16
Google 113:13
gotta 24:15
gotten 51:6 120:18

grainy 84:22 85:16
gray 66:12
Grayslake 31:21
great 65:14
green 146:6
greets 102:5
Group 57:17
grudge 19:3 44:16
 44:22
guarantee 104:11
 105:19 106:6
guaranteed 103:7
guarantees 11:15
 11:17,23 103:14
guard 43:9,17,20
 43:21 44:9,15,17
 44:24 45:4 93:22
 93:22 94:8,11,13
 94:19 95:2 96:9
 96:14 97:5,11,14
 97:16,19 98:22,23
 99:14,23,25 100:1
 104:1 105:21
 148:12 160:17,22
 162:16
guards 35:4 93:21
 94:21
guess 11:25 24:24
 26:5 44:3 85:5
 95:16 107:14
 120:23 125:13
guessing 107:10,14
 107:23 108:2
 127:24
guest 34:14
gun 88:20 95:20
 149:21
gunmen 70:24
 161:5
guns 63:16 124:23
gunshots 70:25
guys 8:11 13:22
 158:9

## H

H-A-U-R-I 5:8
half 10:3 89:20
 148:15

hand 4:18 88:20
  115:6 165:4
handgun 150:1
handguns 73:17
handing 52:1
handling 35:3
handwritten 48:20
hang 20:25 141:5
hanging 102:15,18
happen 6:19,21
  23:15 78:12 81:20
  88:10 89:6,7 99:7
  108:23 145:9
happened 30:21
  39:20 44:9 59:12
  78:8 83:11 85:24
  98:7 128:20 130:4
  131:8 139:16
  145:10 151:4
happening 96:17
  98:11
happens 22:3 88:11
  95:20 145:11,13
  145:14
Happy 93:16
hard 12:13
hardening 11:2
harder 12:18,20
  13:3,6
harm 71:5 82:7,17
  82:18
harm's 94:18
Hauri 1:15 4:14,15
  5:6,8 6:1 9:10
  55:9 107:2 164:10
Hauri's 55:3
head 25:17 46:16
  82:23 127:2
heads 101:13
hear 5:23 98:14
heard 134:15
  143:19
hearing 77:18
hears 97:21
heart 144:12
heightened 37:25
  38:11

Heineke 33:5
heinous 127:5
held 44:15 45:7
  58:6,10 59:3
  88:17 133:3
Helen 31:20
Hello 95:20
help 77:7 109:18
  113:15,17,19
hereunto 165:3
Herrera 29:24
Hey 95:19
hiding 66:22 67:8
  67:10
high 38:17 88:17
  93:20 110:10,11
  139:7 140:24
  141:1,7 143:1,15
  146:10 156:7,17
  157:3,18
highest 24:6,19
  142:22
highlight 48:14
highly 127:9
hired 33:2 46:14
  47:7
history 9:2 61:20
  61:23 62:2,3,4
  78:8 79:2,3,5,7
  126:16 127:19
hit 70:9
Hmm 33:4
hold 58:3,4 59:9
holding 8:16
holdups 89:24
home 51:17,18
homes 14:17
homi- 13:8
homicidal 16:25
homicide 12:3,21
  13:8 14:4 15:24
  16:12 17:18 18:5
  18:23,24 19:18
  20:8 22:13,15
  64:19,24 78:15
  93:25 94:2 103:8
  130:13 139:3

140:22
homicides 12:6
  17:24 25:19,19
honking 97:1,25
  99:1 160:14
Hospitality 34:12
hostile 97:3
hot 90:18
hotel 34:14 35:13
  35:14,16
Hotels 25:14
hour 50:9 89:19
hours 40:20 43:22
  45:11 50:14,21,24
  50:25 51:2 59:2
  89:12 148:15
house 35:24,25
Housing 25:16
Howell-Darby
  34:20
human 11:4
hypothetical 80:25
  81:5 82:1 83:17
  83:20 95:9 112:16
hypothetically 95:2
  96:9
hypotheticals
  84:10

## I

idea 61:5
identification 9:7
  47:22 51:22
  115:22
identified 161:10
identify 113:25
  114:11
identifying 85:17
illegal 26:9
Illinois 1:2,24 2:9
  2:17 4:5,8,12 5:12
  14:18 15:2 27:25
  111:1,4
images 84:22,24
  85:15 115:18
impact 108:9,22
  109:22 144:22
important 60:22

68:21 78:25 79:4
  79:6 86:15 99:9
  133:17 144:9,10
  161:10
impossible 79:25
inaccurate 44:4
incident 31:2 41:3
  44:23 64:21 75:21
  84:7 97:25 100:9
  131:6 160:12
incidents 90:6
include 11:1
  138:20 148:1,25
including 11:9
income 52:17,20
  53:7,7
incomplete 81:5
  82:1 83:19 95:8
  112:16 142:5
increase 85:16
index 3:1,11 141:13
  141:15,20 142:4
  142:15,17 144:8
  144:13,14,15
  146:3,4,5,13
  147:10,20 156:18
  156:22,23 161:9
indicate 37:18
  147:23
indicated 19:22
indicates 13:19
  90:4 128:1
indicating 103:16
indication 97:24
  98:9,15,20 101:18
indicator 97:5
indicators 142:10
individual 6:5
  15:25 16:11 19:4
  20:16 36:15 37:9
  38:24 43:9 45:13
  45:19 46:3 70:24
  102:4 120:20
  151:15
individually 53:20
individuals 69:2
  73:16 74:15,17

75:21 78:16 85:17
  100:16,18 119:25
  120:25 122:13,15
  123:2,14,20 125:3
  125:4 128:2,11,12
  130:14,15 149:20
individuals' 151:12
indoors 92:21 93:9
industry 109:8,13
  109:14 148:23
information 5:3
  7:12 55:2,6,8,13
  62:13 78:11 81:8
  85:25 86:6,17
  91:25 128:18
  130:20 141:13
  156:12
informed 156:5
initiation 128:19
  128:24
injure 72:3 75:6
injured 36:24
  95:23
injuries 34:9 76:4
  136:6,10,16
  148:25 152:17
injuring 123:17
inside 36:21 37:9
  39:20 43:9 45:12
  90:22,23 103:6
installed 141:3
instance 4:13 63:15
  65:14 88:16
  103:25 146:9
  162:17
instruct 54:15
instructing 54:11
intended 95:11
intent 70:24 71:12
  124:8 125:12
intention 73:1
intentions 71:3
intercoms 98:16
interested 164:20
interests 11:6
internal 64:5
International

49:10 58:5 133:12
intersects 126:1
Introduction 135:9
investigation 75:15
 122:1
invoice 50:19
involve 102:17
involved 7:18
 15:18 26:8 30:10
 31:8 32:16 34:4
 36:15 37:7 38:8
 56:21
involves 8:14 16:16
involving 24:20
 36:8 39:18
issue 8:9 10:5 11:17
 30:12 31:9 32:21
 35:23 39:18 44:22
 83:15 94:21 99:12
 108:12,17,20
 111:6 145:11
issues 7:3,9 12:7
 28:4,5 33:25
 38:11 45:1 80:5
 89:11 98:21 99:9
 124:21 132:2
it'd 84:10,10
It'll 115:12
items 135:3
ITLA 57:13

J
J 2:13
Jane 35:22
January 46:24
 78:14 86:3
Jefferson 4:11
Jersey 14:17 15:10
Jesse 36:14
job 91:16 96:8
Joel 35:22
jog 74:19
jogging 69:3 72:10
 74:17
John 45:16
journals 57:8
judge 15:11
judges 14:16

judgment 46:11
jumping 152:7

K
K 2:5
Keefe 1:21 2:14 4:3
keep 16:20 48:23
 90:22,23 94:12
 119:8
keeping 16:17
kids 93:14
kill 8:16 70:1,10,24
 71:5 72:3 75:7
killed 95:23
killing 15:11
 123:15,17
killings 14:24
 15:19
kind 19:7 29:20
 30:7 79:22 83:7
 89:3 96:3,4
 107:10 116:22
 131:6 133:9
kinds 25:23 89:11
 94:24 99:9 103:5
 146:10
Kirchhoff 34:2,4
knew 72:8,15 75:24
 76:1 141:1 160:9
 162:7
know 5:13,16,24
 6:2 8:19 11:22
 15:25 16:11,21
 17:7 18:9,12
 22:12,21 23:24
 24:15,22 25:7,11
 25:11,22 26:3,4
 26:10 28:20 30:20
 31:5 38:7,15
 50:16 51:20 53:3
 53:23 57:2 60:21
 61:25 62:2,3,4,9
 62:11,19 67:9
 70:13 73:2 75:14
 75:25 76:3,6 80:4
 82:4,22 83:21,22
 84:3,19 89:2
 94:14 98:2,3 99:7

100:5 102:19
104:12 109:16,17
109:22 110:7,8,9
110:11,12 114:21
114:24 115:2
116:20 119:9
124:24 128:19
138:25 140:15,25
146:3 147:4
150:11 151:14
156:6 158:3 160:9
162:12
knowledge 20:10
 142:17 162:1
known 11:3 75:20
knows 22:7 103:5
Knox 79:17 159:5
 159:14

L
Lambert 33:13
landing 34:9
lane 69:5 72:11
 97:8 101:16 121:1
 121:10
lastly 78:9
late 87:24 89:10
law 54:8 57:8
 110:19,20,24
 111:2,2,2,4,17,20
 112:11,13 162:15
 162:21
laws 154:7 162:8
 162:12
lay 83:14
layout 113:18
learned 6:21
leave 10:4,14 51:17
lecture 28:2,3
lectures 27:15,19
 28:13
left 23:16 29:11
 36:16 66:3
leg 149:24
legal 11:5 57:14
 79:10,14 80:9,9
 80:10,13 109:7
 111:6,7 137:2

152:24 153:17
163:6,8
lenses 85:19
let's 55:15 84:15
 92:23 93:1,3
 116:4 141:5,6
lethal 95:25
level 13:25
liability 40:12
 43:15 107:4
liable 42:11
lies 24:24
life 11:23
light 66:11,11
lighted 83:24
lighting 84:6,18,19
 84:23,24 85:6,9
 85:13,16,18,23
 86:2,5
lights 87:5,6
liked 60:12
line 3:8 17:22 96:23
 97:6,13,20 99:13
 102:2,5 118:17
 120:1,13 128:21
 133:10 152:11
 160:12,18
liquor 33:12
Lisa 35:12
list 28:20 29:6,7
 60:4 63:7
listed 60:10 137:21
 138:3,7,10 139:1
 139:24 140:12
 148:10 149:3
listing 57:7
lit 84:2
literally 22:19 96:1
litigation 23:22,24
 24:11,18 25:20
 39:5 52:8,18,23
 53:8,16 55:11,11
little 7:7 38:5 48:2
 49:16,22 67:23
 77:13 79:9 106:20
 141:6
lived 96:3

living 52:18
LLC 1:11 2:14 4:7
loading 124:23
Local 5:11
located 4:3,11 9:4
location 9:2,3 35:3
 42:4 61:21 63:25
 64:24 65:11 78:6
 78:17 91:5 131:25
 132:17,20 141:16
 142:15,17 143:8
 143:18 144:20,22
 145:1,2,8 146:1
locations 11:1
 37:20
Lofton 29:14,14
log 64:2
logical 129:6
loiterer 81:16
loiterers 101:20,20
 101:23
loitering 101:17
 102:14,22
long 20:12 35:6
 58:16 74:5 160:22
longer 88:7 122:11
look 8:11 11:16
 50:19 58:8 63:2
 65:17 69:25 71:8
 74:5 86:19 87:7
 87:23 88:1 108:19
 118:1 134:9 146:2
 146:2,4,13 147:18
 147:20 155:23
 156:4,14
looked 26:11 48:3
 70:5 71:4 132:4
 135:3 161:11,14
looking 8:5 25:12
 46:22 65:13,25
 73:5 100:19
 115:24 118:21
 131:5 132:21
 135:14 156:1
looks 50:7 102:20
lot 6:25 13:15 19:6
 25:25 33:17 37:18

Andrew Lee Camphouse 03/15/2022          www.InDemandReporting.com                    (773) 239-6008

40:19 45:11 66:1
66:2,23 67:11,16
68:17 79:21 80:23
81:15 82:6 83:13
83:24 84:2,6 85:6
85:24 88:24,24
89:15 92:7 93:13
93:14,19 94:8
96:21,23 97:11
99:10 101:16,21
101:24 102:1,6,9
102:10,12,20
103:10 104:2
117:18,22 120:18
122:16 125:14,16
125:17,19 126:3,5
126:5,12 139:17
143:21 146:9
156:11 161:6
**lots** 92:20
**loud** 115:10
**lower** 82:18

**M**

**machines** 39:16,18
**major** 94:21
**majority** 26:7
**making** 11:2 45:6
71:23 72:16 91:20
96:1 107:15
**manage** 10:23
**management** 29:14
90:10 91:15,20,21
141:2
**manager** 10:8
**managing** 27:3
57:19,22 91:16
**maneuver** 123:2
**manner** 26:8 44:10
55:9 164:20
**map** 113:13 144:16
147:20
**mapping** 146:5
**March** 1:17 4:2
164:9
**Marie** 35:12
**mark** 47:14
**marked** 9:7,9,9,10

47:22 48:6 51:21
51:22 60:3 115:16
115:16,22
**marker** 114:5
**matches** 135:5
**material** 49:1,1
137:12 158:3
**materials** 48:8 49:3
50:8 51:20 62:8
62:18 90:13
112:22 133:7
155:17,19
**mathematical**
132:13
**matter** 4:6 28:16
**matters** 135:11
164:5
**meal** 88:3 89:4,20
93:13
**Meals** 93:16
**mean** 19:13 26:3
31:12 54:2 65:12
67:10 79:14 80:20
80:22 95:16
101:12 105:25
107:4 129:4,22
133:5,19 135:13
162:11
**meaning** 23:12
51:15
**means** 8:22 13:7
88:24
**meant** 69:25
**measure** 161:21
**measures** 16:10
38:2 81:24 154:8
161:24 162:9,13
**mechanisms** 64:5
**media** 22:5 57:7
**medical** 10:5
**Medrano** 29:23
**meet** 158:7
**member** 45:19
**members** 22:24
**memory** 118:18
**men** 34:8 44:22
**mentally** 19:5,10

**mentioned** 86:15
87:1 89:25 109:15
118:4 134:7,21
146:8
**menu** 118:9,14
119:6 160:23
161:4
**mere** 100:3
**mess** 118:22
**method** 13:23
**Michael** 2:5 4:23
29:13
**middle** 93:15
**mile** 144:25
**mileage** 142:10
**miles** 142:20,21
143:10,13 145:7
145:14,20,25
157:5,14
**military** 6:2,4,8
7:21 8:8 13:19
14:3 64:23 69:7
69:14,15 78:16,21
79:21 95:3 96:12
99:15 103:9,19
104:17,23 127:4
149:10,17 152:25
153:3,11
**mind** 6:13,17 71:9
72:22 75:9,12,13
130:1
**minimal** 136:13
147:25
**minute** 123:3
**minutes** 74:3,3,21
98:8 99:2 102:21
118:25
**missed** 135:7
**missing** 48:11 49:4
53:9 59:15,25
157:25
**mistake** 71:8 72:16
72:19,21 76:7
**mistaken** 72:12
**mitigate** 8:23 13:21
109:16 152:22
156:8

**mitigating** 11:3
**mitigation** 12:14
27:13 79:23 88:15
137:7
**mixed** 38:4
**Mm-hmm** 7:16
25:24 26:7,12
45:8 68:4,7
**mom** 93:14
**moment** 22:11 30:9
77:5 84:16 92:19
133:24
**money** 88:21
**monitor** 161:1
**Moody** 38:19
**morning** 34:24,24
160:13
**motivated** 13:18
127:10
**motivation** 12:12
13:17 14:1,15
69:23 70:5,13
94:6 128:16
**motivations** 70:14
**motive** 75:3,16
76:5
**motives** 19:6
**move** 97:13 126:9
**moves** 144:18
**moving** 117:17
**Muldoon** 2:5,6,6
4:23,23 9:11
11:12 12:23 13:1
13:12 14:7,19,22
15:3,7,12,15,20
16:4,8,19 17:1,5
17:11,13,19 18:1
18:7,11,13,17
19:2,12,19,24
20:3,14,22 21:10
21:19,22,25 22:16
23:12 24:9,12,15
28:25 29:2 37:22
41:7,10,15,17
46:21 52:10 53:1
53:9,12,18,22
54:6,8,13,15,21

54:24 55:18 56:14
59:19,22 61:10,13
62:25 63:2,19
65:2,21 66:18
67:1,4,7 68:2,5
69:10,13,20 70:2
70:11 71:2,11,18
71:20,23 72:15,24
74:4,23 75:1,11
75:23 76:24 77:7
77:11,18 78:18,21
80:25 81:2,4,25
83:17,19 84:8
91:6,8 92:8,10
94:1 95:7,14
96:15,18 99:18
100:10,22 101:2,7
101:10 103:12,21
104:19 105:11
106:3,9,12,14,16
109:7 110:3,6,22
111:13,15,21
112:1,7,9,15
113:8,25 114:4,8
114:10,14,17,20
114:22,25 115:3
116:2,6,24 117:1
117:15 118:7,11
118:21,24 119:23
121:21,24 123:8
123:23 124:2,14
124:19 125:6,20
126:19 127:7,14
127:17,23 128:13
129:1,8,18,21
130:9,16 131:13
132:10,13 135:11
135:18,20 137:15
137:21,25 138:3,7
138:11 139:5,11
139:18,22 140:2,5
140:8,10,15,18
141:21,24 143:22
143:25 146:16,21
146:23 147:1,3,8
147:10,13,15
148:16 149:12,14

In Demand Electronic Court Reporting, Inc   www.InDemandReporting.com                    (773) 239-6008

150:9,23,25 152:5
152:7 153:2,6
154:17,21 157:19
158:7,16,18
159:19,22,25
163:1,10,12,16,18
163:20
**Muldoon's** 54:19
55:18,20
**multiple** 5:13 70:25
70:25 71:1 73:17
73:17
**murdered** 46:3

## N

**name** 4:15 5:6
134:16 135:3
**narrow** 134:11
**narrowly** 134:10
**National** 133:20
**nature** 57:13 64:3
99:2 139:6 150:20
**near** 116:17 120:21
**necessarily** 8:5
13:3 14:12 87:4
90:7 109:21 143:7
**need** 7:13 79:6 81:3
86:17 106:11
112:3 162:15
**needs** 9:19 86:24
87:9 135:24
138:23
**negative** 110:14
**neighborhood**
141:9,20 142:16
145:20
**neighborhoods**
143:15 146:7
**never** 17:3 44:3,8,9
44:10 45:1 96:3
111:9 125:14,18
143:19,19
**New** 14:17 15:10
**news** 14:16
**newspaper** 82:21
**NFPA** 133:18
**nice** 144:16
**night** 34:15 46:4

71:10 87:24 89:7
89:10 101:19
103:10,19 104:18
106:1 160:12
**nightclub** 30:13,17
30:19 36:15,16
37:7,8,18 86:21
87:22
**nightclubs** 24:7,20
25:10 26:1 86:12
92:16
**noise** 29:25
**non-conflict** 7:25
**normal** 7:25 12:21
14:5
**north** 1:22 2:15 4:4
66:23 67:17 68:23
73:22 114:18
118:2,3,5,7,8
122:9 123:21,21
126:12,13
**northbound** 126:2
**Northern** 1:2 4:8
5:12 15:1
**notarial** 165:4
**notary** 4:16
**notes** 48:17,20
**notice** 157:3
**number** 1:9 3:8,8
3:13 25:12 26:4
28:22 57:8 63:12
64:4 114:1,23
134:1 141:18,20
142:22,24 146:3

## O

**oath** 4:18 47:25
**object** 13:12 37:22
53:2 94:1,2
101:11 110:22
153:2,6 154:21
163:12
**objecting** 53:23
**objection** 11:12
12:23 14:7,8,19
15:3,7,12,20 16:4
16:8,19 17:1,5,11
17:19 18:1,7,13

18:16 19:2,12,19
19:24 20:3,14,22
21:10,19,25 22:16
23:12 52:10 61:10
65:2,21 66:18
67:1,4 68:2 69:10
69:20 70:2,11
71:2,11,23 72:15
72:24 74:4,23
75:11,23 78:18
81:4,25 83:19
91:6 92:8 95:7,8,9
95:14 96:15,18
99:18,20 100:10
100:11,11,11,22
101:2,7 103:12,21
104:19 106:3
110:3 112:15
116:24 121:24
123:8,23 124:2,14
124:19 125:6,20
127:7,14,23
128:13 129:1,8,21
143:22 149:12
150:9 159:18
**objections** 111:21
**objective** 8:15,17
**Occasionally** 57:5
**occupants** 71:5
72:3 75:7
**occur** 44:11 95:4
143:7
**occurred** 31:6
96:12 103:9,10,19
105:17
**occurrence** 160:13
**occurring** 65:20
**occurs** 80:23
**OEMC** 132:4,8,20
141:8,12 144:4
**offender** 13:14,16
14:1 32:17 34:23
43:17
**offender's** 94:5
**offering** 102:24
**office** 22:8 32:25
54:20 55:21 56:7

56:13
**officer** 36:9 100:8
123:13 124:1
127:20 128:6
130:8
**officers** 79:21 83:6
100:8
**oftentimes** 12:12
22:25
**oh** 6:20 23:20 34:17
57:14 59:2 60:1
114:20,25 118:24
124:14
**oil** 7:19
**OK** 94:17
**okay** 5:24 6:15,24
7:7 8:18 9:9,15
10:6 11:7 15:23
18:17 20:25 24:12
25:15 28:10 29:6
29:13 31:5 32:21
33:7 34:2,10,12
36:7 38:25 39:13
39:23 40:14,21
41:23 43:2,12,23
45:16,22 46:5,19
47:13,18 49:2,7
49:16,19,22 52:4
55:15 56:6,16,22
57:12,15,20,22
58:2,12,18 59:14
60:2 61:17,25
62:17 63:1,4 64:1
65:17 66:22 67:23
77:16 78:25 80:13
80:16 81:4,18
84:8 85:5 87:21
92:14 93:4,7
98:19,24,25
100:25 102:17
103:2 104:15
105:9 106:8 108:5
111:10 112:19,20
113:22,23 114:4,8
114:10,25 115:3,4
115:9,13,13,20,24
116:2,9,16,20,22

118:5,5,12,20
119:9 120:8 121:4
121:4,13,14
122:10 124:7
126:15 127:12
131:11,18 132:23
134:8 135:2,9,20
135:23 136:1
137:8,10,14
138:11 140:8
142:25 144:3
145:6,10 148:8,9
148:20 150:3,6
151:14,21 152:12
153:5,25 154:4,11
154:24 155:7
157:17 158:1,5,11
158:14 159:3,6
160:3,11,11 161:3
161:8 162:7,18,25
163:1,14,16,20,22
**on-site** 87:25
**once** 94:20
**one's** 81:17
**ones** 25:17 133:16
134:4,5,6,16,17
134:19,21,22,23
155:14
**open** 80:19 81:15
**operate** 22:25
110:10 139:8
**operated** 96:4
**operating** 140:24
156:6,6 157:3
**operation** 8:15
10:23 86:21 88:18
89:10
**operational** 9:5
86:23 89:12
**operations** 7:23
25:14 78:9 86:20
87:23,24
**operator** 4:16
**opine** 92:4 104:16
105:15,20,24
111:7 163:6
**opined** 91:10,23

Andrew Lee Camphouse 03/15/2022    www.InDemandReporting.com    (773) 239-6008

Page 177

opining 27:16 91:1
 91:24 155:11
opinion 40:9 41:1,5
 41:6 42:10,14
 43:23 44:3 47:2
 72:7 76:15 85:12
 86:1,4 99:3
 101:23 107:8
 133:2 136:1,24
 137:8,24 138:6
 148:11,11,20,22
 149:2 155:15
 161:25
opinion's 138:15
opinions 27:10
 29:20 30:7 33:22
 34:1 37:15 39:8
 39:25 42:18 43:6
 43:16 47:2,6
 48:25 49:8 60:6
 61:4,8 91:21
 102:23,24 133:8
 133:14 134:15,25
 135:4 136:20
 138:25 140:11
 154:13,22 155:3
 155:20,25 158:21
 158:23,25 161:19
opportune 21:16
 22:11,14
opportunity 12:16
 22:18,20,25 44:25
 129:10 130:3
 150:15
opportunity's 23:5
opposed 11:21
 12:15 13:9 103:6
 134:11
order 11:8 61:14
 75:4 76:3 79:7
 81:7 86:18,25
 118:12
ordering 118:10
organization 58:13
 58:14
original 105:12
 137:15

originally 102:10
outcome 16:14
 108:10 164:21
outcomes 107:23
outdoors 93:10
outlined 159:15
outside 32:20 33:17
 37:10 65:11 68:21
 82:24 85:6 98:11
 154:13 155:1
Overall 50:1
overnight 104:2
 148:14 162:16

_____

P

p.m 4:3 21:2,4
 47:19,21 90:17,21
 90:23,24 91:15,15
 106:22,24 163:23
package 32:17
 33:12
page 3:8,13 9:17
 28:22,23 60:4
 131:19 132:24
 133:1,2 135:2,10
 135:13,15,17
 136:1 148:3,6,21
 152:10
pages 28:24 29:4
 140:12
paid 50:17
par 85:18
paraphrasing
 136:3
park 32:15 67:20
parked 45:2,10
 117:6,22
Parker 29:13
parking 33:17
 40:19 45:11 66:1
 66:2 67:11,16
 68:17 80:23 81:15
 82:6 83:13,24
 84:2,6 85:6,24
 92:7,20 93:13,18
 94:8 96:21,23
 97:11 99:10
 101:16,20,24

102:1,6,9,10,20
 103:10 104:2,3
 116:19 117:21
 120:18,18 122:16
 125:14,16,17,18
 126:3,5,5,12
 139:17 143:21
 161:6
part 5:19 27:2
 35:24 42:14 44:2
 44:17 45:4 62:13
 72:19 96:8 125:18
 135:5 141:12
 157:2
particular 8:17
 16:1 25:3 33:10
 44:16 63:6,17
 73:6 75:4 76:2,8
 77:25 84:1 87:15
 89:22 91:4 92:23
 111:20 118:15
 129:17 131:3
 143:18 146:13
 153:15
particularly 143:14
parties 164:6,18,19
partner 57:18
party 82:24
passed 120:5
Patricia 32:14
patrolled 93:21
patrolling 94:8
 104:2
patrols 83:7
pause 67:24
paying 88:14
PD 62:6
PDF 135:13
Pecoraro 31:20
peeled 119:8
pending 112:7
people 8:16 16:10
 20:13 22:24 35:1
 70:20 76:1,1 81:8
 82:16 88:24 93:18
 94:17 95:24 96:3
 97:1,9 101:15

102:1 120:17
 123:15 125:9
 161:2
percent 11:18 50:2
 146:6
percentage 24:6,19
 25:18 26:6 49:24
 52:7 53:3,4,7,12
 53:13,24 54:10
 55:9,10 132:2
percentages 52:8
 52:17
perfect 11:19,22
 109:21
perfection 11:19
 104:12,14
perimeters 7:17
period 59:1 63:7
 67:21,25 88:1,7
 102:18 117:7
 124:9 126:8
person 17:7 18:24
 20:10 40:20 102:5
 102:9,10 103:4
 123:16 126:22
personally 126:24
perspective 109:8
 137:3 152:25
phonetic 13:5
phrase 6:6 91:8
 92:10 94:1,2
 104:24
physical 98:10,20
pick 89:2 105:1,2
picked 128:21,25
 129:10
picking 76:7
pink 146:6
place 22:6,8 33:10
 45:15 97:4 108:19
 109:20 113:21
 114:5 137:13
 144:21
placeholder 115:16
placement 113:11
places 22:7 24:20
 25:10 38:3,8

plain 88:9
plaintiff 1:7 2:3
 4:24 29:19 31:14
 31:24 33:19 34:11
 34:17 36:1 37:12
 38:23,23 46:6
 50:6 56:17 136:17
 138:18 147:24
Plaintiff's 9:14
 136:5,10 148:25
 152:16
plaintiffs 49:25
plan 16:13 91:24
 109:3,3 112:20
planner 58:10
planning 7:13
 13:20 20:5
platform 7:22
play 77:4,9,14
please 4:17,21 21:1
 58:9 77:3,4,10,15
 111:24 147:14
 148:5 154:19
plenty 109:18
 153:12
plus 156:9
pod 60:24
point 66:17 67:18
 74:8,8,12 82:11
 86:8 98:6,9 102:3
 108:14,15,16
 120:15,24 121:2
 125:15 126:2
 130:19 135:21
 142:7 144:18
 155:21,21
points 98:15
poker 39:16,18
police 6:3 9:24 10:1
 10:11,18 11:5
 31:22 36:8 64:11
 75:15 76:4 79:21
 90:5,7 98:22
 100:7,8 122:1
 123:13 124:1,4
 127:20 128:6
 130:8 146:19

151:16 154:3
policeman 71:17
policies 90:9,10,13
  90:25
policy 91:1,22
pool 38:15
pops 121:5
population 93:12
portal 51:14,14,14
position 10:4,6
positioning 124:8
positions 10:21,22
  23:18
possibilities 130:18
possibility 85:17
possible 61:6 73:3
  100:13,15 124:5
  125:7,8
possibly 51:1 85:9
  96:20 113:5,8
potential 20:17
potentially 61:3
  63:8 95:21
Pourghobadi 34:12
practice 109:9
  134:4
practices 110:25
  134:2,10 136:8,12
  136:15 138:17
  148:24 151:22
  152:15,19 153:13
  156:15 162:4
Prate 137:9 141:1
  142:23
pre- 12:7
pre-planned 6:10
  6:17 14:3 17:17
  18:5 44:23 123:5
  123:10
pre-planning 15:24
  19:23
pre-trained 6:9,18
predating 78:14
predator 15:23
  16:17,24 17:16
  18:5,23 19:1 20:7
  21:17 22:10,22

predators 12:12,13
  18:20 19:16 20:20
  21:8 22:10,24
  95:4 150:13,14
predatory 64:18
  93:24 94:2 150:7
  150:10
premeditated
  130:8,9
premeditation 16:1
premises 26:13
  107:4,4
preparation 60:5
  65:8
prepare 158:1
presence 82:16
  94:7 99:25 100:3
  164:14
present 164:6
presentation 28:10
presentations
  27:19 28:9,13
presented 27:25
  128:8
pretty 11:6 65:10
  144:9 145:21
  146:1
prevent 12:7,20,21
  13:7 14:4 16:2,24
  17:17,24 18:5
  40:7 43:8 83:7,8
  93:23 94:13 95:6
  96:14 100:2
  103:18 104:17
  136:9,12 151:22
  152:15 153:13
preventable 12:1,3
prevented 99:14
  100:9 103:8
  104:18 105:18,20
  105:25 106:1
preventing 8:2
  109:24
prevention 102:25
  103:1,3 104:12
  108:2 133:22
prey 22:24

Price 46:1
Primarily 42:5
  137:9
primary 78:5
Princeton 69:1
  122:9,16,22
  126:13
principles 134:3
prior 9:2 19:17
  64:15,21,25 65:19
  75:20 89:22 96:22
  98:11 101:25
  153:25
Pritchard 4:15
  164:2 165:7
private 6:19 10:11
  10:20 23:9
probably 24:6 27:8
  117:25
problem 97:6
problems 87:13
procedural 87:9
procedure 5:10
  91:1
procedures 90:9,11
  90:14,25 91:17
  137:12
proceed 5:3,17
proceeding 39:9
process 35:6 36:19
  36:23 130:21
produced 62:17
professional 9:16
  9:20 58:5 76:16
  76:19 77:24 79:11
  133:3 138:22
professor 26:17
profile 142:6
profit 79:25
program 16:13
  27:2 153:12
  156:14
programs 17:10
promulgated
  133:12
proper 84:23
  152:21

properly 83:24
  84:2 160:21
Properties 1:11 4:7
property 34:22,23
  38:24 45:3 80:17
  81:20 125:19
  126:3 161:2
protect 11:8 88:19
  138:17 147:24
protected 79:20
protection 10:8
  17:10 49:9 58:4
  133:11,20
provide 55:8 86:25
  154:8
provided 44:17
  45:5 62:8,12,23
  62:25 66:20 67:3
  112:21 144:13
  155:19
proximally 151:11
proximate 136:16
  148:24
public 4:16 10:14
  10:17
publication 49:12
  134:10
published 49:9
publishers 57:8
pull 67:18
pulled 63:18
pulling 66:24 119:2
  119:5
pure 72:17 75:12
purpose 102:15
purposes 123:15
pursuant 5:10
pursuit 31:22
put 50:14 88:20
  90:16 94:18
  101:13 109:20
  114:5 161:3
puts 157:2
putting 17:15

_____Q_____

Q- 86:21
QSR 49:12,13

86:21 87:2,5,22
  87:24 88:11 89:10
  93:3,7
QSRs 92:15
quabble 13:5
qualifications
  59:17 76:13
quasi-military 8:8
question 3:6 5:20
  19:15 21:6 28:9
  37:23 53:21 54:17
  60:20 61:15 71:24
  76:25 81:8 82:10
  82:20 84:12,15
  85:1,2,19 103:20
  103:23 104:18
  105:9,12 106:2,4
  110:23 111:11,13
  112:2,7,9 120:11
  129:24 137:16
  140:10 145:15
  147:19 154:18
  159:4 161:9
questions 5:20
  76:13 131:21
  139:23 140:7
  158:11,15 161:9
quick 47:15 74:22
  79:19 86:10 87:18
  150:21 158:16
quickly 73:10,20
  93:17 97:22 107:1
  150:22
quite 82:4 144:12

_____R_____

radius 143:4
  157:11,15
radiuses 142:19
raise 4:18
raped 45:14
rapid 73:12,13
  150:20
rapidly 73:16
raping 43:20
rated 88:18 141:15
  141:20 142:5
reach 115:12

124:17
reached 158:22
read 77:2 80:2
  82:20 84:15 90:17
  90:19 111:24
  136:4,18 138:21
  139:19,25 140:16
  140:16 148:21
  152:13 154:18
  155:19 156:4
reading 48:21
real 35:23
really 13:25 16:5
  24:22 25:11,22
  50:2 86:24 96:4
  101:12 124:24
reason 77:24 84:5
  107:20 108:11,13
  125:2 128:1,15
  130:3 145:6
  149:17 153:10
  155:16,22 163:4
reasonable 7:24
  8:1,22 40:6,11
  42:15 43:7,13,14
  43:24 44:6 47:3
  70:9 75:19 76:16
  76:20 79:10,16
  80:8,9 81:23
  83:10 103:17,24
  103:25 104:16
  105:15,24 109:5
  109:16 110:8,17
  111:19 112:13
  133:3 136:7,10,14
  137:4 138:2,15,16
  138:18 139:14
  144:3 147:24
  148:22 149:6,7,10
  152:14 153:1
  155:12 156:7
  159:4,5,10,12
  160:3,7 161:20,22
  161:25 162:23
  163:4
reasonableness
  11:16,20

reasonably 8:20
  41:2 78:1 108:25
  109:2 110:1,20
  133:14 134:24
  136:6,24 137:1
  138:5 139:4,15
  140:22,23 150:7
  153:17 155:12
  160:8
reasoned 76:19
  85:12 107:8,19
  155:24
reasoning 107:9
  156:5,11
reasons 128:7
rebar 34:9
recall 15:8 29:20
  30:7,12 31:9,11
  46:15 49:18 55:24
  55:25 56:15,20
  57:3,11 66:14
  98:18 102:3,8
  120:16 126:25
receive 52:20
recognized 45:13
recommendations
  11:2
recommending
  154:9
record 4:2,22 5:7
  21:1,2,3,4 47:18
  47:20,21,24 54:25
  90:3 106:21,23,24
  127:25 140:18
  146:17 163:23,24
  164:8
recorded 4:10
  164:13
RECORDER 4:1
  4:20 5:2 6:14
  18:15 21:2,4
  47:18,21 77:5,16
  84:16 106:19,21
  106:24 112:3,6
  115:12 163:23
recording 4:16
  77:6,17 82:14

84:17 112:5
  154:20 164:13
records 61:19,20
  61:22,24
recovered 151:17
RECROSS 3:3
red 146:6,6,7,14
REDIRECT 3:3
  163:2
reducing 109:23
refer 64:6 104:23
reference 151:16
referring 65:24
  150:11
reflect 63:11
regard 156:13
regarding 49:12
  55:3,5 59:21 64:5
  131:24
regards 28:3 61:20
region 57:25
regular 8:13 88:22
rejected 36:23
relate 12:6 26:24
  27:16 28:6 37:15
  47:3
related 10:24 26:13
  27:10 28:18 40:1
  42:14,19,20 43:14
  43:16,24 91:2
  92:15 98:1 162:8
  162:12 164:19
relates 8:21 28:10
  76:20
relationship 43:16
relatively 87:25
relevance 13:1 14:9
  14:22 15:3,7,15
  15:20 16:4,19
  17:1,13,19 18:1,7
  19:2,12,19 20:3
  20:14,22 21:10,22
  22:16 65:2 100:10
rely 133:14 134:24
remain 21:14
remained 124:9
remember 21:7

33:23,25 66:10
  105:12 159:6
remote 45:10
rented 35:24
repeat 25:5 58:18
  76:24 77:1,22
repeating 21:7
replayed 77:6,17
  84:17 112:5
  154:20
report 49:2 63:6,10
  63:17,23,24 64:11
  64:13 65:8 91:23
  131:19,20 132:4
  132:20,23 133:3
  135:15 138:3
  139:12,19,24
  140:12 141:14
  142:4 144:6,13,14
  146:3,4,5 148:6
  148:17 151:17
  153:23,24 154:12
  154:14 155:1,4,8
  155:14 157:20,22
  157:23 158:2,10
  158:20,21 159:15
  160:4 161:9 164:4
report's 144:9
reported 34:14
  154:2
Reporting 4:11
reports 141:8
  144:15
represent 102:12
represented 148:14
represents 97:14
request 48:8
require 154:7
required 5:2 37:19
  55:5 78:3 110:23
  111:17
requires 88:14
reread 158:2
research 131:4,5,7
  131:23 162:14
reserve 163:17,20
reserved 165:2

residential 83:2
resolve 46:9
resolved 37:4 45:1
resources 11:4
respond 97:22
response 48:7 49:3
rest 157:24
rest- 33:10
restaurant 25:3,8
  29:16,17 30:4,14
  30:15,16 31:1
  33:15,16 38:2
  40:18 41:2 42:5,7
  42:11,15 43:3,7
  43:13,22 44:1,6
  44:10,18,19 46:2
  63:9,25 64:14
  65:19 79:20 80:18
  80:18,22 81:14
  82:6 83:1,3,12,13
  83:16 84:1,19
  85:6 86:10 87:19
  88:1,9,9,23 89:2
  89:21 92:24,25
  93:2,3,7 97:15
  99:16,16 103:6
  108:24 109:4,25
  110:18 111:17
  112:11,14,19
  131:3,8,22
restaurant's 81:13
  81:16
restaurants 25:9
  26:1 92:23 98:17
resulted 136:3,5,9
  152:16
results 38:18
retail 25:14 79:18
retainer 51:6
retreated 73:20
retrial 32:3,12
return 35:5
review 49:8 72:8
  90:13 101:18
  123:6,19 127:21
  128:6,10
reviewed 49:19

60:5,10 65:7 74:7
119:22 126:21
135:7 142:4
**reviewing** 124:18
133:7 135:4,6
155:17
**revolved** 33:24
**Richard** 31:20
**rider** 48:8
**right** 4:18 6:1
11:21 15:1 19:9
23:5,5 25:17
32:12 36:16 38:19
41:23 43:25 47:13
47:17,24 54:2
59:4 60:2 66:3,12
83:3 85:2 92:19
106:19 107:8
113:24 114:17
115:4,7,11,15,21
116:10,21 117:20
121:15 129:6
139:18,20 140:13
143:11,12,16
145:25 157:24
158:14
**rise** 110:10
**risk** 27:3,12 49:10
78:2,3 80:5 82:7
82:17,18 86:9,13
87:22 88:17 92:14
92:15,21 93:6,20
110:11 139:7
140:24 141:1,7,18
141:23 142:5,22
143:1 146:10
152:21 156:7,17
157:3,18
**risks** 11:3 110:11
110:13,14 141:3
156:8
**road** 145:7,24
**roadway** 67:17
**rob** 145:13
**robbed** 36:2 88:23
**robberies** 25:20
**robbery** 8:12 12:22

13:10 14:5 89:1,5
143:15
**Rocco** 137:9
140:25 142:23
**role** 10:10
**Ron** 131:18
**Ronald** 1:15 4:14
5:8 164:10
**roof** 34:7
**room** 34:15 87:6
88:12 89:14,15
**roughly** 117:9
118:14
**rounds** 82:19,24
83:2
**Rule** 9:14 63:3
**rules** 5:10,11,11,16
**run** 38:17 96:7
**running** 69:3
122:19
**Ryan** 33:13,13
67:19 116:17

—————————
**S**
—————————

**S** 1:15 4:14 5:8
164:10
**Sala** 36:14
**Sat-** 29:23
**Saturnino** 29:23
32:2
**saw** 45:10 67:10
68:16 75:9,18
81:21 95:5 96:13
98:6 117:21
126:22 143:19
155:4
**saying** 26:15,16
97:12 144:8
147:15 155:22
**says** 90:14 142:7
148:21 162:15
**schematics** 113:3
**score** 142:15 143:4
143:7 144:4
146:14 153:20,22
156:18,22,24
**scores** 142:18
**Scott** 1:5 4:6

**Scott-Blake** 37:6
**screaming** 99:1
119:15 120:1
**screen** 48:24,24
74:18
**seal** 165:4
**seat** 102:4 120:19
**second** 17:23 18:17
20:25 29:23 48:4
60:2 96:2 115:9
120:9 121:4 141:5
152:4
**sector** 10:11,15,18
10:20 23:9
**secured** 7:16
**securing** 8:2
**security** 7:3,8
10:23,25 16:9,13
26:14,14 27:2,4
28:4 33:25 35:2,3
37:16,19 38:2
40:20 42:20,22
43:9,17,20,21
44:9,15,17,18,24
45:4,5 49:13
55:10 59:21 76:16
76:20 77:24 79:11
80:17 81:24 83:6
84:4 86:9 91:16
93:21,22,22 94:8
94:11,23 95:2
96:9,14 98:22,23
99:14 104:1 107:5
108:18 109:8,12
109:14,19 110:24
134:2 136:8,11,15
137:3,6,6 138:17
138:21,23 148:23
148:24 151:22
152:15,19 153:12
156:13 160:17,22
162:16

67:13,17 69:2
73:25 74:5,17,19
83:13 85:9 94:11
95:20 97:20 98:13
98:14 99:6 101:9
105:1 108:20
113:17 116:14,16
116:20,22 117:6
117:15,18 118:3,9
119:9,16 121:8,13
122:3,10,15 133:1
135:2,9,24 148:6
**seeing** 85:23
122:14
**seen** 14:16 60:13,25
62:14 68:6,12,13
73:23 76:9 90:4
119:15,22,23,25
120:12,25 124:3
126:23 128:1
131:2 145:9,15
**select** 115:18
**selected** 128:14
130:25 131:1
**selection** 129:14
130:21
**self** 17:24
**send** 55:4
**sense** 89:15
**sent** 54:9 55:7
**seriously** 71:5 72:3
123:17
**serve** 24:21 25:10
37:20 86:10 87:18
94:9
**served** 30:11 31:10
105:22
**service** 31:11 62:6
62:7,9 63:9,12
79:19 132:5
148:12
**services** 10:8 57:4
**serving** 87:11
**set** 46:17,17 47:13
64:6 88:14 165:3
**setting** 25:20 30:25
80:11

**settings** 25:4,6 93:6
93:9
**sexually** 36:1 45:20
**sheets** 90:18
**shell** 151:17
**shift** 46:4 104:2
148:14 162:16
**shoot** 72:1 73:6
95:13 121:23
128:15 130:2,4
149:25
**shooters** 66:15 69:7
70:3,12 72:10
75:19,24 76:10
98:1,5 121:20
125:3,5 127:3
151:6,11
**shooters'** 71:3
**shooting** 39:15,19
39:22 40:3,7,11
41:3,24,24 64:12
64:15,25 68:25
69:8 71:9,25
78:14 80:23 81:19
81:21 82:24 83:11
83:14 84:7 85:8
85:14,24 86:2
89:23 91:5,9 92:7
92:11 96:7,22
98:8,12,20 99:2
101:19,25 103:11
104:17 106:1
126:25 130:11
131:6 135:11
143:20 149:21,21
149:25 150:4
**shootings** 64:14,19
70:20 154:1,2
**shootout** 100:16
**short** 6:9 35:6
87:25 114:9
150:21 156:25
**shortly** 51:11
**shot** 35:4,5 42:1
75:22,22 76:6
82:23 118:17
151:10,15,19

Andrew Lee Camphouse 03/15/2022    www.InDemandReporting.com    (773) 239-6008

Page 181

**shots** 73:17 82:5
**should've** 84:20
 161:20,21
**shoutout** 94:17
**show** 63:6,13,18,21
 64:13,18,23 67:23
 113:22 115:15
**showed** 45:9 61:7
 65:12 142:5
**showers** 45:20
**showing** 118:5
 121:5
**shows** 63:7,22 64:1
 68:23 146:5
**shutting** 89:14
**sic** 4:12
**side** 8:9 29:18 30:5
 31:13,23 32:23
 34:10 35:7 36:3
 37:11 46:5 56:17
 66:24,25 67:18
 68:24,24 72:9
 94:23 96:10,11
 97:7 99:15,16
 114:18,19,19
 116:8,11 117:22
 117:22,23 118:2,3
 118:6,7,8 120:9
 121:5 123:21,22
 143:13 145:20,22
**sides** 69:9 114:15
 115:18
**sight** 117:24 119:5
**signage** 108:22
**signal** 84:11
**signature** 152:11
 163:17,21 165:1
**similar** 27:10 81:20
 83:11,14 92:22
 118:19 126:17
 127:1 131:3,8
 143:20 154:1
**simple** 102:16
**sir** 14:13 16:7
 70:17 84:14 105:7
 109:12 111:4,8
 112:20 117:4

131:12 132:7
 151:2,9 153:9
**sit** 9:20 88:3 89:3
 89:19 93:12
**sit-** 117:17
**sit-down** 88:22,23
 92:25
**sitting** 45:12 82:22
 88:25 94:17 97:10
 117:12 124:23
**situation** 7:11
 21:18 30:25 81:20
 89:12 100:2 161:2
**situations** 92:21
 103:5
**six** 64:6
**slightly** 69:3
**Smith** 2:13 4:25,25
 5:5 6:15,16 9:8,12
 11:24 12:24 13:4
 14:2,10,20,23
 15:5,9,13,17,22
 16:6,15,22 17:2,8
 17:14,21 18:3,8
 18:19 19:8,14,21
 20:1,6,19,24 21:1
 21:5,13,20,23
 22:9 23:3,14
 24:10,14,17 29:1
 29:3 30:1 37:24
 41:9,12,14,20
 46:23 47:23 51:23
 52:11,13 53:6,11
 53:14,19 54:4,7
 54:11,14,17,18,22
 55:1,7,16 59:20
 59:23 61:16 63:1
 63:4,5,20 65:4
 66:4,21 67:2,5,12
 68:4,7,9 69:11,18
 69:24 70:7,16
 71:7,13,15,17,19
 71:21 72:5,20
 73:4 74:7,10,24
 75:8,17 76:11
 77:2,4,9,14,20,22
 77:23 78:19,24

81:1,3,10 82:2
 83:18,25 84:13
 85:4 91:18 92:13
 94:25 95:12,15
 96:16 100:6,14,24
 101:5,9,14 103:15
 104:5 105:6,14
 106:7,11,13,15,18
 106:20,25 109:11
 110:4,15 111:3,14
 111:16,22 112:8
 112:10,18 113:12
 114:2,5,9,13,15
 114:18,21,24
 115:1,4,5,11,13
 115:14,23 116:3,7
 117:3,16 118:9,13
 118:22,25 119:1
 119:24 121:22
 122:2 123:11,24
 124:6,15,20
 125:11,23 126:20
 127:11,15,18
 128:4,22 129:3,12
 129:19 130:6,10
 130:22 131:14,15
 132:11,14 135:17
 135:19,22 137:17
 137:19,22 138:1,4
 138:9,13 139:9,13
 139:20 140:1,4,6
 140:9,14,20
 141:22 142:1
 143:23 144:2
 146:18,22,25
 147:2,7,9,12,14
 147:17 148:19
 149:19 150:17
 151:1 152:9 153:5
 153:8 154:24,25
 157:21 159:18,21
 159:24 163:3,14
 163:17,19,22
**social** 22:5
**society** 22:24
**solely** 156:18
**solutions** 109:19

**solve** 89:13
**somebody** 19:10
 82:5,23 89:20
 102:19 145:6
**son** 15:11
**sorry** 6:14 18:15
 21:7 24:9 25:5
 30:2 34:17 41:7
 53:10 56:25 60:2
 76:22 104:8,9
 116:5 121:4
 131:13 147:16
 151:2 152:10
 154:19
**sort** 6:6,12,19 8:8
 12:22 18:23 72:22
 97:3,4 110:19
 113:3,13 119:19
 124:13 143:16
 147:20 149:23
**sounded** 97:2,2
**sounds** 82:4 144:8
**South** 4:11 143:13
 145:20,22
**space** 17:15 34:6
 79:18
**speak** 69:22 75:2
 111:5
**speaking** 16:23
 77:12 87:3 88:2
 95:2 96:10
**specific** 16:11 78:7
 80:5 126:25 134:9
 134:10 142:16
 144:20 145:1
 162:8,12
**specifically** 139:14
 158:2,20
**specifics** 56:20
**speculate** 70:4
**speculating** 107:10
**speculation** 11:13
 61:11 65:3 66:18
 68:2 70:2 72:17
 75:12,24 95:9
 100:11,22 101:2
 101:10 103:13,22

104:20 107:2,3,13
 107:24 121:24
 123:8,23 124:14
 125:6 127:17,23
 129:1 130:16
**speeches** 27:14
**spell** 5:6
**spend** 73:5
**spent** 50:20,21
**Sr** 1:5 4:6
**stabbed** 47:12
**stalk** 19:16 20:9,13
 20:20 21:8 22:4
**stalked** 20:18
**stalker** 22:7
**stalkers** 22:23
**stalking** 19:23 20:9
 20:16 65:18,22
 124:13
**stance** 149:21,25
**stand** 115:9
**standard** 43:14
 50:9 51:4 79:11
 79:12,14 80:10,14
 109:9,10,12
 134:12 163:4,6,7
 163:8
**standards** 7:24 8:1
 49:11 110:25
 133:11 134:11
 136:8,11,15
 138:17 148:23
 151:22 152:1,15
 152:18 153:13
 156:15 162:4
**standing** 97:22
**start** 7:10 23:10
 96:7 116:4
**started** 23:24 117:9
 159:5
**starting** 116:10,11
 118:6 121:7
**starts** 13:22 94:20
 118:14 131:19
 132:25 135:9
 144:17
**state** 4:21 5:6 27:25

92:3 111:2 136:1
136:2 146:16
**stated** 154:11,14
**statement** 12:19
16:3 26:2 107:15
**STATES** 1:1
**statistic** 26:11
**statistics** 131:22,25
132:9,21
**statutes** 162:19
**stay** 93:18
**stayed** 17:4 160:22
161:1
**step** 103:25
**stepping** 144:7
**steps** 8:23 79:15
109:16 156:8
**stick** 115:7
**stop** 23:9 94:20
147:14
**stopped** 98:19
125:14,18 126:7
148:13
**store** 32:17 33:12
33:12 56:21
156:24
**straight** 72:23
126:12
**strategies** 12:14
27:13 88:15
**street** 1:22 2:7,15
4:4,12 66:24
67:19 68:24 73:22
117:22,23 143:10
145:12
**streets** 113:11
**stress** 96:3,4
**strike** 19:15 151:5
161:17
**strong** 100:4
**strongly** 13:18
**struck** 36:9
**stuff** 25:20 132:8
144:5 156:2
**stumble** 22:19
**style** 6:5 12:7,21
13:8,19,23 14:3

15:19,23 64:23
69:8 78:16 91:4,8
92:6,11 96:12
99:15 103:9,19
104:17,23 127:5
127:12 143:20
149:10,11,17
153:1,4,11
**styled** 93:23 95:3
154:1
**subject** 28:16
**subjects** 28:17
**submitted** 9:21
**substance** 32:11
**substances** 26:9
**substitute** 105:9
**success** 13:15
**successful** 15:6,11
20:5 21:24
**succession** 73:12
73:13
**sued** 43:25 44:1
**suffered** 136:16
**Suite** 1:23 2:8,16
4:4,4
**summary** 46:11
**sundry** 45:6
**supervisor** 45:5
46:3 47:12
**support** 7:22 85:12
86:1 138:6 148:10
**suppose** 8:4 22:17
38:6
**supposed** 38:24
**supposedly** 45:14
**sure** 5:19 24:16
45:9 51:3 66:12
81:11 82:2,12
83:4 87:16,23
95:21 98:24
100:23 106:18
107:6 114:16
115:8 130:18
133:25
**surreptitiously**
35:14
**surrounding** 68:21

**surveillance** 49:19
65:7,10 82:14
83:23 84:21
119:21 120:13
121:2
**survey** 138:21
**SUV** 65:18 66:9,10
66:14,22 67:14
68:23 73:22 119:9
120:4,5 121:13,16
121:17 122:3
123:21 125:4
**SUV-looking** 66:5
**swearing** 97:1
**switch** 120:8
**switching** 106:9
**sworn** 4:19 164:10
**system** 83:5,22
**systems** 82:12

---
**T**

**tablecloth** 93:2
**tactical** 78:16,22
104:24
**tag** 94:23
**take** 8:15,23 16:10
20:12 23:2,5
36:22 47:15 48:17
58:12 74:6 79:15
84:23 106:12,15
109:15 148:13
151:18 156:7
**taken** 4:13 5:9 74:3
108:19 161:21
**talk** 9:23 48:2,5
49:16,22 79:9
92:20 101:15
106:8 107:1
132:23 135:10
**talked** 92:14 155:4
**talking** 6:8 18:22
22:12 25:4,8 41:8
41:10 64:15,25
84:11 92:24 93:7
97:12 135:16
137:12 139:21,22
144:23 146:14
152:19 159:5,8,9

**Tap** 32:15
**target** 6:10,11,18
8:14 11:2 23:1
72:12,22 95:11
**targeted** 12:6,7,20
13:8 14:3,17,24
15:18 70:20 74:22
75:1 76:1 127:12
127:21 128:2,10
128:24 129:13,22
129:25 130:1
**targeting** 129:17
**targets** 63:24
**taught** 26:12,22
27:1,7,9,24
**Tavco** 30:24
**tavern** 86:22
**teach** 26:13 27:6
28:1
**teacher** 26:17
**teachings** 26:24
**telephone** 55:2
**tell** 7:7 12:18 26:5
44:4 52:1 76:19
111:9,10 112:3
121:13 123:9
130:18 134:18
136:4 156:21
**tells** 91:11,15
**ten** 14:18 58:11
**tend** 93:18
**tends** 38:16
**term** 22:22 75:1
78:21 105:7
129:21 133:5
137:1,2,3 150:9
**termed** 10:24 93:23
**terms** 27:12 31:11
55:6 56:1 61:19
80:5 91:12 103:2
137:6 141:18
156:12
**testified** 39:5,9
90:5 142:23
143:19 153:3
159:20 160:5,11
160:16

**testify** 31:12,23
33:18 34:10,16
35:7,17 36:3,25
37:11 38:25 39:23
40:21 45:22
164:11
**testifying** 32:23
39:6
**testimony** 29:8,8
31:15,17,25 32:5
32:8 33:7,20
34:18 35:9,19
36:5,10,12 37:2
37:13 39:2 40:14
40:23 45:24 46:7
49:24 50:11 52:15
90:1 91:3 98:7
113:16,20 155:2
164:4,12 165:3
**textbook** 134:9
**textbooks** 134:2
**Thank** 4:20 9:11
51:25 135:20
**thing** 8:18 11:21
12:22 17:23 29:1
83:1,7 119:19
143:16
**things** 10:24 27:16
60:5 63:10 85:7
86:19 91:12 94:24
102:13 135:6
138:24 148:1
149:1 153:23,24
162:1 164:6
**think** 18:21 22:1
23:2,20 24:1
25:17 28:15 32:3
38:7,22 49:5 54:4
54:4 56:2 59:2
60:11,22 62:25
66:11 82:9 86:23
90:18 92:19 104:8
104:24 109:15
124:4 125:21
131:16 135:8
136:23 137:4
139:2 141:19

Andrew Lee Camphouse 03/15/2022          www.InDemandReporting.com          (773) 239-6008

149:17 153:3
155:5 156:3
157:23,24 158:6
158:13,14 162:7
163:13
**thinking** 7:18 70:3
70:12
**third** 30:24 60:4
**thought** 62:19
161:19
**thoughts** 139:14
**three** 10:3 27:24
34:4,8 37:7 63:8
78:5 86:14,14,18
99:2 144:25
**three-year** 58:21
58:25
**thrown** 46:11
**time** 4:2,17 10:17
20:8,11 21:16
22:14 23:17,17
26:22 27:7 30:20
31:5 36:17 47:10
67:18,21,25 73:5
74:19,19 77:14,16
88:1,5,7 89:11
92:4 96:11 97:20
98:6,10,15 102:18
114:11,15 117:7
119:14 120:15,24
121:2 124:9 126:8
145:10 150:2
155:5,6 158:15
**times** 22:18 50:5,20
64:3 151:14,19,20
**timing** 116:12
**title** 55:23,24
**today** 4:14 5:7,20
9:20 25:4,8 64:16
65:1 76:14 112:22
155:2,7,14 158:1
158:8,12 159:1,23
160:5
**today's** 50:22
**Toju** 29:24,24 32:2
**told** 112:22 132:8
**tool** 141:14 144:12

156:24
**top** 25:17 46:16
127:1 133:10
**topics** 27:9,16
**total** 50:22 53:3,5,6
53:7,24 54:1
**totally** 119:11
**touching** 27:11
**tow** 36:9
**track** 25:23 48:23
**tracking** 64:5
**Tracy** 37:6
**traffic** 104:3
**trained** 105:5
149:25 160:22
**training** 6:19 13:25
59:17 76:12 91:12
91:13,14 124:16
145:5 146:19
162:1
**transaction** 88:8
**transactions** 88:9
88:11 89:16
**transcribed** 164:15
**transcript** 164:3
**transcripts** 48:15
48:18,21 156:1
**trash** 90:16,20
91:22 125:22
**treatise** 133:22
**treatises** 28:17 49:7
133:9,17 134:13
**trial** 29:8 31:15,17
31:25 32:5 33:7
33:20 34:18 35:9
35:19 36:5,12
37:2,13 39:2
40:14,23 45:24
46:7,17 50:11,13
56:22 112:21
**tried** 36:18,20 75:6
**trier** 113:17,20
**TRKYMIK** 39:13
**trot** 122:18
**truck** 36:9
**true** 147:9 164:3
**truth** 164:11,11,12

**truthful** 52:14
**try** 21:15 83:7
95:10,17 96:6
115:10 132:1
**trying** 60:18 89:13
103:23 125:21
129:23 143:3
**turn** 87:4 131:18
**turned** 67:17
126:13 146:17,23
146:25
**turning** 68:23
**twice** 14:8
**two** 8:2 28:23 29:4
31:3 35:4 44:22
63:8 64:14,21,25
69:2,7 70:23
72:10 74:3,3,13
74:21 75:21 78:13
93:14 100:7,16
120:25 122:13,15
123:2,14,20 125:3
125:4,9 128:2,11
130:14,14 131:21
144:25 156:8,9
161:5
**two-flat** 35:25
**type** 8:13 18:24
26:25 31:2 39:25
44:8 52:21 56:19
58:2 66:14 69:14
81:20 83:11,14
85:20 121:17
124:17,18 143:20
145:11
**types** 7:9 24:25
25:2,6 43:15 47:5
57:6 63:10 132:2
**typewriting** 164:15

**U**

**Ulisa** 34:20
**ultimate** 18:4
**ultimately** 32:18
36:23 47:12 100:1
**Um** 52:25
**under-** 105:11
**understand** 5:20

5:23 6:24 47:25
48:6 60:18 80:20
95:24 96:4 102:23
107:6 140:10
143:2
**understanding** 9:2
79:15 80:2,12
95:16
**understood** 28:8
**unduly** 80:1
**uniform** 94:22
**UNITED** 1:1
**units** 83:3
**University** 27:1,25
**unloading** 73:17
**unpreventable**
11:11
**unreasonable**
79:23
**upstairs** 35:24
**use** 7:12 93:24
105:7 113:6
129:25 134:4,13
134:17,19,22
136:7,10,14 137:1
138:16 148:22
152:14 162:22
**USRA** 56:2
**usually** 8:7,14
10:24,24 13:18
16:16 21:18 24:5
102:17
**utilized** 7:21

**V**

**vagueness** 37:22
**vandalism** 82:4
**variable** 20:8
**variety** 11:6
**various** 45:6
**vehicle** 65:22 66:5
66:14,15,16 67:8
67:11,14,15,17
68:16 69:3,8,9
71:6 72:11,12,22
72:23,25 73:6,9
75:5,7 76:8 93:13
116:17 117:20

122:6 126:9,17
**vehicles** 20:21 21:9
102:5 119:18
**venue** 56:4
**venues** 25:13
**versus** 4:6 7:25
13:6 25:10,20
29:14,24 30:24
31:20 32:14 33:13
34:3,12 35:22
39:13 45:16 49:25
52:8 55:10 80:19
86:11,12 87:22
92:16,20 93:10
101:16 102:24
107:9 130:2
**vicinity** 100:9
125:15
**victim** 19:23 20:8
20:17 21:15 22:3
22:4 32:19 42:1
43:18,19,21
**victims** 19:17 20:21
21:9 76:10
**victims'** 151:7
**video** 1:15 4:16
39:16,18 49:20
60:24 61:3,6
65:16,17 67:3,10
67:13,13,24 68:6
68:14,16,20 71:21
72:9 81:21 83:14
95:5 96:13 98:6
101:9,19 105:1,2
112:24 113:22
114:6 116:12
119:14,21 120:12
120:24 122:11
123:6,20 124:4
149:22
**video-recorded** 4:5
**videotape** 74:5
**view** 118:3 119:11
120:2
**viewed** 150:14
**Village** 31:21
**violation** 90:8

violence 6:22
vis-à-vis 140:25
visit 88:10
visiting 37:8
visitors 34:4
visits 45:6
vitae 9:16
Vonzell 1:5 4:6
vs 1:9
vulnerable 89:10

**W**

wait 21:16 22:11
 151:25 152:2
 154:17,17,17
Waive 163:17
walk 12:16 97:16
walking 102:1,5,10
 113:21 120:17
 122:15
walks 102:11,19,21
want 7:14 8:19
 9:23 13:5 20:4
 22:14 23:8 48:2
 49:22 58:10 67:15
 79:9,24 87:6
 90:22,23 92:20
 93:19,21 94:9,16
 101:15,15 106:8
 113:22 131:11,18
 132:23 139:18,25
 140:2,6,6,9
wanted 48:5 107:1
wants 16:11 93:12
 140:15
war 7:5
warrants 98:21
Washington 2:7
wasn't 42:1 59:8,13
 62:17 66:20 90:10
 125:24 146:17
 160:17
watch 21:15
Waukegan 9:24
 10:2
way 16:24 28:10
 36:20 40:1 50:2
 61:4,9,25 76:13

85:22 92:5 94:18
 97:7 99:3 100:18
 103:7,16,16
 105:23 119:6
 126:22 127:3,5
 130:18 136:22
 155:22
ways 18:4 22:4
 57:6 103:2
we'll 48:3 49:16
 54:17 65:16 101:9
 115:19 163:20
we're 6:8 22:21,21
 25:3,8 47:24 55:5
 64:15,25 65:12
 92:2 93:7 115:24
 116:8 118:5 120:8
 135:16 139:21
 158:19
we've 18:21 31:18
 32:3 114:6
weak 23:2
weapons 73:10
Wearing 94:22
web 49:12
webinars 27:14,20
Webster 27:1,5
Wednesday 1:16
 4:2
welcoming 87:7
well-reasoned
 108:12
well-trained 94:15
Wendy 125:15
Wendy's 1:11 4:7
 64:14 66:2,24,25
 78:17 83:15 84:6
 86:11 91:5 96:11
 105:17 117:23
 121:20 123:22
 125:14,16,17,19
 126:3,5,12 136:6
 136:7,13,13,25
 137:6 138:15,21
 140:25 141:15
 143:8,21 145:8,13
 145:14 148:22

149:6 152:13
 154:1,3,8 156:5
 156:13 161:14,19
went 23:21 37:8
 44:4 45:11 67:16
 72:22 82:25
 141:13
weren't 61:7 70:17
west 2:7 67:18
 96:10 114:18
 117:23
What'd 158:9
WHEREOF 165:3
white 66:12 93:2
 129:10,16
who've 96:3
whoa 141:21,24
wide 11:6
window 88:13,16
 89:16,24 96:24
 97:16 99:11
 120:22 160:24,24
 161:4
witness 4:14,19
 11:15 13:2,14
 15:4,8,16,21 16:5
 16:9,20 17:6,10
 17:12,20 18:2,12
 18:14 19:3,13,20
 19:25 20:4,15,23
 21:12 22:1,17
 23:11 41:3,16,18
 46:22 52:12 61:12
 61:14 65:24 66:19
 67:9 68:8 69:15
 69:22 70:4,13
 71:4,14,16,25
 72:18 73:2 74:8
 75:2,14,25 77:1,3
 77:8,21 78:23
 81:7 82:3 83:21
 84:18 91:7,10,20
 91:21 92:9,12
 94:4 95:10 96:20
 99:22 100:13,23
 101:3,12 103:14
 103:23 104:22

105:13 106:5
 110:7 112:17
 113:10 116:25
 118:12 121:25
 123:9 124:3 125:8
 125:21 127:9,24
 128:14 129:2,9,23
 130:17 135:21
 137:18 138:12
 139:6 140:13,17
 144:1 147:16,19
 148:18 149:13,16
 150:13,24 152:6
 163:11,13 164:5
 164:10,14 165:2
witnessed 126:17
 126:24
witnesses 17:9
 88:25
women 37:7
Woods 32:14
Woodworth 30:24
word 105:10
 129:25
words 77:19 79:16
work 10:18 12:13
 22:6,8 23:22,25
 24:24 48:24 52:9
 52:18,21,23 53:16
 55:3,9,11,18
 57:15,16 82:12
 86:11 110:13
worked 6:25 7:2,5
 7:19 9:24 55:17
working 23:10,10
 24:10 83:5,6,12
 83:22,23 136:22
works 97:7
world 23:16
worship 22:6
would've 40:9 41:1
 42:10,14 43:6,12
 43:23 60:12,22
 99:14 100:20
 101:3 104:18
 105:19,21,22
 136:13 139:16

160:17,18 161:1,3
 161:24
wouldn't 13:2
 69:15 124:22
 159:14
Wow 25:22
wrestling 129:24
write 48:25
written 28:16
wrong 29:1 76:6
 82:11 136:4
 141:19

**X**

**Y**

yeah 24:14 25:6
 38:6 41:22 42:5
 47:1 54:13 59:24
 60:17 66:13 67:9
 72:18 76:24 77:20
 95:19 106:15,16
 106:18 108:14
 114:14,15 115:1
 118:19 120:18
 132:15 134:6
 135:19 137:18
 140:14 145:17
 150:14 152:5
 163:11,19
year 24:3 50:3
 52:24,25 53:8,17
 59:6
years 10:1 14:18
 23:22,23 25:19
 26:4,23 27:5,8,15
 27:20,24 28:14
 29:9 50:4 52:7,10
 52:11 55:14,22
 58:11 63:8,8
 64:15,21,25 78:13
 80:3 89:22 131:2
 144:15
yelling 97:1 98:16
young 34:8
YouTube 105:3

**Z**

| | | | | |
|---|---|---|---|---|
| **zero** 144:18 | **0:12:57** 11:17 | **0:23:31** 20:11 | **0:35:39** 28:9 | **0:47:21** 35:6 |
| **zone** 7:25 8:6,7 | **0:13:04** 11:20 | **0:23:35** 20:14 | **0:35:47** 28:12 | **0:47:31** 35:10 |
| **zones** 7:5,6,7,9,17 | **0:13:20** 11:23 | **0:23:59** 20:18 | **0:35:54** 28:15 | **0:48:04** 35:16 |
| 146:14 | **0:13:33** 12:2 | **0:24:11** 20:22 | **0:36:05** 28:19 | **0:48:23** 35:20 |
| ——— | **0:14:01** 12:8 | **0:24:20** 21:2 | **0:36:23** 28:22 | **0:48:48** 35:25 |
| **0** | **0:14:09** 12:10 | **0:24:31** 21:7 | **0:36:37** 28:25 | **0:49:07** 36:3 |
| **0:00:32** 4:9 | **0:14:33** 12:14 | **0:24:42** 21:11 | **0:36:45** 29:5 | **0:49:12** 36:6 |
| **0:00:44** 4:14 | **0:14:52** 12:19 | **0:24:50** 21:16 | **0:36:55** 29:9 | **0:49:41** 36:9 |
| **0:00:52** 4:18 | **0:15:08** 12:22 | **0:24:54** 21:21 | **0:37:02** 29:12 | **0:49:56** 36:12 |
| **0:01:01** 4:22 | **0:15:21** 13:3 | **0:25:14** 22:3 | **0:37:08** 29:15 | **0:50:23** 36:17 |
| **0:01:06** 5:1 | **0:15:41** 13:10 | **0:25:45** 22:8 | **0:37:30** 29:18 | **0:50:41** 36:21 |
| **0:01:11** 5:7 | **0:15:48** 13:13 | **0:26:02** 22:13 | **0:37:38** 29:22 | **0:50:56** 36:24 |
| **0:01:26** 5:12 | **0:16:13** 13:17 | **0:26:15** 22:18 | **0:37:51** 30:2 | **0:51:01** 37:2 |
| **0:01:34** 5:17 | **0:16:30** 13:20 | **0:26:30** 22:22 | **0:38:12** 30:6 | **0:51:09** 37:6 |
| **0:01:44** 5:22 | **0:16:50** 13:24 | **0:26:50** 22:25 | **0:38:22** 30:9 | **0:51:37** 37:10 |
| **0:01:49** 5:25 | **0:17:22** 14:6 | **0:27:10** 23:6 | **0:38:32** 30:12 | **0:51:47** 37:13 |
| **0:02:06** 6:3 | **0:17:28** 14:11 | **0:27:37** 23:11 | **0:38:39** 30:17 | **0:51:57** 37:17 |
| **0:02:14** 6:6 | **0:17:40** 14:15 | **0:27:43** 23:15 | **0:38:49** 30:21 | **0:52:10** 37:21 |
| **0:03:05** 6:11 | **0:17:55** 14:19 | **0:27:59** 23:19 | **0:39:06** 30:25 | **0:52:19** 37:25 |
| **0:03:15** 6:14 | **0:18:00** 14:25 | **0:28:35** 23:23 | **0:39:23** 31:4 | **0:52:29** 38:4 |
| **0:03:34** 6:19 | **0:18:05** 15:3 | **0:28:53** 24:3 | **0:39:32** 31:7 | **0:52:53** 38:9 |
| **0:03:44** 6:23 | **0:18:10** 15:7 | **0:29:01** 24:7 | **0:39:54** 31:11 | **0:53:01** 38:12 |
| **0:03:59** 7:2 | **0:18:18** 15:11 | **0:29:10** 24:11 | **0:40:04** 31:15 | **0:53:26** 38:18 |
| **0:04:05** 7:5 | **0:18:21** 15:16 | **0:29:13** 24:16 | **0:40:11** 31:19 | **0:53:47** 38:22 |
| **0:04:20** 7:9 | **0:18:26** 15:20 | **0:29:28** 24:21 | **0:40:35** 31:22 | **0:54:16** 38:25 |
| **0:04:49** 7:13 | **0:18:51** 16:2 | **0:29:55** 25:1 | **0:40:47** 31:25 | **0:54:27** 39:6 |
| **0:04:58** 7:17 | **0:18:59** 16:5 | **0:30:05** 25:4 | **0:40:59** 32:4 | **0:54:33** 39:10 |
| **0:05:27** 7:20 | **0:19:29** 16:12 | **0:30:19** 25:8 | **0:41:10** 32:9 | **0:54:49** 39:14 |
| **0:06:04** 8:3 | **0:19:53** 16:18 | **0:30:42** 25:13 | **0:41:17** 32:13 | **0:55:31** 39:19 |
| **0:06:19** 8:6 | **0:19:59** 16:21 | **0:31:02** 25:17 | **0:41:58** 32:19 | **0:55:39** 39:22 |
| **0:06:51** 8:12 | **0:20:10** 16:25 | **0:31:14** 25:21 | **0:42:09** 32:21 | **0:56:02** 40:3 |
| **0:07:27** 8:17 | **0:20:16** 17:4 | **0:31:26** 25:23 | **0:42:18** 32:24 | **0:56:09** 40:7 |
| **0:07:40** 8:21 | **0:20:28** 17:10 | **0:31:33** 26:1 | **0:42:31** 33:3 | **0:56:23** 40:12 |
| **0:08:10** 8:25 | **0:20:40** 17:18 | **0:31:45** 26:4 | **0:42:40** 33:6 | **0:56:32** 40:16 |
| **0:08:32** 9:4 | **0:20:59** 17:25 | **0:32:10** 26:9 | **0:43:00** 33:11 | **0:57:10** 40:20 |
| **0:08:56** 9:10 | **0:21:11** 18:6 | **0:32:22** 26:11 | **0:43:13** 33:14 | **0:57:20** 40:23 |
| **0:09:07** 9:14 | **0:21:15** 18:9 | **0:32:36** 26:14 | **0:43:44** 33:17 | **0:57:37** 41:3 |
| **0:09:20** 9:17 | **0:21:20** 18:16 | **0:32:43** 26:18 | **0:43:52** 33:20 | **0:57:46** 41:8 |
| **0:09:37** 9:21 | **0:21:41** 18:24 | **0:32:48** 26:22 | **0:44:22** 34:1 | **0:57:49** 41:12 |
| **0:09:53** 9:24 | **0:21:46** 19:2 | **0:33:02** 26:25 | **0:44:29** 34:3 | **0:57:53** 41:17 |
| **0:10:01** 10:3 | **0:22:07** 19:5 | **0:33:26** 27:4 | **0:44:57** 34:7 | **0:57:59** 41:22 |
| **0:10:15** 10:7 | **0:22:27** 19:11 | **0:33:50** 27:8 | **0:45:17** 34:10 | **0:58:05** 41:25 |
| **0:10:36** 10:12 | **0:22:32** 19:13 | **0:34:03** 27:11 | **0:45:28** 34:13 | **0:58:11** 42:3 |
| **0:10:51** 10:18 | **0:22:44** 19:18 | **0:34:32** 27:17 | **0:45:55** 34:16 | **0:58:16** 42:7 |
| **0:11:34** 10:25 | **0:22:56** 19:23 | **0:34:43** 27:22 | **0:46:01** 34:18 | **0:58:26** 42:12 |
| **0:12:01** 11:3 | **0:23:02** 20:2 | **0:35:01** 27:25 | **0:46:33** 34:24 | **0:58:35** 42:16 |
| **0:12:16** 11:6 | **0:23:10** 20:5 | **0:35:28** 28:5 | **0:46:55** 35:3 | **0:58:43** 42:21 |
| **0:12:37** 11:11 | | | | |

Andrew Lee Camphouse 03/15/2022     www.InDemandReporting.com     (773) 239-6008

| | | | | |
|---|---|---|---|---|
| 0:58:54 43:1 | 1:07:22 49:1 | 1:16:53 56:24 | 1:27:02 64:3 | 1:35:16 73:3 |
| 0:59:05 43:5 | 1:07:34 49:6 | 1:17:03 57:3 | 1:27:24 64:7 | 1:35:29 73:8 |
| 0:59:20 43:10 | 1:07:56 49:11 | 1:17:13 57:6 | 1:27:27 64:11 | 1:35:40 73:12 |
| 0:59:34 43:15 | 1:08:23 49:14 | 1:17:33 57:9 | 1:27:46 64:16 | 1:35:46 73:15 |
| 0:59:49 43:18 | 1:08:33 49:18 | 1:17:47 57:11 | 1:28 21:2 | 1:35:55 73:19 |
| | 1:08:40 49:21 | 1:17:55 57:13 | 1:28:00 64:19 | 1:36:05 73:23 |
| **1** | 1:08:48 49:25 | 1:18:01 57:16 | 1:28:23 65:1 | 1:36:19 74:3 |
| 1 3:14 9:7,10 28:21 | 1:09:08 50:3 | 1:18:07 57:19 | 1:28:30 65:6 | 1:36:25 74:7 |
| 28:25 131:12,14 | 1:09:23 50:9 | 1:18:15 57:23 | 1:28:45 65:11 | 1:36:31 74:12 |
| 131:17 132:24 | 1:09:31 50:13 | 1:18:27 58:3 | 1:28:58 65:15 | 1:36:41 74:20 |
| 135:14 142:8,20 | 1:09:40 50:17 | 1:18:57 58:7 | 1:29 21:4 | 1:36:50 74:23 |
| 154:11,12 155:2 | 1:10:01 50:20 | 1:19:41 58:11 | 1:29:23 65:20 | 1:37:07 75:5 |
| 157:12,14 158:19 | 1:10:20 50:24 | 1:20:02 58:15 | 1:29:41 66:1 | 1:37:21 75:10 |
| 158:20 | 1:10:28 51:2 | 1:20:08 58:19 | 1:29:48 66:3 | 1:37:27 75:13 |
| 1- 143:4 157:15 | 1:10:40 51:5 | 1:20:23 58:23 | 1:29:50 66:7 | 1:37:50 75:22 |
| 1:00:19 43:22 | 1:10:46 51:9 | 1:20:33 59:2 | 1:29:59 66:12 | 1:38:07 76:2 |
| 1:00:29 43:25 | 1:11:03 51:15 | 1:20:40 59:5 | 1:30:15 66:17 | 1:38:22 76:5 |
| 1:00:43 44:5 | 1:11:07 51:19 | 1:20:51 59:12 | 1:30:22 66:20 | 1:38:41 76:8 |
| 1:01:01 44:11 | 1:11:24 51:21 | 1:21:01 59:15 | 1:30:34 66:25 | 1:39:06 76:17 |
| 1:01:05 44:14 | 1:11:37 52:2 | 1:21:10 59:19 | 1:30:37 67:6 | 1:39:17 76:22 |
| 1:01:28 44:18 | 1:11:49 52:4 | 1:21:13 59:25 | 1:30:47 67:11 | 1:39:21 77:1 |
| 1:01:45 44:22 | 1:12:02 52:9 | 1:21:21 60:2 | 1:31:14 67:21 | 1:39:24 77:4 |
| 1:02:12 45:3 | 1:12:05 52:11 | 1:21:38 60:6 | 1:31:23 67:25 | 1:39:38 77:8 |
| 1:02:31 45:7 | 1:12:13 52:15 | 1:21:48 60:10 | 1:31:27 68:3 | 1:39:42 77:13 |
| 1:02:55 45:14 | 1:12:20 52:18 | 1:21:56 60:13 | 1:31:31 68:7 | 1:39:47 77:16 |
| 1:03:05 45:17 | 1:12:28 52:22 | 1:22:26 60:16 | 1:31:36 68:15 | 1:39:58 77:20 |
| 1:03:31 45:21 | 1:12:44 52:25 | 1:22:31 60:23 | 1:31:48 68:21 | 1:40:14 78:1 |
| 1:03:37 45:23 | 1:12:52 53:5 | 1:22:44 61:1 | 1:31:57 68:25 | 1:40:27 78:4 |
| 1:03:47 46:1 | 1:13:02 53:8 | 1:22:58 61:5 | 1:32:09 69:5 | 1:40:44 78:7 |
| 1:04 4:3 | 1:13:09 53:13 | 1:23:09 61:9 | 1:32:18 69:9 | 1:41:01 78:10 |
| 1:04:10 46:5 | 1:13:26 53:25 | 1:23:14 61:13 | 1:32:23 69:14 | 1:41:53 78:17 |
| 1:04:20 46:9 | 1:13:31 54:3 | 1:23:24 61:18 | 1:32:31 69:17 | 1:41:58 78:22 |
| 1:04:29 46:12 | 1:13:36 54:10 | 1:23:48 61:23 | 1:32:37 69:23 | 1:42:07 79:1 |
| 1:04:47 46:16 | 1:13:40 54:16 | 1:23:55 61:25 | 1:32:45 70:3 | 1:42:16 79:4 |
| 1:04:52 46:18 | 1:13:50 54:23 | 1:24:05 62:3 | 1:32:54 70:6 | 1:42:38 79:8 |
| 1:05:00 46:21 | 1:14:07 55:3 | 1:24:16 62:6 | 1:33:02 70:10 | 1:43:00 79:12 |
| 1:05:09 47:1 | 1:14:24 55:6 | 1:24:24 62:10 | 1:33:13 70:15 | 1:43:35 79:18 |
| 1:05:18 47:4 | 1:14:50 55:12 | 1:24:35 62:13 | 1:33:22 70:21 | 1:43:56 79:21 |
| 1:05:27 47:8 | 1:14:57 55:15 | 1:24:57 62:18 | 1:33:36 71:1 | 1:44:21 80:1 |
| 1:05:58 47:12 | 1:15:09 55:19 | 1:25:12 62:21 | 1:33:49 71:6 | 1:44:49 80:6 |
| 1:06:07 47:14 | 1:15:20 55:22 | 1:25:20 62:25 | 1:34:00 71:12 | 1:45:07 80:11 |
| 1:06:13 47:19 | 1:15:42 56:1 | 1:25:27 63:4 | 1:34:06 71:17 | 1:45:15 80:14 |
| 1:06:22 47:25 | 1:15:56 56:4 | 1:25:47 63:9 | 1:34:12 71:24 | 1:45:46 80:19 |
| 1:06:31 48:4 | 1:16:11 56:8 | 1:26:04 63:14 | 1:34:33 72:4 | 1:45:59 80:23 |
| 1:06:46 48:9 | 1:16:15 56:14 | 1:26:26 63:18 | 1:34:50 72:13 | 1:46:07 81:1 |
| 1:06:51 48:13 | 1:16:22 56:17 | 1:26:33 63:22 | 1:34:55 72:17 | 1:46:12 81:5 |
| 1:06:58 48:18 | 1:16:37 56:21 | 1:26:43 63:25 | 1:35:07 72:23 | 1:46:21 81:9 |
| 1:07:03 48:22 | | | | |

Andrew Lee Camphouse 03/15/2022     www.InDemandReporting.com     (773) 239-6008

**1:46:25** 81:13
**1:46:33** 81:17
**1:46:48** 81:22
**1:46:56** 82:1
**1:47:24** 82:8
**1:47:54** 82:15
**1:48:09** 82:18
**1:48:35** 82:25
**1:48:51** 83:3
**1:49:14** 83:8
**1:49:45** 83:16
**1:49:49** 83:20
**1:50:06** 83:24
**1:50:13** 84:3
**1:50:26** 84:7
**1:50:34** 84:12
**1:50:44** 84:16
**1:51:23** 84:21
**1:51:40** 84:25
**1:51:55** 85:3
**1:52:06** 85:8
**1:52:33** 85:14
**1:52:53** 85:17
**1:53:10** 85:21
**1:53:25** 85:24
**1:53:38** 86:3
**1:53:48** 86:7
**1:54:14** 86:13
**1:54:29** 86:16
**1:55:01** 86:22
**1:55:37** 87:2
**1:55:50** 87:5
**1:56:07** 87:9
**1:56:29** 87:13
**1:56:43** 87:16
**1:56:53** 87:20
**1:57:13** 87:23
**1:57:48** 88:4
**1:57:58** 88:7
**1:58:17** 88:10
**1:58:48** 88:15
**1:59:22** 88:21
**1:59:45** 88:25
**10** 90:23 91:15
  133:1,2 135:2
**10:00** 90:21
**10:30** 148:13

**100** 11:18
**11** 135:3,10,13
**111** 2:7
**115** 3:17
**118** 1:22 2:15 4:4
**12** 165:8
**13** 116:6
**1500** 2:8
**158** 3:4
**16** 151:17,19,20
**163** 3:4
**179** 17
**18** 46:25
**1988** 10:16
**1994** 58:10
**1995** 24:1,3,19

---
**2**

**2** 3:15 47:14,22
  48:7 60:4
**2:00** 34:23
**2:00:04** 89:4
**2:00:18** 89:9
**2:00:36** 89:12
**2:00:56** 89:16
**2:01:13** 89:20
**2:01:29** 89:24
**2:01:44** 90:2
**2:02:00** 90:6
**2:02:18** 90:11
**2:02:30** 90:15
**2:02:41** 90:18
**2:02:53** 90:21
**2:03:08** 90:25
**2:03:25** 91:5
**2:03:28** 91:9
**2:03:44** 91:13
**2:04:03** 91:17
**2:04:18** 91:22
**2:04:31** 92:1
**2:04:50** 92:7
**2:04:54** 92:11
**2:05:07** 92:16
**2:05:14** 92:19
**2:05:24** 92:22
**2:05:35** 92:25
**2:05:39** 93:3
**2:05:53** 93:6

**2:05:59** 93:8
**2:06:31** 93:16
**2:07:01** 93:21
**2:07:33** 93:25
**2:07:58** 94:6
**2:08:18** 94:10
**2:08:39** 94:14
**2:08:57** 94:18
**2:09:16** 94:21
**2:09:31** 94:24
**2:09:55** 95:6
**2:10:03** 95:9
**2:10:18** 95:13
**2:10:24** 95:18
**2:10:34** 95:20
**2:10:47** 95:24
**2:11** 47:19
**2:11:13** 96:5
**2:11:27** 96:8
**2:11:56** 96:14
**2:12:00** 96:19
**2:12:10** 96:22
**2:12:20** 96:25
**2:12:39** 97:4
**2:12:57** 97:8
**2:13:15** 97:12
**2:13:45** 97:18
**2:14:03** 97:23
**2:14:15** 98:1
**2:14:20** 98:4
**2:14:33** 98:8
**2:14:42** 98:12
**2:14:50** 98:14
**2:14:59** 98:18
**2:15:10** 98:22
**2:15:31** 99:3
**2:15:43** 99:8
**2:16:20** 99:16
**2:16:23** 99:19
**2:16:40** 99:24
**2:16:54** 100:2
**2:17:04** 100:5
**2:17:14** 100:9
**2:17:24** 100:12
**2:17:33** 100:16
**2:17:46** 100:21
**2:17:51** 100:23

**2:17:56** 101:2
**2:18** 47:21
**2:18:07** 101:8
**2:18:14** 101:11
**2:18:28** 101:17
**2:18:38** 101:21
**2:18:58** 102:2
**2:19:15** 102:6
**2:19:32** 102:11
**2:19:42** 102:14
**2:19:52** 102:18
**2:20:10** 102:21
**2:20:20** 102:25
**2:20:28** 103:3
**2:20:46** 103:6
**2:21:06** 103:11
**2:21:14** 103:14
**2:21:31** 103:20
**2:21:49** 103:24
**2:22:07** 104:4
**2:22:11** 104:8
**2:22:25** 104:13
**2:22:58** 104:18
**2:23:06** 104:21
**2:23:20** 104:25
**2:23:34** 105:3
**2:23:45** 105:7
**2:23:58** 105:12
**2:24:14** 105:18
**2:24:34** 105:22
**2:24:49** 106:2
**2:24:54** 106:4
**2:25:03** 106:8
**2:25:07** 106:14
**2:25:12** 106:18
**2:25:14** 106:22
**2:25:29** 107:2
**2:25:36** 107:5
**2:25:53** 107:10
**2:26:02** 107:14
**2:26:31** 107:19
**2:26:40** 107:23
**2:26:47** 108:3
**2:26:55** 108:7
**2:27:27** 108:12
**2:27:41** 108:16
**2:27:47** 108:18

**2:28:21** 108:23
**2:28:50** 109:3
**2:29:07** 109:9
**2:29:13** 109:13
**2:29:35** 109:17
**2:30:01** 109:21
**2:30:24** 110:2
**2:30:46** 110:9
**2:31:15** 110:14
**2:31:34** 110:21
**2:31:42** 110:25
**2:31:47** 111:2
**2:31:56** 111:6
**2:32:03** 111:9
**2:32:08** 111:12
**2:32:12** 111:15
**2:32:27** 111:20
**2:32:39** 111:24
**2:32:50** 112:2
**2:33:29** 112:6
**2:33:35** 112:9
**2:33:47** 112:14
**2:33:53** 112:17
**2:34:15** 112:22
**2:34:22** 113:1
**2:34:30** 113:4
**2:34:42** 113:9
**2:34:56** 113:13
**2:35:13** 113:18
**2:35:26** 113:21
**2:35:35** 113:24
**2:35:40** 114:3
**2:35:45** 114:7
**2:35:51** 114:12
**2:35:55** 114:16
**2:35:57** 114:21
**2:36:00** 114:25
**2:36:03** 115:3
**2:36:17** 115:7
**2:36:31** 115:11
**2:36:35** 115:13
**2:36:43** 115:17
**2:36:50** 115:21
**2:36:58** 115:25
**2:37:02** 116:5
**2:37:08** 116:9
**2:37:23** 116:13

| | | | | |
|---|---|---|---|---|
| 2:37:38 116:18 | 2:47:49 124:10 | 2:58:01 132:25 | 3:02:24 135:14 | 3:11:18 143:8 |
| 2:37:45 116:20 | 2:47:58 124:14 | 2:58:22 133:4 | 3:02:28 135:18 | 3:11:24 143:12 |
| 2:38:06 116:23 | 2:48:07 124:18 | 2:58:46 133:8 | 3:02:33 135:20 | 3:11:33 116:12 |
| 2:38:10 117:4 | 2:48:17 124:23 | 2:59:03 133:12 | 3:02:44 135:25 | 3:11:36 121:7 |
| 2:38:16 117:8 | 2:48:31 125:1 | 2:59:16 133:17 | 3:02:59 136:3 | 3:11:37 143:16 |
| 2:38:22 117:11 | 2:48:41 125:5 | 2:59:29 133:20 | 3:03:34 136:17 | 3:11:52 143:21 |
| 2:38:31 117:14 | 2:48:47 125:7 | 2:59:40 133:23 | 3:03:40 136:20 | 3:11:55 143:25 |
| 2:38:37 117:18 | 2:49:06 125:13 | 20 4:7 50:24 59:2 | 3:03:54 136:25 | 3:12 117:9 |
| 2:38:48 117:23 | 2:49:13 125:16 | 20- 53:15 | 3:04:03 137:3 | 3:12:01 144:5 |
| 2:39:03 118:1 | 2:49:21 125:19 | 2007 23:20 | 3:04:29 137:7 | 3:12:10 144:9 |
| 2:39:13 118:4 | 2:49:35 125:25 | 2018 46:24 64:13 | 3:04:44 137:9 | 3:12:36 144:13 |
| 2:39:21 118:6 | 2:49:52 126:3 | 78:15 85:10,14 | 3:05:07 137:13 | 3:12:50 117:18 |
| 2:39:25 118:10 | 2:50:08 126:9 | 86:3 89:23 105:17 | 3:05:25 137:16 | 3:12:51 144:16 |
| 2:39:32 118:15 | 2:50:15 126:13 | 2020 1:9 53:16 | 3:05:28 137:21 | 3:12:57 120:6 |
| 2:39:43 118:19 | 2:50:38 126:18 | 2021 53:16 | 3:05:31 138:2 | 3:13 122:8 |
| 2:40:02 118:21 | 2:50:49 126:23 | 2022 1:17 4:2 164:9 | 3:05:37 138:6 | 3:13:00 144:18 |
| 2:40:09 118:25 | 2:51:13 127:2 | 165:8 | 3:05:40 138:10 | 3:13:20 144:23 |
| 2:40:15 119:4 | 2:51:27 127:6 | 21 3:9 | 3:06:10 138:19 | 3:13:36 145:2 |
| 2:40:21 119:7 | 2:51:40 127:10 | 216 4:11 | 3:06:19 138:23 | 3:13:40 122:17 |
| 2:40:30 119:10 | 2:51:48 127:17 | 226 63:3 | 3:06:27 139:1 | 3:13:45 145:5 |
| 2:41:56 119:16 | 2:51:57 127:22 | 25 27:5 50:25 | 3:06:43 139:4 | 3:13:54 145:8 |
| 2:42:06 119:20 | 2:52:17 128:3 | 26 9:14 | 3:07:03 139:8 | 3:14:03 122:23 |
| 2:42:16 119:23 | 2:52:37 128:11 | 27 28:23 | 3:07:10 139:12 | 3:14:11 145:14 |
| 2:42:22 120:2 | 2:53:00 128:17 | 28 28:23 | 3:07:18 139:17 | 3:14:18 145:18 |
| 2:42:34 120:6 | 2:53:15 128:21 | 29 117:10 132:6 | 3:07:22 139:21 | 3:14:25 145:22 |
| 2:42:40 120:10 | 2:53:22 128:25 | 295 50:9 | 3:07:26 139:24 | 3:14:33 146:1 |
| 2:42:50 120:15 | 2:53:26 129:6 | | 3:07:30 140:3 | 3:15:01 146:7 |
| 2:43:06 120:20 | 2:53:41 129:11 | ——— 3 ——— | 3:07:33 140:7 | 3:15:16 146:10 |
| 2:43:25 121:2 | 2:53:51 129:17 | 3 3:16 51:21,22,24 | 3:07:42 140:12 | 3:15:21 146:15 |
| 2:43:40 121:6 | 2:54:02 129:25 | 118:6 122:7 | 3:07:45 140:17 | 3:15:28 146:20 |
| 2:43:51 121:11 | 2:54:25 130:5 | 135:19 141:18,20 | 3:08:00 140:23 | 3:15:31 146:24 |
| 2:44:01 121:15 | 2:54:35 130:9 | 142:6,8,9,20,20 | 3:08:19 141:1 | 3:15:36 147:4 |
| 2:44:12 121:20 | 2:54:40 130:15 | 142:22,24 143:10 | 3:08:34 141:4 | 3:15:38 147:9 |
| 2:44:23 122:1 | 2:54:50 130:19 | 143:13 145:7,14 | 3:08:39 141:6 | 3:15:41 147:14 |
| 2:45:00 122:5 | 2:55:01 130:23 | 145:20,25 157:5 | 3:08:51 141:9 | 3:15:45 147:18 |
| 2:45:08 122:8 | 2:55:08 131:1 | 3- 157:9 | 3:09:04 141:14 | 3:15:51 147:22 |
| 2:45:16 122:11 | 2:55:25 131:4 | 3-mile 143:4 | 3:09:29 141:18 | 3:16:14 147:25 |
| 2:45:29 122:14 | 2:55:47 131:9 | 3,000 51:6 | 3:09:33 141:21 | 3:16:16 148:3 |
| 2:45:48 122:17 | 2:56:00 131:12 | 3:00 34:24 | 3:09:36 141:25 | 3:16:44 148:8 |
| 2:45:59 122:19 | 2:56:05 131:16 | 3:00:15 134:3 | 3:10:04 142:6 | 3:16:52 148:11 |
| 2:46:12 122:24 | 2:56:21 131:19 | 3:00:27 134:8 | 3:10:16 142:9 | 3:17:26 148:15 |
| 2:46:27 123:4 | 2:56:57 131:23 | 3:00:58 134:12 | 3:10:21 142:13 | 3:17:38 148:18 |
| 2:46:34 123:8 | 2:57:16 132:3 | 3:01:09 134:16 | 3:10:32 142:18 | 3:18:04 148:25 |
| 2:47:03 123:16 | 2:57:31 132:6 | 3:01:22 134:20 | 3:10:36 119:3 | 3:18:10 149:3 |
| 2:47:20 123:22 | 2:57:37 132:9 | 3:01:34 134:25 | 3:10:49 142:22 | 3:18:56 149:8 |
| 2:47:27 124:1 | 2:57:40 132:15 | 3:01:47 135:4 | 3:11:00 143:1 | 3:19:03 149:11 |
| 2:47:37 124:5 | 2:57:49 132:21 | 3:01:55 135:7 | 3:11:08 143:4 | 3:19:06 149:15 |
| | | 3:02:13 135:11 | | |

**3:19:15** 149:18
**3:19:26** 149:23
**3:19:33** 150:1
**3:19:42** 150:4
**3:19:53** 150:8
**3:20:00** 150:12
**3:20:19** 150:16
**3:20:34** 150:21
**3:20:39** 150:25
**3:20:56** 151:5
**3:21:27** 151:8
**3:21:30** 151:10
**3:21:42** 151:13
**3:22:08** 151:17
**3:22:20** 151:20
**3:22:43** 151:23
**3:22:45** 152:4
**3:22:49** 152:11
**3:23:03** 152:17
**3:23:30** 152:23
**3:23:48** 153:1
**3:23:51** 153:4
**3:23:55** 153:9
**3:24:34** 153:14
**3:24:51** 153:18
**3:25:01** 153:22
**3:25:05** 153:24
**3:25:13** 154:1
**3:25:28** 154:5
**3:25:43** 154:9
**3:25:59** 154:14
**3:26:05** 154:19
**3:26:29** 154:23
**3:26:44** 155:4
**3:26:59** 155:8
**3:27:27** 155:15
**3:27:49** 155:19
**3:28:00** 155:23
**3:28:10** 156:2
**3:29:02** 156:9
**3:29:32** 156:15
**3:29:43** 156:18
**3:30:04** 156:25
**3:30:16** 157:4
**3:30:20** 157:9
**3:30:24** 157:14
**3:30:28** 157:16

**3:30:34** 157:20
**3:30:47** 157:25
**3:31:10** 158:4
**3:31:20** 158:6
**3:31:25** 158:9
**3:31:33** 158:12
**3:31:53** 158:15
**3:32:04** 158:20
**3:32:19** 158:24
**3:32:24** 159:2
**3:32:33** 159:5
**3:32:42** 159:10
**3:32:51** 159:15
**3:32:54** 160:1
**3:33:05** 160:5
**3:33:13** 160:9
**3:33:37** 160:14
**3:33:46** 160:19
**3:34:06** 160:25
**3:34:29** 161:6
**3:35:16** 161:11
**3:35:23** 161:15
**3:36:04** 161:22
**3:36:17** 162:2
**3:36:20** 162:6
**3:36:31** 162:9
**3:36:37** 162:13
**3:36:49** 162:17
**3:36:51** 162:20
**3:36:58** 162:24
**3:37** 106:21
**3:37:14** 163:1
**3:37:33** 163:7
**3:37:43** 163:12
**3:37:51** 163:16
**3:37:55** 163:19
**3:44** 106:24
**30** 51:2 164:9
**300** 1:23 2:16 4:5
**30th** 1:17 4:2
**31st** 64:13 85:14
  86:3 105:17
**37** 119:3
**395** 50:11
**3950** 118:14

---
**4**
---
**4** 3:17 80:22 114:3

115:17,22 136:1
  140:12 148:14
  157:5
**4-mile** 157:9
**4:56** 163:23
**45** 50:1
**47** 3:15

---
**5**
---
**5** 3:4 106:17 140:12
**500** 7:1
**51** 3:16
**53** 3:9

---
**6**
---
**6** 90:16,23 91:14
  142:9,20 148:6
  157:14
**6-mile** 157:15
**60602** 2:9
**60661** 1:24 2:17 4:5
**60662** 4:12
**6829** 1:9 4:7

---
**7**
---
**7** 135:19 136:1
  148:6

---
**8**
---

---
**9**
---
**9** 3:14 131:19
  132:25
**90** 146:5